# EXHIBIT A

# STATE OF NORTH CAROLINA

▶ File No.
22 CVS 16733

Mecklenburg _____ County

In The General Court of Justice
☐ District ☒ Superior Court Division

*Name of Plaintiff*
Kanani Wolf

*Address*
c/o David M. Wilkerson, P.O. Box 7376

*City, State, Zip*
Asheville, North Carolina 28802-7376

## VERSUS

*Name of Defendant(s)*
Bank of America, N.A.

## CIVIL SUMMONS

☐ Alias and Pluries Summons

G.S. 1A-1, Rules 3, 4

*Date Original Summons Issued*

*Date(s) Subsequent Summon(es) Issued*

### To Each of The Defendant(s) Named Below:

*Name And Address of Defendant 1*

Bank of America, N.A.
c/o CT Corporation, Registered Agent
160 Mine Lake Ct., Ste. 200
Raleigh, NC 27615

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served.  You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

*Name And Address of Plaintiff's Attorney (If None, Address of Plaintiff)*
David M. Wilkerson
Van Winkle Law Firm
P.O. Box 7376
Asheville, North Carolina 28802-7376

*Date Issued* 10-17-22

*Time* 2:30 ☒ AM ☐ PM

*Signature*

☒ Deputy CSC ☐ Assistant CSC ☐ Clerk of Superior Court

☐ **ENDORSEMENT**
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

*Date of Endorsement*

*Time* ☐ AM ☐ PM

*Signature*

☐ Deputy CSC ☐ Assistant CSC ☐ Clerk of Superior Court

**NOTE TO PARTIES:** *Many Counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial.  The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 10/01
© 2001 Administrative Office of the Courts

(Over)

████████████████ **RETURN OF SERVICE** ████████████████

I certify that this Summons and a copy of the complaint were received and served as follows:

## DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service (*specify*)

☐ Defendant WAS NOT served for the following reason:

## DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to person named below.

*Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service (*specify*)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid<br>$ | Signature of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name of Sheriff (Type or Print) |
| Date of Return | County of Sheriff |

AOC-CV-100, Side Two, Rev. 10/01
© 2001 Administrative of the Courts

STATE OF NORTH CAROLINA

FILED

2022 OCT 17 P 2: [illegible]

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

No. _22 CVS 16723_

KANANI WOLF, individually, and on behalf of
all others similarly situated,

Plaintiff,

v.

BANK OF AMERICA, N.A.,

Defendant.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Kanani Wolf, individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint against Defendant Bank of America, N.A. ("BofA," "Bank," or "Defendant") and alleges as follows:

## INTRODUCTION

1.     This lawsuit is brought as a class action on behalf of Plaintiff and thousands of similarly situated Bank of America accountholders who have been deceived into so-called me-to-me scams via Zelle, incurred losses, and were not reimbursed by Defendant even after being timely notified by the defrauded accountholder.

2.     The Bank's misrepresentations and omissions, in marketing materials, about the Zelle money transfer service deceived its customers and damaged BofA accountholders who: have been the victim of "bank employee impersonation" fraud on the Zelle platform; who have incurred losses due to that particular fraud that have not been reimbursed by Defendant; and who were entitled by the marketing representations of Defendant regarding the Zelle service and by Defendant's contract promises to a full reimbursement of losses caused by bank employee impersonation fraud on the Zelle service.

3.      Zelle is a person-to-person payment transfer service that allow a consumer to send money to another person without needing to write a check, swipe a physical card, or exchange cash.

4.      There are approximately 1,500 member banks and credit unions who participate in Zelle. Those members engage in their own significant marketing efforts to encourage their accountholders to sign up for Zelle by marketing Zelle as a fast, safe and secure way for consumers to send money. This is false. In fact, there are huge, undisclosed security risks of using the service that Defendant omitted from its marketing push to get BofA accountholders to sign up for Zelle.

5.      Defendant prominently touts Zelle to BofA accountholders as a secure, free and convenient way to make money transfers. However, Defendant misrepresents and omits a key fact about the Zelle service that is unknown to accountholders: that there is virtually no recourse for consumers to recoup losses due to fraud. Indeed, unlike virtually every other payment method commonly used by American consumers—debit cards, credit cards, and checks—there is a no protection for accountholders who are victims of fraud, and virtually no recourse for accountholders attempting to recoup losses due to fraud.

6.      The unique, misrepresented, and undisclosed architecture of the Zelle payment system means—again, unlike other payment options commonly used by American consumers— that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection.

7.      Worse, Defendant misrepresents and omits the truth about a secret policy they have adopted: Defendant does not and will not reimburse BofA accountholders for losses via Zelle due to fraud, even where those losses are timely reported by accountholders, and even where (as with the "me-to-me" scam described below) the Bank itself provides key assistance to the scammers.

8.    Defendant was required not to misrepresent the unique and dangerous features of the Zelle service in its marketing about it and in contractual representations. But it failed to do so.

9.    This is especially true with respect to bank employee impersonation fraud. In this common scam, also called "me-to-me" fraud, a scammer—often from a bank caller ID—tells the consumer that his or her bank account was compromised, and persuades the person to send money to what appears to be himself or herself using Zelle. In reality, the scammer has linked the consumer's cellphone to their own fraudulent Zelle account.

10.    To use Zelle, customers must link either an email address or a phone number to their BofA Zelle account. If a BofA customer creates a Zelle account using only an email, then a customer's cellphone number can still be used to link to other Zelle accounts. Scammers capitalize on this inherent security flaw by linking BofA customers cellphone numbers to their own fraudulent Zelle accounts.

11.    This scam cannot succeed without the assistance of the Bank, specifically the Bank's mistaken and negligent linking of a legitimate BofA accountholder's cellphone number to a scammer's Zelle account. That error is the key link that allows this scam to take place.

12.    As a result, users like Plaintiff sign up for and use the Zelle service without the benefit of accurate information regarding that service, and later end up with huge, unreimbursed losses due to fraud. Such users never would have signed up for Zelle in the first place if they had known the extreme risks of signing up for and using the service.

13.    These risks are well known to Defendant but are omitted from all of its marketing regarding the Zelle service.

14.    As a recent New York Times investigation showed, fraud on Zelle is a widespread scourge of which Defendant is well aware. Quoting an industry expert, the *Times* reported:

"Organized crime is rampant," said John Buzzard, Javelin's lead fraud analyst. "A couple years ago, we were just starting to talk about it" on apps like Zelle and Venmo, Mr. Buzzard said. "Now, it's common and everywhere."

The banks are aware of the widespread fraud on Zelle. When Mr. Faunce called [his bank] to report the crime, the customer service representative told him, "A lot of people are getting scammed on Zelle this way." Getting ripped off for $500 was "actually really good," Mr. Faunce said the rep told him, because "many people were getting hit for thousands of dollars."

*Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem*, The New York Times (March 6, 2022), https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html (last accessed March 28, 2022).

15.     Had Plaintiff and the Class members known of the true operation and risks of Zelle—risks Defendant alone was aware of and actively misrepresented—they would not have signed up for and used the Zelle service.

16.     Plaintiff and the Class members have been injured by Defendant's practices. Plaintiff brings this action on behalf of herself, the putative Classes, and the general public. Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on behalf of the general public to prevent BofA from continuing to engage in its illegal practices as described herein.

## PARTIES

17.     Plaintiff Kanani Wolf is a citizen and resident of Santa Monica, California.

18.     Defendant Bank of America, N.A. is a federally chartered bank with its principal place of business in Charlotte, North Carolina.

## JURISDICTION AND VENUE

19.     This is an action for injunctive relief, violation of state consumer protection laws, and breach of contract. The amount in controversy exceeds $25,000 exclusive of interest, costs, and attorneys' fees.

20.     Defendant is subject to personal jurisdiction in North Carolina as its principal place of business is in Charlotte, North Carolina.

21.     Venue for this action is proper in this Court pursuant to N.C. Gen. Stat. §1-82 because Defendant Bank of America, N.A. resides in Mecklenburg County.

## FACTUAL ALLEGATIONS

### A.     Overview

22.     Created in 2017 by the largest banks in the U.S. to enable instant digital money transfers, Zelle is by far the country's most widely used money transfer service. Last year, people sent $490 billion in immediate payment transfers through Zelle.[1]

23.     The Zelle network is operated by Early Warning Services, LLC a company created and owned by seven banks, including Defendant: Bank of America, Capital One, JPMorgan Chase, PNC, Truist, U.S. Bank and Wells Fargo.

24.     Zelle introduced itself to the American public with a massive advertising blitz starting in 2018. Zelle and partner banks marketed Zelle as a safer alternative to other instant payment apps "because it's backed by the banks."

25.     Zelle's aggressive marketing touted its security features. In one TV commercial, performer Daveed Diggs from the Broadway show *Hamilton* rapped, "You can send money safely cause that's what it's for / It's backed by the banks so you know it's secure."

26.     Plaintiff recalls viewing this advertisement.

27.     It is free for existing BofA accountholders to sign up with Zelle, and in fact Zelle is integrated into the websites and mobile apps of BofA. In marketing and within the website and

---

[1] ZellePay.com, *Nearly Half a Trillion Dollars Sent by Consumers and Businesses with Zelle in 2021* (February 02, 2022), https://www.zellepay.com/press-releases/nearly-half-trillion-dollars-sent-consumers-and-businesses-zelle-2021 (last visited October 5, 2022).

app itself, Defendant encourages BofA accountholders to sign up for the Zelle service—a sign up that occurs quickly within the BofA website or mobile app.

28. During the Zelle sign-up process, users are not affirmatively provided with agreements or disclosures previously provided at the time they opened their BofA account..

29. While Zelle provides a link to what it calls a "User Agreement" on its website, at no time during the sign-up process on BofA's website or app did Plaintiff agree to be bound by that document.

30. Sign up for the Zelle service allows the fast transfer of account funds to other Zelle users.

31. The Zelle service is very popular, but it also has a massive fraud problem—in no small part because of the immediacy with which money transfers are made on the service. If a fraudster removes money from a Zelle user's bank account, either directly or by fooling the Zelle user to transfer money, those funds are unrecoverable to the consumer.

32. Nearly 18 million Americans were defrauded through scams involving person-to-person payment apps like Zelle in 2020 alone, according to Javelin Strategy & Research, an industry consultant.

33. Nearly 18 million people have been victims of "widespread fraud" on money transfer apps like Zelle, according to a letter sent in late April of 2022 to Zelle by U.S. Senators Elizabeth Warren of Massachusetts, Robert Menendez of New Jersey and Jack Reed of Rhode Island.[2]

---

[2] Letter from Elizabeth Warren, Robert Menendez, Jack Reed, Sen., U.S. Cong., to Al Ko, CEO, Early Warning Services (April 2, 2022).

34.     "Zelle's biggest draw—the immediacy of its transfers—also makes scams more effective and 'a favorite of fraudsters,' as consumers have no option to cancel a transaction even moments after authorizing it," the letter stated.

35.     A Senate report from October 2022 revealed that just four banks tallied 192,878 cases of fraud worth collectively $213.8 million in 2021 and the first half of 2022 where a customer claimed they had been fraudulently tricked into making a payment. In only roughly 3,500 cases did those banks reimburse the customer, the report found. Further, in the cases where it is clear funds had been taken out of customers' account without authorization, only 47% of those dollars were ever reimbursed.

36.     Specifically, PNC Bank had 8,848 cases of Zelle fraud in 2020, and is on pace to have roughly 12,300 cases this year. U.S. Bank had 14,886 cases in 2020 and had 27,702 cases in 2021. Truist had 9,455 cases of fraud and scams on Zelle in 2020, which ballooned to 22,045 last year.

37.     Organized crime is rampant on Zelle and other person-to-person transfer services.

38.     For example, a common scam involves a scammer impersonating a bank employee who alerts the bank customer to "suspicious" or "fraudulent" account activity and offers to help prevent the alleged fraud by advising that the accountholder transfer money to a different bank account. Unsuspecting Zelle users, tricked into making a fraudulent transfer, in many cases send hundreds or thousands of dollars to fraudsters.

39.     In short, and unbeknownst to average Zelle users, the Zelle platform has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists and those who use social media sites to advertise fake concert tickets and purebred puppies.

40.     Scams like these are rampant on the Zelle network precisely because of the design and architecture of the network, specifically that money transfer is instantaneous and unrecoverable. Indeed, there is virtually no recourse for consumers to recoup losses due to fraud, unlike other payment methods commonly used by American consumers—debit cards, credit cards, and checks. Zelle provides no protection for accountholders who are victims of fraud, and BofA provides virtually no recourse for accountholders attempting to recoup losses due to fraud.

41.     "Scams have become widespread on Zelle, a money-transfer platform owned by the largest banks in the nation," one US Senator said at an April 26 Congressional hearing. "The banks are well aware of these scams but have done little to enhance Zelle's security or reimburse defrauded consumers."

42.     Craigslist, Paypal, and Venmo faced early criticism for leaving users vulnerable to fraud. In response, each made changes. Craigslist, for example, added a warning about scams on every sale listing. Paypal increased the protections it offers on some digital sales and provided a detailed disclosure about what transactions it will and won't protect.

43.     And Venmo—which, like Zelle, does not protect users if a seller does not deliver what they promised—upgraded its security policies in 2015 to better detect fraud, by notifying customers when someone adds an email address or new device to their account. The Federal Trade Commission later criticized the company for not having those protections in place from the start.

44.     The unique, misrepresented, and undisclosed architecture of the Zelle system and BofA's own fraud policies means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement or protection for victimized accountholders.

**B.** **Defendant Falsely Markets Zelle as a Safe and Secure Way to Transfer Money, Omits Information Regarding the Extreme Risks of Signing Up for and Using the Service, and Misrepresent Fraud Protections Regarding Zelle in its Account Contracts**

45.     At all relevant times, BofA's website and app featured a page devoted to explaining and marketing Zelle.

46.     That page directs people immediately to the Zelle sign-up process and expressly says: "You are not liable for fraudulent Online and mobile Banking transactions when you notify the bank within 60 days of the transaction first appearing on your statement and comply with security responsibilities. See Section 5 of our Online Banking Service Agreement for full terms and conditions." Plaintiff recalls viewing this page prior to signing up.

47.     Reasonable consumers like Plaintiff understand that to mean fraud is protected. BofA knows this is a reasonable assumption, especially in combination with the many "safe" representations BofA and Zelle make in their marketing. But BofA knows a secret that it does not tell consumers: it unilaterally and unreasonable decided "fraud" only means transfers initiated by someone other than the accountholder.

48.     BofA has recently deleted this "fraud protection" promise.

49.     In its marketing about Zelle and during the Zelle sign-up process within the Bank's mobile app or website, Defendant makes repeated promises that Zelle is a "fast, **safe** and easy way to send and receive money" (emphasis added).

50.     Defendant also promise: "Move money in the moment. It's simple and **secure** – with lots of people you know." (emphasis added).

51.     Defendant again promised: "With Zelle, money payments and requests are simple, **safe**—and free—using the Bank of America Mobile app." (emphasis added).

52.     At no time in its marketing or during the sign-up process does Defendant warn potential users of the true security risks of using Zelle—including the risk of fraud and the risk that fraudulent losses will never be reimbursed by BofA or Zelle.

53.     Defendant's Zelle service can cause unsuspecting consumers like Plaintiff to incur massive losses on their linked bank accounts.

54.     Defendant misrepresents (and omits facts about) the true nature, benefits, and risks of the Zelle service, functioning of which means that users are at extreme and undisclosed risk of fraud when using Zelle. Had Plaintiff been adequately informed of these risks, she would not have signed up for or used Zelle.

55.     Defendant's marketing representations about Zelle—including within BofA's app and website—misrepresent and never disclose these risks and material facts, instead luring BofA accountholders to sign up for and use the service with promises of ease, safety and security.

56.     These representations—which all users view during the sign-up process—are false and contain material omissions.

57.     In its Zelle FAQs, BofA expressly stated:

1.  **What is *Zelle*®?**
    The Bank of America Mobile Banking app now includes *Zelle* — the new way to send and receive money with friends, family and people you know, with a U.S. bank account, typically within minutes, no matter where they bank.

2.  **Is it secure?**
    Yes, with our Bank of America Mobile Banking Security Guarantee, you are protected by the same security you're used to where you will not be liable for fraudulent transactions (when reported promptly) and we will help keep your information safe.

58.     But BofA misrepresentations and omissions are especially pernicious because it alone knows a secret that it does not tell consumers: it unilaterally and unreasonable decided "fraudulent" only means transfers initiated by someone other than the accountholder.

59.     Indeed, upon information and belief, the Bank maintains a secret policy whereby they refuse to reimburse fraud losses incurred via Zelle, even where its accountholders timely inform BofA of the fraud.

60.     Defendant misrepresents and fails to disclose this secret policy.

61.     Further, BofA's Deposit Agreement & Disclosures ("the Account Disclosures") applicable to consumer accounts repeatedly promises users that, if they timely report fraud, such fraud will be fairly investigated and accountholders will not be liable for fraudulent transfers.

62.     For transactions governed by Regulation E, the Agreement states:

**Consumer's Liability for Unauthorized Transfers**
Tell us AT ONCE if you believe your card or your personal identification number (PIN) or other code has been lost or stolen. Also, tell us AT ONCE if you believe that an electronic fund transfer has been made without your permission using information from your check. The best way to keep your possible losses down is to call us immediately. Your losses could include all of the money in your account plus, if you have an overdraft protection plan linked to your account, any transfers from another account or any advances on a credit line.

[...]

If you tell us within two business days after you learn of the loss or theft of your card or code, you can lose no more than $50 if someone uses your card without your permission.

If you do NOT tell us within two business days after you learn of the loss or theft of your card or code, and we can prove we could have stopped someone from using your card or code without your permission if you had told us, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us in writing within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or hospital stay) kept you from telling us, we will extend the time periods.

*Note: These liability rules are established by Regulation E, which does not apply to business deposit accounts. For personal deposit accounts, our liability policy regarding unauthorized debit card or ATM card transactions, and unauthorized Online Banking transactions may give you more protection, provided you report the transactions promptly. Please see the agreement you receive with your ATM or debit card and the Online Banking agreement.*

[...]

### Contact in Event of Unauthorized Transfer; and Lost or Stolen Card, PIN or Other Code

If you believe your card, PIN or other code is lost or stolen, or learned by an unauthorized person, or that someone has transferred or may transfer money from your account without your permission, notify us immediately by calling the number listed below.

Telephone: 1.800.432.1000

You can also write to us at: Bank of America, P.O. Box 53137, #7405, Phoenix, AZ 85072-3137

You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

If unauthorized activity occurs, you agree to cooperate during the investigation and to complete a Lost/Stolen Card and Fraud Claims Report or similar affidavit.

[...]

### In Case of Errors or Questions about your Electronic Transfers You May Sign into Online Banking to Report the Error Promptly, or Call or write us at the telephone number or address below, as soon as you can, if you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt.

Call us at 1.800.432.100 during normal Claims Department business hours or write us at Bank of America, P.O. Box 53137, #7405, Phoenix, AZ 85072-3137.

We MUST hear from you NO LATER than 60 days after we sent you the FIRST statement on which the error or problem appeared... We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question... For errors involving new accounts, point of sale, or foreign-initiated transfers transactions, we may take up to 90 days

(instead of 45) to investigate your complaint or question... We will tell you the results within 3 business days after completing our investigation. If we decided that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

*See Account Disclosures*, at 60-61.

63. For transactions *not* governed by Regulation E, the Agreement provides:

Review Statements and Report Suspected Problems Immediately
You must promptly review the notices, statements and other communications, along with any accompanying checks and other items, we send you. You must also report problems or **unauthorized transactions** to us immediately, by calling the number for customer service on your statement.

*Id.*, at 40 (emphasis added).

64. The Agreement further states:

What Are Problems and Unauthorized Transactions
Problems and **unauthorized transactions include suspected fraud**; missing deposits; **unauthorized electronic transfers**; missing, stolen, or unauthorized checks or other withdrawal orders; checks or other withdrawal orders bearing an unauthorized signature, endorsement or alteration; illegible images; encoding errors made by you or us; and counterfeit checks. This is not a complete list.

*Id.*, at 42 (emphasis added).

65. The Agreement also indicates:

Except as otherwise expressly provided elsewhere in this agreement, if you fail to notify us in writing of suspected problems or **unauthorized transactions within 60 days after we make your statement or items available to you, you agree that: • you may not make a claim against us relating to the unreported problems or unauthorized transactions, regardless of the care or lack of care we may have exercised in handling your account;**

[...]

If you report to us that an unauthorized transaction has occurred on your account, we may require you to confirm your report in writing. We may also require that you give us a statement, under penalty of perjury, about the facts and circumstances relating to your report and provide such other information and proof as we may reasonably request. If you assert a claim regarding a problem, you must cooperate

with us in the investigation and prosecution of your claim and any attempt to recover funds. You also agree to assist us in identifying and in seeking criminal and civil penalties against the person responsible. You must file reports and complaints with appropriate law enforcement authorities. If you fail or refuse to do these things, we will consider your failure or refusal to be your ratification of the defect in the statement or item, unauthorized transaction or other problem and your agreement that we can charge the full amount to your account.

*Id.*, at 43.

66.     These provisions are and were reasonably understood by Plaintiff to mean that Plaintiff would not be liable for Zelle transfers effectuated by fraud. But BofA unilaterally and unreasonably decided "fraud" only means transfers initiated by someone other than the accountholder.

### C.     The Bank Employee Impersonation or Me-to-Me Scam

67.     This Action concerns a specific form of fraud that is assisted and enabled—even if unwittingly—by the Bank.

68.     So-called "me-to-me" fraud (or bank employee impersonation fraud) occurs when a scammer—often from a bank caller ID—tells the consumer that his or her bank account was compromised, and persuades the person to send money to what appears to be himself or herself using Zelle. In reality, the scammer has linked the consumer's cellphone to a fraudulent Zelle account.

69.     Another common bank employee impersonation scam involves a scammer who alerts the bank customer to suspicious account activity and offers to help prevent the alleged fraud by advising that the accountholder transfer money to a different bank account. Unsuspecting Zelle users, tricked into making a fraudulent transfer, in many cases send hundreds or thousands of dollars to fraudsters.

70.     This scam cannot succeed without the assistance of the Bank, specifically the Bank's mistaken and negligent linking of a legitimate BofA accountholder's cellphone number to scammer's account. That error is the key link that allows this scam to take place.

71.     BofA had the tools and information to stop this incorrect linkage, but failed to do so.

72.     Combined with the porous and dangerous Zelle architecture and design, as discussed above, Bank of America aided and abetted the bank impersonation scam that afflicted Plaintiff and thousands of others.

73.     Bank of American should have prevented this error on the front end or, at the very least, correct this error after it occurred. It failed to do either.

74.     As one consumer advocate has stated: "If a bank mistakenly links your cellphone number to a scammer's account, that's an error that should be corrected and you should be able to get your money back," said Lauren Saunders, associate director at the National Consumer Law Center.

**D.      Bank of America Is Required to Follow EFTA Requirements and It Fails to Do So**

75.     The Electronic Fund Transfer Act requires banks to reimburse customers for losses on transfers that were "initiated by a person other than the consumer without actual authority to initiate the transfer."[3]

76.     An unauthorized Electronic Fund Transfer ("EFT") is an EFT from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefits. 12 C.F.R. § 1005.2(m).

---

[3] Electronic Fund Transfers FAQ, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/ (last accessed June 6, 2022).

77.     Unauthorized EFTs include transfers initiated by a person who obtained a consumer's access device through fraud or robbery and consumer transfers at an ATM that were induced by force. Comment 2(m)-3 and 4.

78.     According to the Consumer Financial Protection Bureau ("CFPB"), "If a consumer has provided timely notice of an error under 12 CFR 1005.11(b)(1) and the financial institution determines that the error was an unauthorized EFT, the liability protections in Regulation E section 1005.6 would apply."[4]

79.     Recent CFPB guidance on unauthorized electronic fund transfers indicates person-to-person payments are electronic fund transfers, such as transactions made with Zelle, and trigger "error resolution obligations" to consumers to protect them from situations where they are fraudulently induced to initiate an unauthorized electronic transfer from a third-party.[5]

80.     The CFPB has made it clear that a transaction that is fraudulently induced by a third party is an unauthorized electronic fund transfer subject to the limitations of liability in 12 C.F.R. § 1005.6.[6]

81.     Even so, BofA has not reversed or refunded all funds of Plaintiff's disputed and unauthorized transactions, though obligated to do so.

82.     Because banks, such as BofA, fail to protect consumers as widespread "fraud flourishes" on Zelle, Senators Elizabeth Warren, Robert Menendez and Jack Reed sent a letter to the CEO of Zelle noting:

> The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act protected victims of fraudulent money

---

[4] *Id.*
[5] *Id.*
[6] 12 C.F.R. § 1005.6 (Regulation E), Comment 2(m)-3, https://www.consumerfinance.gov/rules-policy/regulations/1005/interp-2/#2-k-Interp-1 ("An unauthorized [electronic fund transfer] includes a transfer initiated by a person who obtained the access device from the consumer through fraud") (last accessed June 6, 2022).

transfers, **including those who were "induced" into transferring the money themselves,** while the FDIC issued a report in March 2022 finding that both the banks and the platform—in this case Zelle—were held responsible for fraudulent electronic transfers through Regulation E.

*Senator Warren Letter to Zelle on Scams and Fraud* (April 20, 2022), (https://www.warren.senate.gov/imo/media/doc/2022.04.29%20Letter%20to%20Early%20Warning%20Systems%20LLC.pdf) (last accessed June 6, 2022) (emphasis added).

83.     A recent Wall Street Journal article discussed potential CFPB action regarding fraud protections on Zelle, noting that congressional officials "complain that banks aren't doing enough to help customers duper into making fraudulent payments," like Plaintiff, but the CFPB's forthcoming guidance is expected to address banks' liabilities in these circumstances "by maintaining that fraudulently induced transactions, *even those approved by the consumer*, are considered unauthorized."[7]

84.     This makes sense. In the digital age, where it only takes a username or phone number to transfer money in seconds, it's "antiquated" for reimbursement to hinge on whether a consumer or fraudster taps the send button. As the Senate Banking Committee told the CFPB Director Rohit Chopra:

> If a bank permits a scammer or fraudster onto the platform, then that bank should naturally bear some responsibility when its own customer uses a bank-provided payment service to rip off others—rather than telling customers that it is their fault for being victimized.

*Senate Banking Committee Letter to CFPB re Frauds and Scams Zelle* (July 20, 2022), https://www.menendez.senate.gov/imo/media/doc/letter_to_cfpb_regarding_zelle.pdf (last accessed July 21, 2022).

85.     Unfortunately, BofA regularly fails to consider fraudulently induced Zelle transactions as "unauthorized" electronic transfers, thus depriving accountholders of their rights

---

[7] *CFPB to Push Banks to Cover More Payment-Services Scams*, The Wall Street Journal (July 18, 2022), https://www.wsj.com/articles/consumer-bureau-to-push-banks-to-refund-more-victims-of-scams-on-zelle-otherservices-11658235601 (last accessed July 21, 2022).

to be reimbursed for such fraudulent transfers, even where the losses are timely reported by consumers.

86.     As one U.S. Senator said to CEOs of some of the banks that own Zelle: "Zelle is not safe. You built the system, you profit from every transaction on the system and you tell people that it is safe. But when someone is defrauded, you claim that's the customer's problem," said Senator Elizabeth Warren, during a Senate Banking Committee hearing in September, 2023.

**E.     Plaintiff Wolf's Experience**

87.     When Plaintiff signed up for Zelle she was not informed that Zelle's service had a significant "catch" and that significant monetary losses could result from signing up for the service—or that those losses almost never are reimbursed by users' banks or credit unions.

88.     For example, on June 11, 2022, a fraudster masquerading as a BofA representative transferred $3,500 from Plaintiff's personal bank account using the Zelle service.

89.     On or about June 11, 2022, Plaintiff received an incoming call identified as Bank of America from phone number 1-800-432-1000 which Plaintiff recognized as the Bank's customer service number found on the back of BofA debit and credit cards.

90.     Upon answering, the fraudster introduced themselves as a representative from Bank of America's fraud department. The fraudster claimed the call was to alert Plaintiff of suspected "fraudulent activity" on Plaintiffs account; the "fraudulent activity" was purported to be two transfers of $1,500.00 and $2,000.00 totaling $3,500.00. The fraudster gave Plaintiff assurances and guided her through the process of "reversing" the fraudulent activity debited against her bank account.

91.     In order to restore her account funds, the fraudster instructed Plaintiff to make two Zelle transfers for the same amount of the "fraudulent activity" (i.e., $1,500.00 and $2,000.00).

92.     The fraudster never asked Plaintiff to disclose personal information such as her account passwords or pins.

93.     The fraudster walked Plaintiff through the process of adding a new Zelle recipient in her Bank of America mobile app and reassured Plaintiff that taking these steps will restore her account funds. As instructed, Plaintiff sent $1,500.00 to the new Zelle recipient the fraudsters duped Plaintiff into adding.

94.     Next, Plaintiff repeated the same steps for the second transfer in the amount of $2,000.00.

95.     Upon sending the second transfer, Plaintiff began to grow weary and she asked to speak with the fraudster's supervisor. The fraudster put Plaintiff on hold and then disconnected the call.

96.     Immediately, Plaintiff called the BofA customer service number who, after hearing Plaintiff recount her experience with the fraudster impersonating as a BofA agent, informed Plaintiff that she had fallen victim to a scam.

97.     Despite Plaintiff timely alerting BofA of the fraud, BofA refused to reimburse her for the loss.


## CLASS ALLEGATIONS

98.     Pursuant to Rule 23 of the North Carolina Rules of Civil Procedure, Plaintiff brings this action individually and as representatives of all those similarly situated, on behalf of the below-defined Classes:

> **Nationwide Class:**
> All persons with a BofA account who were subject to a BofA employee impersonation scam or me-to-me scam and incurred unreimbursed losses due to fraud using the Zelle service.

**California Class:**
All California persons with a BofA account who were subject to a
BofA employee impersonation scam or me-to-me scam and incurred
unreimbursed losses due to fraud using the Zelle service.

99.     Excluded from the Classes are Defendant and its affiliates, parents, subsidiaries,

employees, officers, agents, and directors. Also excluded are any judicial officers presiding over

this matter and the members of their immediate families and judicial staffs.

100.    This case is appropriate for class treatment because Plaintiff can prove the elements

of her claims on a class wide basis using the same evidence as would be used to prove those

elements in individual actions alleging the same claims.

101.    **Numerosity:** The members of the Classes are so numerous that joinder of all

members would be unfeasible and impracticable. The precise membership of the Classes is

unknown to Plaintiff at this time; however, it is estimated that the Classes are greater than one

hundred individuals. The identity of such membership is readily ascertainable via inspection of

Defendant's books and records or other approved methods. Class members may be notified of the

pendency of this action by mail, email, internet postings, and/or publication.

102.    **Common Questions of Law or Fact:** There are common questions of law and fact

as to Plaintiff and all other similarly situated persons, which predominate over questions affecting

only individual Class members, including, without limitation:

a)      Whether Defendant's representations and omissions about the Zelle service are

        false, misleading, deceptive, or likely to deceive;

b)      Whether Defendant failed to disclose the risks of using the Zelle service;

c)      Whether Plaintiff and the Class members were damaged by Defendant's conduct;

d) Whether Defendant's actions or inactions violated the consumer protection statute invoked herein;

e) Whether Defendant's actions or inactions violated the EFTA; and

f) Whether Plaintiff is entitled to a preliminary and permanent injunction enjoining Defendant's conduct.

103. **Predominance of Common Questions:** Common questions of law and fact predominate over questions that affect only individual members of the Classes. The common questions of law set forth above are numerous and substantial and stem from Defendant's uniform practices applicable to each individual Class member. As such, these common questions predominate over individual questions concerning each Class member's showing as to his or her eligibility for recovery or as to the amount of his or her damages.

104. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, Plaintiff and all Class members were similarly injured through Defendant's uniform misconduct as alleged above. As alleged herein, Plaintiff, like the members of the Classes, was deprived of monies that rightfully belonged to them. Further, there are no defenses available to Defendant that are unique to Plaintiff.

105. **Adequacy of Representation:** Plaintiff is an adequate class representative because she is fully prepared to take all necessary steps to represent fairly and adequately the interests of the members of the Classes, and because her interests do not conflict with the interests of the other Class members she seeks to represent. Moreover, Plaintiff's attorneys are ready, willing, and able to fully and adequately represent Plaintiff and the members of the Classes. Plaintiff's attorneys are experienced in complex class action litigation, and they will prosecute this action vigorously.

106. **Superiority:** The nature of this action and the claims available to Plaintiff and members of the Classes make the class action format a particularly efficient and appropriate procedure to redress the violations alleged herein. If each Class member were required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Plaintiff with its vastly superior financial and legal resources. Moreover, the prosecution of separate actions by individual Class members, even if possible, would create a substantial risk of inconsistent or varying verdicts or adjudications with respect to the individual Class members against Defendant, and which would establish potentially incompatible standards of conduct for Defendant and/or legal determinations with respect to individual Class members which would, as a practical matter, be dispositive of the interests of the other Class members not parties to adjudications or which would substantially impair or impede the ability of the Class members to protect their interests. Further, the claims of the individual members of the Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto.

## FIRST CAUSE OF ACTION
### North Carolina Unfair Trade Practices Act ("NCUTPA")
### N.C. Gen. Stat. Ann. §§ 75-1.1, *et seq.*
### (Asserted on Behalf of Plaintiff and the Nationwide Class)

107. Plaintiff repeats and realleges the above allegations as if fully set forth herein.

108. The North Carolina Unfair Trade Practices Act ("NCUTPA"), makes unlawful "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. Ann. § 75-1.1(a).

109. BofA advertised, offered, or sold goods services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C.

Gen. Stat. Ann. § 75-1.1(b), by offering the Zelle money transfer services through its website and mobile app.

110. As alleged herein, BofA, violated the NCUTPA by knowingly and intentionally representing in marketing materials that it provides "safe" and "secure" money transfer services via Zelle through its website and mobile app.

111. Moreover, as alleged herein, BofA, knowingly and intentionally concealed and failed to disclose material facts regarding Zelle in violation of the NCUTPA. Specifically, BofA omitted from all its marketing the material security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by BofA as a matter of secret policy due to its unilateral and unreasonable decision that "fraud" only means transfers initiated by someone other than the accountholder.

112. BofA's practice of refusing to reimburse its accountholders' for fraudulent Zelle transactions is deceptive and unfair because of BofA's marketing representations that Zelle transfers from consumers' accounts are safe and secure and because of its marketing and contractual promises which indicate accountholders will not be liable for fraudulent transfers, if they timely report the fraud.

113. By knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding use of the Zelle service, as detailed above, BofA engaged in one or more unfair or deceptive business practices prohibited by the NCUTPA.

114. Defendant's misrepresentations and omissions regarding the Zelle service were made to Plaintiff and the Nationwide Class members in a uniform manner.

115. Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppression of material facts, as alleged herein, had a tendency or

capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff and the Nationwide Class members.

116. The facts regarding Defendant's Zelle service that Defendant knowingly and intentionally misrepresented, omitted, concealed, and/or failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff and the Nationwide Class members.

117. The harm to Plaintiff and the Class outweighs the utility of BofA's practices. There were reasonably available alternatives to further BofA's legitimate business interests, other than the misleading and deceptive conduct described herein.

118. Defendant's business practices have misled Plaintiff and the proposed Nationwide Class and will continue to mislead them in the future.

119. Plaintiff and Nationwide Class members relied on Defendant's misrepresentations.

120. Plaintiff and Nationwide Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff and Nationwide Class members did not, and could not, unravel Defendant's deception on their own.

121. Had Plaintiff known the true risks of using the Zelle service, she never would have signed up for and used the Zelle service through BofA's website and mobile app.

122. BofA's actions affected commerce in North Carolina and nationwide, as many BofA customers incurred fraud losses via Zelle.

123. As a direct and proximate result of Defendant's deceptive and unfair conduct, Plaintiff and Nationwide Class members suffered and will continue to suffer actual damages.

Defendant's deceptive and unfair conduct is ongoing and present a continuing risk of future harm to Plaintiff and the Nationwide Class.

124.    Plaintiff and the Nationwide Class members seek an order enjoying Defendant's unfair and deceptive acts or practices in violation of the NCUTPA and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available pursuant to the NCUTPA.

## SECOND CAUSE OF ACTION
### California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (Asserted on Behalf of Plaintiff and the California Class)

125.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

126.    The UCL defines "unfair business competition" to include any "unlawful, unfair, or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

127.    The UCL imposes strict liability. Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

### *"Deceptive Prong"*

128.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

129.    Defendant's practices, as described herein, constitute "fraudulent" business practices in violation of the UCL because, among other things, Defendant's marketing regarding Zelle indicates the Bank will protect against fraudulent losses incurred using the Zelle service. Moreover, Defendant concealed the security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by BOA as a matter of secret policy, is a practice that is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

### *"Unfair" Prong*

130.     A business practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practices against the gravity of the harm to the alleged victims.

131.     Defendant's actions constitute "unfair" business practices because, as alleged above, they declined to reverse fraudulent charges on the accounts of Plaintiff and California Class Members, despite marketing representations, contract promises, and statutory obligations pursuant to EFTA.

132.     The harm to Plaintiff and California Class Members grossly outweighs the utility of Defendant's practices as there is no utility to practices of Defendant.

*"Unlawful" Prong*

133.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

134.     Defendant's acts and practices alleged above constitute unlawful business acts or practices as they have violated the plain language of EFTA as described in Plaintiff's Fourth Cause of Action below.

135.     The violation of any law constitutes as "unlawful" business practice under the UCL.

136.     These acts and practices alleged were intended to or did result in violations of EFTA.

137.     Defendant has and will continue to unlawfully deny the transaction disputes of Plaintiff, the California Class, and the public by claiming that said disputed transactions are "authorized," even though said transactions are actually "unauthorized," as that term is defined by EFTA and applicable regulations. Consequently, the practices of BofA constitute unfair and unlawful business practices within the meaning of the UCL.

138.     Pursuant to the UCL, Plaintiff and the California Class are entitled to preliminary and permanent injunctive relief and order Defendant to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the Class of all the revenues associated

with this unfair and unlawful competition, or such proton of said revenues as the Court may find applicable.

139.    Pursuant to the UCL, Plaintiff and the California Class are entitled to preliminary and permanent injunctive relief and an order requiring Defendant to cease this unfair and unlawful competition, as well as disgorgement and restitution to Plaintiff and the California Class of all revenues associated with this unfair and unlawful competition, or such portion of said revenues as the Court may find applicable.

**THIRD CAUSE OF ACTION**
**Violation Of California's False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(Asserted on Behalf of Plaintiff and the California Class)**

140.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

141.    California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, states that "[i]t is unlawful for any ... corporation ... with intent ... to dispose of ... personal property ... to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated ... from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement...which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading...."

142.    Defendant's material misrepresentations and omissions alleged herein violate Bus. & Prof. Code § 17500.

143.    Defendant knew or should have known that its misrepresentations and omissions were false, deceptive, and misleading.

144.    Pursuant to Business & Professions Code §§ 17203 and 17500, Plaintiff and the members of the California Class, on behalf of the general public, seeks an order of this Court

enjoining Defendant from continuing to engage, use, or employ their practice of misrepresenting the Zelle service.

145.     Further, Plaintiff and the members of the California Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding restitution of the money wrongfully acquired by Defendant by means of said misrepresentations.

146.     Additionally, Plaintiff the members of the California Class seek an order requiring Defendant to pay attorneys' fees pursuant to Cal. Civ. Code § 1021.5.

**FOURTH CAUSE OF ACTION**
**Violation of the Electronic Funds Transfer Act ("EFTA")**
**15 U.S.C. §§ 1693, *et seq.***
**(Asserted on Behalf of Plaintiff and the Classes)**

147.     Plaintiff repeats and realleges the above allegations as if fully set forth herein.

148.     The Electronic Fund Transfer Act and Regulation E apply to electronic fund transfers that authorize a financial institution to debit or credit a consumer's account. 12 C.F.R. § 1005.3(a).

149.     The primary objective of the EFTA is "the protection of individual consumers engaging in electronic fund transfers and remittance transfers." 12 C.F.R. § 1005.1(b).

150.     Defendant BofA is a financial institution. 12 C.F.R. § 1005.2(i).

151.     Zelle is a financial institution, as the applicable code, 12 C.F.R. § 1005.2(i), is interpreted by the Consumer Financial Protection Bureau.

152.     "If a financial institution, within sixty days after having transmitted to a consumer pursuant to [15 U.S.C. § 1693d(a), (c), or (d)] or notification pursuant to [15 U.S.C. § 1693d(d)] receives oral or written notice in which the consumer[:] (1) sets forth or otherwise enables the financial institution to identify the name and the account number of the consumer; (2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to [15 U.S.C.

§ 1693d(b)], the consumer's account, contains an error and the amount of such error; and (3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred," the financial institution is required to investigate the alleged error. 15 U.S.C. § 1693f(a).

153.    After said investigation, the financial institution must determine whether an "error" has occurred and report or mail the results of such investigation and determination to the consumer within ten (10) business days. 15 U.S.C. § 1693f(a).

154.    A financial institution that provisionally recredits the consumer's account for the amount alleged to be in error pending an investigation, however, is afforded forty-five (45) business days after receipt of notice of error to investigate. *Id.* § 16993f(c).

155.    Pursuant to the EFTA, an error includes "an unauthorized electronic fund transfer." Id. § 1693f(f).

156.    An Electronic Fund Transfer ("EFT") is any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 C.F.R. 1005.3(b)(1). Accordingly, Regulation E applies to any person-to-person ("P2P") or mobile payment transactions that meet the definition of EFT. 12 C.F.R. § 1005.3(b)(1)(v); id., Comment 3(b)(1)-1.ii.

157.    Unauthorized EFTs are EFTs from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit. 12 C.F.R. § 1005.2(m).

158.    According to the CFPB, when a third party fraudulently induces a consumer into sharing account access information that is used to initiate an EFT from the consumer's account, that transfer meets Regulation E's definition of an unauthorized EFT.

159.    In particular, Comment 1005.2(m)-3 of Regulation E explains that an unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through robbery or fraud. As such, when a consumer is fraudulently induced into sharing account access information with a third party, and a third party uses that information to make an EFT from the consumer's account, the transfer is an unauthorized EFT under regulation E. 12 C.F.R. § 1005.2(m), Comment 1005.2(m)-3.

160.    Here, Plaintiff and Members of the Classes were fraudulently induced by third-party scammers impersonating BofA representatives to make unauthorized money transfers from their BofA accounts.

161.    After the unauthorized EFTs were made, the EFTs appeared on the bank statements of Plaintiff and Members of the Classes.

162.    Plaintiff and Members of the Classes notified Defendant Bank of America, N.A. of these errors within sixty (60) days of their appearances on their accounts.

163.    As a direct and proximate result of Defendant's conduct, Plaintiff and Members of the Classes were unable to reclaim the account funds taken from scammers from unauthorized EFTs.

164.    Defendant knowingly and willfully concluded that the transfers of funds via Zelle on accounts of Plaintiff and Members of the Classes were not in error when such conclusions could not reasonably have been drawn from the evidence available to the financial institutions at the time of the investigation. 15 U.S.C. § 1693f(e)(2).

165.    Defendant intentionally determined that the unauthorized transfer of funds via Zelle on accounts of Plaintiff and Members of the Classes were not in error due to, at least in part, their financial self-interest as a stakeholder in Zelle.

166.    Defendant refused to reverse or refund funds to Plaintiff and Members of the Classes.

167.    As such, Plaintiff and Members of the Classes are each entitled to (i) actual damages; (ii) treble damages; (iii) the lesser of $500,000.00 or one percent (1%) of the net worth of Defendant; and (iv) reasonable attorneys' fees and costs. *Id.* §§ 1693f(e)(2), 1693m(a)(2)(B)–(3).

### FIFTH CAUSE OF ACTION
**Breach of Contract Including Breach of the Covenant of Good Faith and Fair Dealing**
**(Asserted on Behalf of Plaintiff and the Classes)**

168.    Plaintiff repeats and realleges the above allegations as if fully set forth herein.

169.    Plaintiff and members of the Classes contracted with Defendant for checking account services, as embodied in the Account Disclosures.

170.    Defendant breached the terms of its contract with consumers when as described herein, Defendant failed to fairly investigate reported fraudulent, unauthorized transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle service.

171.    Further, under the law of each of the states where Defendant does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

172.    This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

173.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply

with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

174.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

175.    Defendant breached the covenant of good faith and fair dealing when it failed to fairly investigate reported fraudulent, unauthorized transactions on the Zelle money transfer service and failed to reimburse accountholders for fraud-induced losses incurred using the Zelle, and unilaterally adopting an unreasonable definition of "unauthorized" where "fraud" only means transfers initiated by someone other than the accountholder.

176.    Each of Defendant's actions were done in bad faith and was arbitrary and capricious.

177.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

178.    Plaintiff and members of the Classes have sustained damages as a result of Defendant breaches of the contract and covenant of good faith and fair dealing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Classes, appointing Plaintiff as representative of the Classes, and appointing counsel for Plaintiff as lead counsel for the respective Classes;

B. Declaring that Defendant's policies and practices as described herein constitute a violation of the state consumer protection statutes invoked herein, breach of contract and a breach of the covenant of good faith and fair dealing, and/or BofA's conduct is a violation of the Electronic Funds Transfer Act.

C. Enjoining Defendant from the unlawful conduct as described herein;

D. Awarding restitution of all monies Defendant acquired as a result of the wrongs alleged herein in an amount to be determined at trial;

E. Compelling disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

F. Awarding actual and/or compensatory damages according to proof;

G. Punitive and exemplary damages;

H. Treble damages and attorneys' fees as provided by law;

I. Awarding pre-judgment interest at the maximum rate permitted by applicable law;

J. Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

K. Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: October 12, 2022

Respectfully, submitted,

David M. Wilkerson
NC State Bar No. 35742
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Phone: 828-258-2991
Fax: 828-257-2767
Email: dwilkerson@vwlawfirm.com

*Counsel for Plaintiff and the Proposed Class*

# EXHIBIT 1

# Deposit Agreement and Disclosures

*Effective April 7, 2017*



bankofamerica.com

Applies in all states.

Bank of America, N.A. Member FDIC. ©2017 Bank of America Corporation.
91-11-2000B (04/17)



29501

# Table of Contents

**Welcome to Bank of America** .................................................................... 1
How to Get Started ...................................................................................... 1
How to Access Your Account ...................................................................... 1
**The Agreement for Your Account** ............................................................ 2
Binding Contract .......................................................................................... 2
Changes to This Agreement ........................................................................ 2
Closing an Account ...................................................................................... 2
Governing Law ............................................................................................. 3
**Explanation of Some Terms** ..................................................................... 4
**Information About You and Your Account** .............................................. 5
Information You Give Us ............................................................................... 5
Identification ................................................................................................. 5
Bank of America's Privacy Policy for Consumers ........................................ 5
Sharing Information with Affiliates ............................................................... 5
Consumer Reports and Other Inquiries ....................................................... 5
Disclosing Information About You and Your Account ................................... 6
Telephone Calls: Calling, Monitoring and Recording .................................. 6
Release of Information .................................................................................. 7
**Account Ownership** ................................................................................... 7
Some General Terms .................................................................................... 7
Some Basic Terms for Joint Accounts ......................................................... 7
Some Basic Terms for "Payable on Death" Accounts .................................. 8
Some Basic Terms for Business and Other Non-Personal Accounts .......... 9
Transferring Ownership ................................................................................ 9
**Checking and Savings Accounts** .......................................................... 10
Types of Accounts ...................................................................................... 10
Eligibility for NOW Accounts ...................................................................... 10
Demand Deposit Accounts .......................................................................... 10
How We Calculate Interest on Interest Bearing Checking and Savings Accounts ....... 10
Combined Balance Service .......................................................................... 11
Limits on Linking Accounts ........................................................................ 12
Limits on Withdrawals and Transfers from Savings Accounts ................... 12
**Time Deposit or CD Account** ................................................................. 13
Types of CDs .............................................................................................. 13
How We Calculate Interest on CDs ............................................................ 13
Disbursing Interest ..................................................................................... 14
CDs That Automatically Renew ................................................................... 14
CDs That Do Not Automatically Renew ....................................................... 14
Grace Period ............................................................................................... 14
Deposits to a CD ......................................................................................... 15
Early Withdrawals ....................................................................................... 15
Closing or Redeeming a CD ........................................................................ 15
**Information About Fees and Changing Your Account** ......................... 16
**Insufficient Funds – Overdrafts and Returned Items** ......................... 17
Overdrafts and Declined or Returned Items .............................................. 17

Impact of Holds ........................................................................................... 17
Extended Overdrawn Balance Charge ......................................................... 19
Personal Accounts – Overdraft Practices and Settings .............................. 19
Business Accounts – Overdraft Practices and Settings .............................. 19
Posting Orders ............................................................................................ 20
Occurrences ................................................................................................ 20
Overdraft Protection Plans .......................................................................... 20
**Processing and Posting Orders** ........................................................... 22
Processing Transactions and Posting Orders ............................................. 22
Posting Orders ............................................................................................ 22
Changing Posting Orders ............................................................................ 23
Posting Orders Determined at End of Day .................................................. 23
Overdraft Fees ............................................................................................ 23
Certain Transactions Made After Business Day Ends ................................. 24
**Processing Deposits and Cashed Items** .............................................. 25
Cashing Items or Accepting Items for Deposit ........................................... 25
Checks Lost in the Collection Process ........................................................ 25
Collection Items ........................................................................................... 26
Demand Drafts and Remotely Created Checks ........................................... 26
Deposit Preparation and Acceptance .......................................................... 26
Deposit Error Correction ............................................................................. 27
Encoding Deposits ...................................................................................... 27
Endorsing Checks ....................................................................................... 27
Identifying the Account for Your Deposit .................................................... 28
Overpayments and Reversals ...................................................................... 28
Returned Items ............................................................................................ 28
Substitute Checks ....................................................................................... 29
Third-Party Endorsements .......................................................................... 29
**When Funds are Available for Withdrawal and Deposit Holds** ........... 30
Your Ability to Withdraw Funds .................................................................. 30
Longer Delays May Apply ........................................................................... 30
Special Rules for New Accounts ................................................................. 31
Government Checks, Cashier's Checks and Other Special Types of Checks ... 31
Cash Withdrawal Limitation ........................................................................ 32
Holds on Other Funds ................................................................................. 32
**Processing Withdrawals** ........................................................................ 33
Cashing Checks for You .............................................................................. 33
Cashing or Accepting Your Checks for Others ........................................... 33
Checks with Legends or Restrictions .......................................................... 33
Collection Items ........................................................................................... 33
Check Stock and Ink ................................................................................... 33
Converting Checks to Electronic Debits ..................................................... 34
Examining Checks ....................................................................................... 34
Items Resulting from Voluntary Disclosure ................................................ 35
Large Cash Withdrawals ............................................................................. 35
Paying Checks and Other Items ................................................................. 35
Stale-Dated and Postdated Checks ............................................................ 35
Substitute Checks, Indemnified Copies, Images and Image Replacement Copies .... 35

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 40 of 76

Unpaid Items ........................................................................35
**Substitute Checks and Your Rights** ..............................**36**
**Notices, Statements and Other Communications** ..........**37**
General Terms for Notices, Statements and Other Communications .............37
Notices..................................................................................37
Statements..........................................................................38
Check Image, Safekeeping and Enclosure Services ..........39
Your Address and Change of Address................................39
**Actions You Can Take to Help Protect Your Account**..........**40**
**Reporting Problems**........................................................**42**
Your Responsibility.............................................................42
What Are Problems and Unauthorized Transactions..........42
Reviewing Your Account Statements..................................42
We Are Not Liable If You Fail To Report Promptly..............43
Written Confirmation and Other Assistance ......................43
Our Investigation and Maximum Liability ..........................43
Business Insurance............................................................44
Opening a New Account.....................................................44
**Foreign Items and Foreign Currency** ...........................**44**
What Is a Foreign Item.......................................................44
Be Cautious About Accepting Foreign Items......................44
Currency Exchange Rates .................................................44
Wires Sent to a Foreign Currency Account.........................45
You May Not Write Foreign Currency Checks .....................45
Processing and Collecting Foreign Items...........................45
**Other Terms and Services** ...........................................**47**
Account Changes................................................................47
Automatic Transfer Service ...............................................47
Check and Deposit Slip Forms ...........................................47
Check Copies......................................................................48
Compliance.........................................................................48
Conflicting Demands and Disputes....................................48
Converting an Account........................................................49
Cutoff Time for Receipt of Orders ......................................49
Death or Incompetence ......................................................50
Facsimile Signature...........................................................50
Deposit Bank Assessment..................................................50
Fingerprint.........................................................................50
"Freezing" Your Account ....................................................50
Indemnification and Limitation of Liability ........................51
Legal Process – Subpoena and Levy ..................................51
Multiple Signatures Not Required .....................................52
Notice of Withdrawal .........................................................52
Powers of Attorney/Appointment and Payment to Agents ..53
Records...............................................................................53
Right of Setoff ...................................................................53
Sample of Your Signature ..................................................54
Stop Payment Orders and Postdated Orders .....................54
Subaccounts.......................................................................55

Unclaimed Property – Accounts Presumed Abandoned or Inactive..............56
Verification of Transactions and Right to Reverse Transactions ..............57
Waiver, Severability, and Change of Law by Agreement ....57
**Electronic Banking Services** .......................................**58**
Types of Electronic Banking Services ................................58
Access ID............................................................................59
Electronic Banking Disclosures .........................................60
**ATM Safety Tips** ...........................................................**63**
Protect Your ATM Card and Personal Identification Number (PIN)............63
Be Aware of Your Surroundings at ATMs............................63
Protect Your Privacy...........................................................63
Request Emergency Assistance..........................................63
**Funds Transfer Services**..............................................**64**
Remittance Transfers .........................................................64
Sending Funds Transfers ...................................................65
Receiving Funds Transfers .................................................66
ACH Debits and Credits......................................................66
**Tax Information** ............................................................**67**
**Resolving Claims**..........................................................**68**
What does "Claim" Mean?...................................................68
How Claims on Personal Accounts will be Resolved..........68
How Claims on Business Accounts will be Resolved..........68
Judicial Reference..............................................................68
Arbitration..........................................................................69
Limitation and Non-Severability ........................................70
Rules of Interpretation.......................................................70
Jurisdiction and Venue ......................................................70

# Welcome to Bank of America

Thank you for opening and keeping an account with us.

Please read this entire agreement carefully so you understand your rights and obligations for your deposit account and deposit relationship with us and keep it in a convenient place for future reference.

In this agreement, "Bank of America", "Bank", "we", "us" and "our" means Bank of America, N.A. "You" and "Your" means each and every owner of the account and each and every other person with authority to withdraw funds from the account or otherwise operate the account.

Our accounts and services are generally available through all of our channels - in our financial centers, through telephone banking and online. However, some accounts and services may not be available at all times, in all locations, or through all channels.

## How to Get Started

After you open your account, please consider these optional services. They can help you manage your account.

- **Debit card** – use your debit card to pay for purchases at merchants that accept debit cards, to make deposits at Bank of America ATMs, and to withdraw cash from ATMs.
- **Direct Deposit** – have your paycheck, retirement benefits, or other source of income deposited electronically into your checking or savings account.
- **Online Banking** – helps you manage and keep better track of your finances. Here are some of the things you can do using Online Banking:
  - Check your account balances and review transaction history.
  - Transfer funds between your accounts or to other Bank of America customers' accounts.
  - Receive your statements and posted checks online, then review or print them at your convenience.
  - Reorder checks and change your address.
- **Online Bill Pay service** – pay your bills electronically.
- **Online Alerts** – provide an electronic notice through email or text message about account activity, such as when a direct deposit posts or when your balance drops below an amount you set.
- **Scheduled Savings Transfers** – helps make saving easier by automatically transferring money from your checking account to your savings account.
- **Keep the Change®** – helps you grow your savings by automatically transferring money from your personal checking to your savings with each eligible debit card purchase.
- **Overdraft Protection Service** from another linked account, such as your savings or credit card account – helps you avoid overdrafts and declined or returned checks and other items by automatically transferring available funds from your linked account to your checking account.

## How to Access Your Account

You can access your account and get information about our accounts and services:

- At our financial centers and at Bank of America ATMs.
- Through our Online Banking Service at bankofamerica.com.
- By calling customer service at the number on your account statement.
- You can locate our nearest financial center or ATM on our website at bankofamerica.com.

# The Agreement for Your Account

## Binding Contract

This *Deposit Agreement and Disclosures*, the applicable *Schedule of Fees*, the signature card and other account opening documents for your account are part of the binding contract between you and us (this "Agreement") for your deposit account and your deposit relationship with us. They contain the terms of our agreement with you. Please read all of these documents carefully.

This *Deposit Agreement and Disclosures* also summarizes certain laws and regulations that apply to common transactions, provides some disclosures for deposit accounts required by federal law, and establishes terms that cover some transactions or situations that the law either does not cover or allows us to change by this contract. The *Schedule of Fees* lists our accounts and account fees.

When you complete our account opening documents (as an example, you sign our signature card), request an account, or keep your account open, you acknowledge that you have reviewed and understand the terms of this Agreement and you agree to be governed by these terms. You understand that these terms, as we may change or supplement them periodically, are a binding contract between you and us for your deposit account and your deposit relationship.

Our deposit relationship with you is that of debtor and creditor. This Agreement and the deposit relationship do not create a fiduciary, quasi-fiduciary or special relationship between us. We owe you only a duty of ordinary care. Our internal policies and procedures are solely for our own purposes and do not impose on us a higher standard of care than otherwise would apply by law without such policies or procedures.

We give this Agreement to you when we open your account. You may obtain additional copies of this Agreement at a financial center or by calling the number on your statement.

## Changes to This Agreement

We may change this Agreement at any time. We may add new terms. We may delete or amend existing terms. We may add new accounts and services and discontinue existing accounts or services. We may convert existing accounts and services into new accounts and services.

We ordinarily send you advance notice of an adverse change to this Agreement. However, we may make changes without prior notice unless otherwise required by law. We may, but do not have to, notify you of changes that we make for security reasons or that we believe are either beneficial or not adverse to you.

When we change this Agreement, the then-current version of this Agreement supersedes all prior versions and governs your account.

If you continue to use your account or keep it open, you are deemed to accept and agree to the change and are bound by the change. If you do not agree with a change, you may close your account as provided in this Agreement.

See the *Notices, Statements and Other Communications* section for information about how we provide notice.

## Closing an Account

You or we may close your checking or savings account at any time without advance notice, except that we may require you to give us seven days advance notice when you intend to close your savings or interest bearing checking account by withdrawing your funds. See *Notice of Withdrawal* in the *Other Terms and Services* section. You or we may close your time deposit account at maturity without advance notice. Bank of America may close your account or convert your account to another account type at its discretion due to excessive overdrafts.

If an account was closed and then we reopen it, the account is subject to our standard terms and fees for that type of account. Any waiver that applied before the account was closed does not apply when we reopen the account.

If your account reaches a zero balance, or you apply for an account but never deposit funds into it, we may either keep the account open or close the account without notice.

Sometimes after an account is closed, we receive a deposit for credit to the account or a check or other item for payment from the account. If this happens, we may at our option and without any liability to you: either return the deposit, check or other item; or we may reopen the account and accept the deposit, check or other item for you, even if this overdraws your account.

Sometimes after an account which had funds in it is closed, and while we are still holding the funds from the account, we receive a withdrawal request, check or other item for payment from the account. We may refuse the withdrawal request and return the check or other item. We are not liable for any losses or damage that may result from refusing the withdrawal or dishonoring the check or other item, even if we are still holding funds that would cover the withdrawal, check or other item.

When you ask us to close your account, we may continue to pay transactions as we receive them while we process your closure request. When we complete our closure process, we may close your account, even if your account has a balance and transactions you've told us about are still pending.

If your account is overdrawn when closed, you agree to pay immediately all amounts you owe us. If your account had funds in it when closed, we may:

- hold the funds for your pick up or to pay outstanding or expected items or claims;
- deposit the funds in another of your accounts with us; or
- mail the funds to any of you by check at the address in our records for the account.

If your account earned interest before it closed, your funds stop earning interest when you ask us to close your account, even if we continue to hold the funds. As an example, if we mail funds from an interest bearing account to you by check, then your funds do not earn interest, even if the check is returned to us or is not cashed.

This Agreement continues to govern matters related to your account even after your account closes.

## Governing Law

This Agreement, and your and our rights and obligations under this Agreement, are governed by and interpreted according to federal law and the law of the state where your account is located. However, your rights and obligations for Remittance Transfers shall be governed by and interpreted as described in the Funds Transfer Services section. We ordinarily maintain your account at the financial center where we open your account. However, we may transfer your account to another financial center in the same state or in a different state. If state and federal law are inconsistent, or if state law is preempted by federal law, federal law governs.

# Explanation of Some Terms

## Definitions

Please keep in mind the following definitions as you review the Agreement.

Annual Percentage Yield (APY) is a percentage rate reflecting the total amount of interest paid on the account, based on the interest rate and frequency of compounding.

Average daily balance for a statement cycle – we take the balance that we determine is in the account for each day in the statement cycle, add those balances together, and then divide that sum by the number of days in the statement cycle.

Bank of America, Bank, we, us and our mean Bank of America, N.A.

Financial Center means a branch of Bank of America.

Business days – our business days are Monday through Friday, excluding bank holidays. Hours of the business day for a financial center are available at that financial center.

Collected balance is the ledger balance for the account minus that portion of funds deposited for which we have not received credit based on the availability schedule we apply to the account. We ordinarily apply the availability schedule provided to us by the Federal Reserve Bank to determine the time that we receive credit for deposited funds.

Item includes all orders and instructions for the payment, transfer or withdrawal of funds from an account. As examples, item includes: a check, substitute check, purported substitute check, electronic transaction (including an ACH transaction, ATM withdrawal or transfer, or point of sale transaction), draft, demand draft, remotely created check, remotely created consumer check, image replacement document, indemnified copy, preauthorized draft, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, or other order of instruction for the payment, transfer, or withdrawal of funds, or an image, digital image or a photocopy of any of the foregoing. Item also includes any written document created or authorized in your name that would be a check or draft but for the fact that it has not been signed. Item may also include a cash-in ticket and a deposit adjustment. Item may also include a check, draft, warrant, or other item deposited to your account, including a deposited item that was returned unpaid.

Minimum daily balance – the lowest balance that we determine is in the account during a statement cycle.

You and your means each and every owner of the account and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account.

## Headings and Interpretation

We include section and paragraph headings in this Agreement to help you find terms and provisions. The headings are for convenience or reference only. They do not limit the term or provision.

Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

In some sections we give examples. The examples cover some, but not all, of the situations or items that are covered by the section.

# Information About You and Your Account

## Information You Give Us

When you open a deposit account with us, you give us information about yourself and confirm that it is correct. We enter the information into our records. We may rely on that information until you notify us of a change and we have had a reasonable time to act on the new information.

## Identification

Federal law, including the USA PATRIOT Act, requires all financial institutions to obtain, verify and record information that identifies each customer who opens an account with that financial institution.

When you apply for an account, we will ask for your legal name, address, date of birth and your Tax Identification Number (TIN). We may require one or more forms of unexpired photo identification. We may validate the information you provide to us to ensure we have a reasonable assurance of your identity. We may contact you for additional information. If your account is funded before we verify your information, you may not have access to your funds. If we are not able to verify your identity to our satisfaction, we will not open your account or we may close the account if it was previously funded.

## Bank of America's Privacy Policy for Consumers

Our privacy policy for consumers is described in our publication, *U.S. Consumer Privacy Notice.* We provide our privacy policy to consumers who open a personal account with us. The privacy policy describes our policy on handling customer information and describes the situations when we may disclose information, including some examples.

You can also review our privacy practices on our website at bankofamerica.com/privacy.

## Sharing Information with Affiliates

Accounts Held by Consumers We may share information that we have about you and your accounts among the Bank of America family of companies. Please refer to our publication, *U.S. Consumer Privacy Notice,* for information about the categories of information we may share among the Bank of America family of companies and how you may tell us not to share certain types of information among our family of companies.

Accounts Held by Businesses We may share information about our experiences with you with Bank of America Corporation and its subsidiaries and affiliated companies ("Bank of America Affiliates") and selected third parties. We may also share information that you have provided to us on applications or that we receive from outside sources among the Bank of America Affiliates. However, individuals may tell us not to share information about them from applications or outside sources compiled for purposes of determining eligibility for credit, insurance or other services by either calling us at 1.888.341.5000 or by notifying us at bankofamerica.com/privacy.

## Consumer Reports and Other Inquiries

We may make any inquiries that we consider appropriate to help us verify your identity and determine if we should open, maintain, collect or close your account. This may include verification of employment and consumer reports or other reports from account information services and other consumer reporting agencies.

If you ask, we will tell you whether we requested such a report and, if we did request a report, we will tell you the name, address and telephone number of the reporting agency.

## Disclosing Information About You and Your Account

This section applies to both business and personal accounts. We may disclose information about your accounts to consumer reporting agencies and to other persons or agencies who, in our judgment, have a legitimate purpose for obtaining information.

For example, subject to any applicable financial privacy laws or other laws or regulations, we may provide information on you and your accounts:

* to consumer reporting agencies, such as ChexSystems, Inc.;
* to anyone who we reasonably believe is conducting a legitimate credit inquiry, including inquiries to verify the existence or condition of an account for a third party such as a lender, merchant or consumer reporting agency;
* in response to any subpoena, summons, court or administrative order, or other legal process which we believe requires our compliance;
* in connection with collection of indebtedness or to report losses incurred by us;
* in compliance with any agreement between us and a professional, regulatory or disciplinary body;
* in connection with potential sales of businesses;
* to service providers who help us meet your needs by assisting us in providing or offering our products or services; and
* to other third parties as is described in our publication *U.S. Consumer Privacy Notice* or as required under applicable law or regulation.

For personal accounts, the terms of our *U.S. Consumer Privacy Notice* governs in the event of a conflict between the terms of this section and the terms of our *U.S. Consumer Privacy Notice.*

Account Information Services/Consumer Reporting Agencies If we close your account because of your unsatisfactory handling, we generally report to consumer reporting agencies such as ChexSystems, Inc. your name, address, Taxpayer Identification Number (TIN), driver's license number and the date and reason we closed the account. The consumer reporting agency may supply this information to others. This may adversely impact your ability to establish an account at any financial institution for up to five years from the date of the report.

We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

## Telephone Calls: Calling, Monitoring and Recording

When you give a telephone number directly to us, or place a telephone call to us, you authorize us to place calls to you at that number. You understand that a "telephone number" includes a cell phone number and "calls" include both telephone calls and text messages to or from your phone or cell phone. As examples, we may place calls to you about fraud alerts, deposit holds, and amounts you owe us (collection calls) on your account. When we place calls to you, we may use automatic dialers and artificial, text, or prerecorded messages.

You authorize us to monitor, and to record, telephone conversations and other electronic communications you have with us and with our representatives for reasonable business purposes, including security and quality assurance. We will not remind you that we may be monitoring or recording a call at the outset of the call unless required by law to do so.

You consent and agree in advance to these terms and conditions.

## Release of Information

You can obtain information about your account by many methods, including at a financial center, by telephone, by mail and through Online Banking. We believe we have adopted reasonable security measures for each method, but we cannot ensure against unauthorized inquiries or intrusions. You agree that we are not responsible for the release of information to anyone who has gained possession of your ATM card, debit card or other code or access device or who has learned your identifying characteristics such as personal identification number (PIN), account number or social security number, even if you have not authorized them to obtain the information.

# Account Ownership

### Some General Terms

When you open an account, we may rely on information you give us and we maintain in our records. We determine the type and ownership of the account from this information. When you ask us to make a change to this information or your account, and we agree to the change, the change is not effective until we have had a reasonable time to act on the new information. As an example, if you ask us to change the signers on your account, your requested change is not effective until we have a reasonable time to act on it. If we ask you to give us additional documents or information, and you do not do so promptly, we may close your account.

When we accept a deposit to an account or permit a withdrawal or payment from an account, we may rely upon the form of the account and the terms of this Agreement at the time we process the transaction. We do not have to inquire about the source or ownership of any funds we receive for deposit or about the application of any withdrawal or payment from an account. When we permit a withdrawal or payment from an account at the request of any signer, or the agent of any signer, in accordance with the terms of this Agreement, the withdrawal or payment is a complete release and discharge of the Bank from all claims regarding the withdrawal or payment.

If you instruct us to open an account in the names of two or more people, and we do so, but later determine that one or more of them have not completed our account opening documents or other requirements, you agree to hold us harmless for reliance on your instruction. We may in our discretion for all purposes and circumstances (including determining ownership of the account following the death of any person in whose name the account was opened) either treat the account as being owned solely by the person who have signed or completed our account opening documents or other requirements. If we treat the account as owned by all persons in whose names the account was opened, we may permit the non-signing person to withdraw funds or take other action on the account without any liability to you.

We may open an account without regard to whether you are married and without regard to whether the funds on deposit are your community or separate property. We may require you to close the account in order to remove a co-owner, terminate a joint ownership or change a payable on death or trust designation.

### Some Basic Terms for Joint Accounts

If more than one person's name appears in the title of an account without a fiduciary, beneficiary or other designation, then the account is a joint account. All persons whose names appear on the account are co-owners of the account, regardless of whose money is deposited in the account.

Each co-owner acts as the agent of each other co-owner. Each co-owner authorizes each other co-owner to operate the account without the consent or approval of any other co-owner. We may

act and rely on the instructions of one co-owner without liability to any other co-owner. So as examples, one co-owner may without the consent or approval of the others:

- add additional persons as co-owners;
- deposit funds and withdraw or transfer part or all of the funds in the account;
- endorse for deposit to the joint account on behalf of any other co-owner an item payable to another co-owner;
- instruct us to stop payment on a check or other item that another co-owner wrote on the account;
- obtain an ATM card or a debit card;
- draw upon an overdraft or other line of credit connected to the account;
- obtain information about the account, including transactions conducted by other co-owners;
- pledge the account as security for any debts; and
- close the account.

Each co-owner is jointly and severally liable to us for all fees, charges and other amounts owed to us on, and all costs, losses and liabilities related to, this Agreement or the account. Note that our right of setoff described in the *Right of Setoff* section of this Agreement applies to joint accounts.

All joint accounts are presumed to be joint accounts with the right of survivorship, unless the applicable state law does not permit this presumption or you have agreed with you in writing that the account is owned in another capacity. Right of survivorship means that when a co-owner dies, the funds in the account belongs to the surviving co-owner(s), subject to our right to charge the account for any amount the deceased co-owner or a surviving co-owner owes us. The rights of survivorship continue between surviving co-owners and we may pay the funds in the account to any surviving co-owner. The applicable state law may impose requirements that must be met to create a joint account with right of survivorship. You are solely responsible for meeting these requirements.

### Some Basic Terms for "Payable on Death" Accounts

For an individual or joint account, you may choose to make your account payable on your death to one or more payable on death ("POD") beneficiaries. You can make your account a POD account by instructing us to list each POD beneficiary on the account and complying with the applicable state law. The applicable state law usually imposes requirements that must be met to create a POD account. As an example, you may have to include certain words or letters in the account title to create a POD account, such as: "payable on death," "POD," "in trust for," "ITF," "as trustee for," "ATF," "transfer on death," "TOD," or "Totten Trust." You are solely responsible for meeting these requirements. We may treat an account which names a POD beneficiary as a POD account. However, if the applicable requirements are not met, we may treat your account as though there is no POD beneficiary.

During your lifetime, a POD account belongs to you. You may close the account, remove or add one or more POD beneficiaries, change the account type or ownership, and withdraw all or part of the funds in the account. When the account owner or last co-owner dies, we may pay any funds remaining in the account to the then surviving (if any) POD beneficiary(ies), subject to our right to charge the account for any amount a deceased owner, co-owner or POD beneficiary owes us. We may distribute the account balance, subject to any bank claims, to such beneficiaries payable to one or all surviving beneficiaries jointly, or payable individually, in equal shares, to each surviving beneficiary. A POD beneficiary does not acquire an interest in the account until after the death of the account owner or the last co-owner. A POD beneficiary may acquire an interest in the account at that time but only if the POD beneficiary is alive.

## Some Basic Terms for Business and Other Non-Personal Accounts

If the account owner is a corporation, unincorporated association, limited liability company, limited liability partnership, fiduciary, partnership, sole proprietorship or other entity holding an account in any capacity other than an individual capacity, each person signing the signature card or completing other account opening requirements represents and agrees that they:

- are fully authorized to execute all documents or otherwise complete our requirements in their stated capacity;
- have furnished all documents or other information necessary to demonstrate that authority; and
- will furnish other documents and complete other requirements as we may request from time to time.

We may refuse to recognize any resolution affecting the account that is not on our form or that appears to us to be incomplete or improperly executed.

## Transferring Ownership

Your account is for your use only. It is non-transferable and non-negotiable. Ownership of your account is transferable only on our records with our consent.

- You may not grant, transfer or assign any of your rights to your account without our written consent.
- Even if we consent, we may require that you close the account and that the new account owner open a new account in their name.
- We may refuse to acknowledge or accept your attempted pledge or assignment of your account or any interest in it, including a notice of security interest.

# Checking and Savings Accounts

## Types of Accounts

We offer several different types of checking and savings accounts for personal and business customers.

- The *Personal Schedule of Fees* describes our personal accounts and lists applicable fees.
- The *Business Schedule of Fees* describes our business accounts (other than Commercial accounts) and lists applicable fees. The *Business Schedule of Fees* does not apply to Commercial accounts.

## Eligibility for NOW Accounts

NOW accounts are commonly called interest checking accounts. Federal law provides that NOW accounts may only be opened and used by the following customers:

- individuals (including sole proprietors),
- certain nonprofit organizations,
- federal, state or local governmental entities, and
- fiduciaries (such as a bank trust department) where one or more individuals hold the entire beneficial interest in the funds.

If we believe that you are not eligible to own a NOW account, we may either close the account or convert it to another type of account. When we refer in this agreement to checking accounts, the reference includes NOW accounts.

## Demand Deposit Accounts

Demand deposit accounts are commonly called checking accounts. All types of customers can open a demand deposit account. Most demand deposit accounts do not earn interest.

We do offer an interest bearing demand deposit account to business customers. Please ask us for details.

When we refer in this agreement to checking accounts, the reference includes demand deposit accounts.

## How We Calculate Interest on Interest Bearing Checking and Savings Accounts

If you have an interest bearing checking or savings account, then please note the following.

- Your funds earn a variable rate. Your interest rate and annual percentage yield ("APY") may change. At our discretion, we may change the interest rate for your account at any time without notice or limit.
- We compound and credit interest to your account monthly.
- We use the daily balance method to calculate the interest on your account. The daily rate is 1/365 — or in a leap year we may use 1/366 — of the interest rate.
- For personal checking accounts and personal and business savings accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day.
- For business checking accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine applies for reserves applicable generally to transaction accounts under the rules of the Federal Reserve).

- For Public Service Trust Accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine is required to offset service charges).
- When you deposit a non-cash item (such as a check), interest begins to accrue on the non-cash item no later than the business day on which we receive credit for the non-cash item.

Some checking and savings accounts do not earn interest. The checking and savings accounts that earn interest are described in the Schedule of Fees as interest bearing accounts. Other checking and savings accounts do not earn interest. We pay interest only in whole cents.

We set interest rates at our discretion. We may set the interest rate based on a specific account, customer, customer relationship, or based on the location or channel through which we open the account. This means that the interest rate and APY we offer on the same type of account may be higher or lower based on these factors. For example, an account opened through our Online Banking channel may earn a different rate (either higher or lower) than the same type of account opened in a financial center or by mail.

We may also offer interest rate bonuses and other special promotions based on these factors. Interest rate bonuses and other special promotional offers may not apply to all accounts, customers, customer relationships, locations or methods of account opening.

When we consider your customer relationship with us, that may include whether you have other accounts with us, your balances with us in your other accounts and how you use services that we offer with accounts.

You may obtain current interest rates for your account by calling us at the number for customer service on your statement or by asking a financial center associate.

Balance Tiers The daily interest rate we pay on some accounts depends on the tier into which the balance in the account falls. A tier is a range of account balances. If you have one of these accounts, your balance earns the interest rate and APY in effect that day for the balance tier associated with your end-of-day balance. We may set the rate for each tier in any amount. The interest rate for one tier may be the same rate, or a higher or lower rate, than the rate for a lower tier. We may change the tiers that apply to an account at any time without notice. Different tiers apply to different types of accounts.

## Combined Balance Service

With some checking accounts you can designate your checking account as your primary checking account and then link many of your other accounts to it for pricing. When you link another account for pricing, you can use the balances in the other account to help you meet the combined balance required to avoid the monthly maintenance fee on your primary checking account. The Schedule of Fees lists the required combined balance for each checking account to which the service applies and the types of accounts that can be linked for pricing.

You must tell us what other accounts you want us to link to your checking account for pricing. We do not link your other accounts for pricing unless you tell us to do so. To determine what accounts are linked for pricing, please call us.

When an existing account is closed and a new account is opened to replace the existing account, we do not automatically link the new account to your checking account for pricing, even if the existing account was linked. You must tell us to link the new account for pricing.

When we calculate a balance or combined balance, we may ignore accrued interest, funds subject to a hold of any type, and each loan or line of credit that is in default. For each linked account, the period of time that we use as the basis for calculating the balance, and the day that we use to determine the balance, in the linked account may be different from the statement cycle for the primary checking account.

You still need to meet the balance requirements, if applicable, in each linked account to avoid the monthly maintenance fees on those accounts.

You understand that the statement for your primary checking account may include information about each linked account, including the account name, number and balance. We may make this information available to each owner and signer of any linked account. We may also send you a single combined statement that reports activity for your primary checking account and each deposit account linked to that account, instead of separate statements for each account. See Combined Statements in the Statements and Notices section.

## Limits on Linking Accounts

Some restrictions apply to what accounts can be linked to checking for pricing, including the following. You may only link an account to one checking account at a time. At least one of the owners of the linked account must also be an owner of the checking account. You may not link personal and business accounts together. You may not link a loan or line of credit that is in default.

We may in our discretion place other restrictions on what accounts can be linked.

## Limits on Withdrawals and Transfers from Savings Accounts

This Agreement and federal law impose limits on the number of certain types of withdrawals and transfers you can make each month from a savings account. Please note that these limits do not apply to withdrawals and transfers you make at one of our financial centers, by mail or at an ATM.

You can make no more than a total of six transactions each monthly statement cycle (or each month if you have a quarterly statement cycle) from among the following:

- Preauthorized transfers from your savings account (including transfers for overdraft protection),
- Telephone transfers or other electronic transmissions from your savings account.
- Online Banking and Mobile Banking transfers or bill payment transfers from your savings account.
- Transfers by check, draft or debit card, if allowed on your savings account.

We count a transaction on the date that we post it to your savings account. This date may be different from the date you authorize, transfer or write the transaction, which means a transaction made during one statement cycle may not be counted until a later statement cycle.

If you exceed the transaction limits on more than an occasional basis, we may revoke your privileges on that account or we may convert your savings account to another type of account, such as a checking account. Your funds may no longer earn interest after we convert your account.

When you use our Online Banking bill payment service, we recommend that you do not use a savings account as your bill payment account because of these limits on transfers.

Note: Even if you make no more than 6 transactions, a fee may still apply to some withdrawals or transfers. Please see the Schedule of Fees for your account.

Case 3:22-cv-00621-RJC-DCK    Document 1-1    Filed 11/16/22    Page 47 of 76

# Time Deposit or CD Account

When you open a time deposit account, you agree to leave your funds in the account until the maturity date of the account. We often refer to a time deposit account as a "CD" or a "Certificate of Deposit", even though we do not issue a "certificate".

This Agreement applies to CDs you open under your Individual Retirement Account (IRA) or Coverdell Education Savings Account (CESA) plans. Please see the *Traditional/Roth Individual Retirement Custodial Accounts and Disclosure Statements* and the *Coverdell Education Savings Custodial Account and Disclosure Statement* for additional terms of these plans.

A time deposit account is neither transferable nor negotiable.

## Types of CDs

We offer several different types of CDs for personal and business customers.

The *Personal Schedule of Fees* describes our personal CDs.

The *Business Schedule of Fees* describes our business CDs.

## How we Calculate Interest on CDs

Your funds earn interest during the term of the time deposit account. We calculate interest as follows:

- Time deposits earn interest at a fixed rate except for Opt-Up® CDs and Variable Rate IRAs. Fixed rate means that the interest rate that we apply to your account on the day we open it will not change for the term of the account.

- For an Opt-Up CD, your interest rate and annual percentage yield may change. The interest rate that we apply to it on the day that we open your Opt-Up CD remains fixed throughout the term of your Opt-Up CD unless you exercise your one time option to reset the interest rate. This reset option is described in the *Schedule of Fees*.

- For a Variable Rate IRA, your funds earn a variable rate. Your interest rate and annual percentage yield may change. At our discretion, we may change the interest rate for your account at any time without notice or limit.

- For terms of 27 days or less, we credit interest to your account at maturity. For terms of 28 days or more, we compound interest monthly and we credit interest to your account monthly and at maturity or disburse it to you according to the interest disbursement option you select.

- We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the ledger balance that we determine is in the account each day. The daily rate is 1/365 — or in a leap year we may use 1/366 — of the interest rate.

- When you deposit a non-cash item (such as a check), interest begins to accrue on the non-cash item on the business day the deposit is received. Deposits you give us on a weekend or bank holiday are treated as received the next business day.

- The annual percentage yield for your account assumes that interest will remain on deposit until maturity. A withdrawal will reduce earnings.

We generally set interest rates for new time deposit accounts based on the type of CD, the amount you deposit, and the term you select. We set interest rates at our discretion. Rates for new accounts may change daily. We pay interest only in whole cents.

We may also set interest rates based on a specific account, customer, customer relationship or based on the location or channel through which we open the account. This means that the

interest rate and APY we offer on the same type of CD may be higher or lower based on these factors. For example, a CD opened through our Online Banking channel, may earn a different rate (either higher or lower) than the same type of CD opened in a financial center or by mail. We may also offer interest rate bonuses and other special promotions based on these factors. Interest rate bonuses and other special promotional offers may not apply to all accounts, customers, customer relationships, locations or methods of account opening.

When we consider your customer relationship with us, that may include whether you have other accounts with us, your balances with us in your other accounts and how you use services that we offer with accounts.

You may obtain current rates by calling us at the number for customer service on your statement or by asking a financial center associate.

## Disbursing Interest

You may choose to have us credit your interest to your account. With this option, we reinvest the interest in your account monthly and at maturity.

Alternatively, you may have us regularly disburse the interest from your account by having us credit the interest to a Bank of America checking or savings account or by having us mail a check for the interest.

Depending on the term of your account, disbursement options include monthly, quarterly, semi-annually, annually on the anniversary date, and at maturity.

## CDs That Automatically Renew

Unless your account information states that your time deposit does not automatically renew, we automatically renew your account by reinvesting your funds. We reinvest both principal and interest, unless you elected to have your interest disbursed. (See *Disbursing Interest* in this chapter.)

When we automatically renew your CD, the term for the reinvested CD is the same length as the previous term of your account unless we notify you that we are changing the term of the CD. For time deposits with a fixed interest rate, the interest rate and APY for any renewal term is based on the rate we offer on the first day of the new term for the type of CD, amount and term of the reinvested deposit. Unless specifically stated otherwise, any bonus or special promotion we are offering will not apply to automatically renewing accounts.

If at any maturity date we no longer offer time deposit accounts of the same term and type, we may reinvest your funds in a time deposit that we believe offers similar features.

## CDs That Do Not Automatically Renew

Some time deposit accounts do not automatically renew. If your account information states that your time deposit does not automatically renew, then your account does not earn interest after its maturity date.

## Grace Period

The grace period begins on the first day after the maturity date. The grace period is one calendar day for terms of seven through 27 days and seven calendar days for terms of 28 days or more. You may make a deposit or withdrawal, or change the length of the term, once during the grace period and, if you take one of these actions, the grace period ends on that day. If the last day of the grace period is a non-business day (a weekend or bank holiday), then the grace period ends on the last business day before that non-business day. We may pay interest during the grace period based on the rate we offer on the first day of the new term for the type of CD, amount, and term of the deposit.

## Deposits to a CD

You may make an additional deposit to your account during its grace period. Otherwise, for all CDs except Variable Rate IRAs you may not make deposits during the term of the CD.

You may not make a deposit to a time deposit account by wire or automated clearinghouse (ACH) transfer.

## Early Withdrawals

You have contracted to keep your funds on deposit for the stated term. You may not withdraw all or part of a time deposit account except as provided in this Agreement.

At our discretion, we may allow you to withdraw all or part of your funds at times other than the grace period. We generally withdraw interest before principal. Each time we permit you to make an early withdrawal of principal, we may charge you an early withdrawal penalty. If your account has not earned enough interest to cover an early withdrawal penalty, we deduct any interest first and take the remainder of the penalty from your principal.

We calculate all early withdrawal penalties on the principal amount withdrawn at the interest rate in effect on the account on the withdrawal date. The early withdrawal penalty is:

- For CDs with terms of less than 90 days, the greater of all interest earned on the amount withdrawn or an amount equal to seven days interest on the amount withdrawn;
- For CDs with terms of 90 days up to 12 months, the penalty is an amount equal to 90 days interest on the amount withdrawn;
- For CDs with terms of 12 months up to 60 months, the penalty is an amount equal to 180 days interest on the amount withdrawn; and
- For CDs with terms of 60 months or longer, the penalty is an amount equal to 365 days interest on the amount withdrawn.

Please note that the term of a CD is the specified period of time you agreed to leave your funds on deposit – not the time remaining until maturity of your CD.

We add to the early withdrawal penalty the amount of any cash bonuses we paid you when you opened or reinvested the account.

If we are required to pay an amount from your CD (e.g. levy or garnishment), we may charge you an early withdrawal penalty, calculated on the amount withdrawn from the CD.

An early withdrawal from an IRA may also be subject to additional federal tax (and possibly additional state and local taxes) if you are under age 59 1/2.

## Closing or Redeeming a CD

We may close or redeem an automatically renewable account at the end of the term. You may close or redeem your account during its grace period.

# Information About Fees and Charging Your Account

## Fees

You agree to pay for our services in accordance with the fees that apply to your account and your deposit relationship with us.

Account Fees Your account is subject to the fees described in the *Schedule of Fees* that applies to your account.

- The *Personal Schedule of Fees* lists account fees that apply to our personal deposit accounts.
- The *Business Schedule of Fees* lists account fees that apply to our business deposit accounts except for Commercial accounts (the *Business Schedule of Fees* does not apply to Commercial accounts).
- The schedule that applies to your account is part of the binding contract between you and us.

The fees for many of our products and services may vary from state to state or between regions within a state. We charge account fees to you based on the state or region in which the financial center where we maintain your account is located. Account fees are not based on your state of residence or the state where you use or purchase the service. Your account fees and terms may differ from those of other customers with the same type of account, based on our assessment of your overall relationship with us.

Fees for Other Services In addition to checking, savings and CD accounts we also offer many other services, such as wire transfers, cashier's checks and bond redemption. You can get current information about these services and the fees that apply to them at a financial center or by calling us at the customer service number shown on your account statement. We may occasionally list fees for some of these services in the *Schedule of Fees*. Fees for these services may vary from state to state. The fees you pay for these services are those charged by us in the state where you sell you the service. We may charge these fees at any time without notice.

How We Set Fees We set our fees based on many factors, including the value we offer, our competitive position, deterrence of misuse of an account by our customers, consideration of profit and the safety and soundness of the Bank. We may also consider costs in setting fees, but we do not set our fees based only or primarily on the direct or overall costs and expenses associated with providing the particular account or service involved.

Calculating Balances When we calculate an account balance or combined balance to determine whether a fee applies to your account, we may use the balance that we determine is in each account. We may ignore accrued interest and funds subject to a hold of any type. For a balance in an account linked to a checking account, the period of time that we use as the basis for calculating the balance, and the day that we use to determine the balance, in the linked account may be different from the statement cycle for the primary checking account. If a loan or line of credit is linked, we may ignore each loan or line of credit that we determine is in default.

## Charging an Account

We may deduct fees, overdrafts and other amounts you owe us under this Agreement from your accounts with us or our affiliates, except that this provision does not apply to any consumer credit covered by the federal Truth in Lending law. We may make these deductions at any time without prior notice to you or request from you. If there are not enough funds in your account to cover the amounts you owe us, we may overdraw your account, without being liable to you. You agree to pay immediately all fees, overdrafts and other amounts you owe us.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 49 of 76

We may use deposits you or others make to your account (including deposits of payroll and government benefits) to pay fees, overdrafts and other amounts you owe us.

Some government payments (such as Social Security, Supplemental Security Income, Veterans and other federal or state benefits) may be protected from attachment, levy, garnishment or other legal process under federal or state law. If such protections would otherwise apply to deductions we make for amounts you owe us, to the extent that you may do so by contract, you waive these protections and agree that we may use these funds to pay fees, overdrafts and other amounts you owe us under this Agreement.

Please see the *Right to Setoff* section of the Agreement for more information.

# Insufficient Funds – Overdrafts and Returned Items

You can avoid fees for overdrafts and declined or returned items by making sure that your account always contains sufficient available funds to cover all of your transactions. We offer services that you can use to help you manage your account and help you avoid overdrafts, such as our Online Banking service and Online Alerts. Please see *How to Get Started* section in the *Introduction*.

We recommend that you enroll in one of the optional Overdraft Protection plans described below. These plans can help you avoid overdrafts and declined or returned items. While fees apply when you use an Overdraft Protection plan, the fees under the plan may be less expensive than the fees for overdrafts and declined or returned items.

## Overdrafts and Declined or Returned Items

When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. If you have enrolled in one of the optional Overdraft Protection plans and have enough available funds in the linked account under the Overdraft Protection plan, we transfer funds to cover the item. Otherwise, without notice to you, we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).

We pay overdrafts at our discretion, which means we do not guarantee that we will always, or ever, authorize and pay them. If we overdraw your account to pay items on one or more occasions, we are not obligated to continue paying future insufficient funds items. We may pay all, some, or none of your overdrafts, without notice to you. If we do not authorize and pay an overdraft, then we decline or return the transaction unpaid.

The *Schedule of Fees* for your account explains when we charge you fees for overdrafts and for declined or returned items and the dollar amount of the fees. Please review the *Schedule of Fees* for your account carefully.

If we overdraw your account, you agree to repay us immediately, without notice or demand from us. We ordinarily use deposits you or others make to your account to pay overdrafts, fees and other amounts you owe us.

## Impact of Holds

Sometimes funds in your account are not available to cover your checks and other items. When we determine that funds in your account are subject to a hold, dispute, or legal process, then those funds are not available to cover your checks and other items. We usually make this determination once at the end of the day when we process items. As examples of holds, holds include deposit holds, holds related to cash withdrawals, and authorization holds we place on the account for debit card transactions.

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available funds may change between the time you authorize a transaction and when the transaction is paid. When you use your debit card and you authorize the merchant with whom you use your card or to whom you previously provided your information to ask Bank of America to approve the transaction you want to make. At this time, in order for the transaction to go through, we must promise the merchant to pay for the purchase upon the merchant's request.

A hold immediately reduces the amount of available funds in your account by the amount of the authorization request. If, while the hold is in place, you do not have enough available funds in your account to cover other transactions you may have conducted (such as a check you previously wrote), those items may overdraw your account or be returned unpaid. This may result in an overdraft fee on the debit card transaction if this happens. In most cases, the hold expires when the transaction is paid.

The amount being held is not applied to the debit card transaction or to any specific transaction. If the hold expires and the transaction has not been paid, the amount being held is returned to your available funds. After the hold expires, we determine whether you have sufficient funds available to pay the debit card transaction. If you do not have sufficient funds, the debit transaction will cause you to overdraw, and, if it is a recurring transaction, may incur an overdraft fee. This can occur even if your account did have sufficient available funds when the merchant requested authorization.

Your debit card transaction is paid when the merchant presents it to Bank of America for payment – that is, when the merchant asks us to transfer the funds from your account to the merchant. It is important to note that authorization and payment of debit card transactions do not occur simultaneously – there can be days between.

If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant. If that occurs the debit card transaction will overdraw your account because we must honor our promise to pay the merchant. You may incur an overdraft fee when this happens.

Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transaction, the debit card transaction will overdraw your account and you may incur an overdraft fee.

We may also treat as an insufficient funds item each fee that creates an overdraft and each deposited item returned to us unpaid that creates an overdraft.

For some business accounts, when your account is overdrawn, we also charge you interest on the overdraft amount. Please see the *Schedule of Fees* for your account.

*What are "Items"?* Items include all orders and instructions for the payment, transfer, or withdrawal of funds from your account. As examples, item includes a check, draft, image, substitute check, everyday non-recurring debit card transaction, recurring debit card transaction, ACH transaction, ATM transaction, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, and in-person payment, transfer or withdrawal instruction. For more examples, please review the definition of items in the *Explanation of Some Terms* section.

*What are everyday non-recurring debit card transactions and what are recurring debit card transactions?* Everyday non-recurring debit card transactions are usually purchases made with your debit card or debit card number on a one-time or day-to-day basis. As examples, you use your debit card for purchases of groceries, gas, or coffee in the morning. Recurring debit card transactions

are usually transactions that you set up to occur automatically, such as automatic bill payments. As examples, you give merchants your debit card number to use for rent, mortgage, car, or utility payments. We rely on the merchant that processes the transaction to determine if it is a recurring transaction or an everyday non-recurring transaction.

## Extended Overdrawn Balance Charge

The Extended Overdrawn Balance Charge is an overdraft fee. This fee is in addition to Overdraft Item and NSF: Returned Item fees that may apply to your account for each overdraft or returned item. This additional charge applies to your account when we determine that your account has been overdrawn for 5 or more consecutive business days. You can avoid this fee by promptly covering your overdraft – deposit or transfer enough available funds to cover your overdraft, plus any fees we assessed, within the first 5 consecutive business days that your account is overdrawn.

Please see the Schedule of Fees for your account for more information about this fee.

## Personal Accounts - Overdraft Practices and Settings

We automatically apply our standard overdraft practices to personal accounts. We refer to this as our Standard Overdraft Setting. We also offer an optional Decline All Transactions overdraft setting.

With our Standard Overdraft Setting, we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions. This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. There is an exception for some ATM withdrawals. We may occasionally give you the opportunity at our ATMs to agree to our overdraft practices for a specific ATM withdrawal and, if you agree, we authorize and pay that ATM withdrawal. Please note that overdraft fees can apply to these withdrawals. We tell you at our ATM when this is available. With this overdraft setting, we may authorize and pay overdrafts for other types of transactions. Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments. For more examples of other transactions, please review the definition of Items.

Optional Decline All Transactions Overdraft Setting. This is an optional overdraft setting that you can ask us to apply to your account. With the Decline All Transactions overdraft setting, you ask us not to authorize or pay any transaction unless we determine that at the time of the transaction you appear to have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. This means that you are telling us to decline or return these transactions unpaid. Please note that returned item fees can apply to declined or returned transactions. With this setting you may be offered the ability to overdraft at the ATM as described above.

With either overdraft setting, your account might still become overdrawn. Please see the Impact of Holds section for an example of how this could occur.

With either overdraft setting, you may still incur fees for overdrafts and declined or returned items, including the Extended Overdrawn Balance Charge. Please review the Schedule of Fees for your account carefully.

## Business Accounts - Overdraft Practices and Settings

We automatically apply our standard business overdraft setting to business accounts. With our standard business overdraft setting, we may occasionally authorize and pay overdrafts for all types of transactions. For some business accounts, we offer an optional Decline All Transactions

overdraft setting that you can ask us to apply to your account. With the Decline All Transactions overdraft setting, you ask us not to authorize or pay any transaction unless we determine that at the time of the transaction you appear to have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. This means that you are telling us to decline or return these transactions unpaid. Please note that returned item fees can apply to declined or returned transactions.

With either overdraft setting, you may still incur overdrafts and fees for overdrafts and declined or returned items.

## Posting Orders

We determine the order in which we process and post deposits and other credits and checks and other items to your account. We may pay or authorize some items, and decline or return others, in any order. We deem appropriate. When you do not have enough available funds to cover all of the items presented that day, some processing and posting orders can result in more insufficient funds items and more overdraft and returned item fees than other orders. We may choose our processing and posting orders regardless of whether additional fees result.

Please see the Processing and Posting Orders section for more information.

## Occurrences

An "occurrence" is a day during which your account has at least one overdraft item or returned item. If we transfer your account to another financial center or convert it to a different type of account, your record of overdraft items and returned items continues to apply.

## Overdraft Protection Plans

We recommend that you enroll in one of the optional Overdraft Protection plans described below to help protect your account from overdrafts and declined or returned items. You can enroll most checking accounts and money market savings accounts in these plans. Please ask us whether your account is eligible. The fees under these plans may be less expensive than the fees for overdrafts and returned items.

The Schedule of Fees for your account explains the fees and other charges that apply to Overdraft Protection plans. Please review the Schedule of Fees for your account carefully.

Please note the following. Some of these Overdraft Protection plans are not available in all states. If the account you link for overdraft protection is opened in a different state than your primary checking account, there may be limitations on the ability to transfer funds the same day. Only one plan can be linked to an account at a time. Some accounts are not eligible for these plans. Under some plans we make transfers in a minimum amount so we might not make a transfer if you do not have at least the minimum transfer amount available under the plan. To have overdraft protection, at least one of the owner(s) of the account must be an owner of the other account. Certain other restrictions apply.

Overdraft Protection from Another Deposit Account This plan links your account to another Bank of America deposit account for overdraft protection. The other deposit account can be a second checking account or a savings account.

When you do not have enough available funds in your account to cover an item, we may automatically transfer funds from the available balance in your other deposit account to your account. We generally charge an overdraft protection transfer fee for each transfer. Funds you deposit into your other deposit account may not be available immediately for overdraft protection transfers. If you use your savings account for this service, each transfer counts as one of the six limited transactions you are allowed each month from your savings account. We cancel this Overdraft Protection plan if your account or the other deposit account is closed.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 51 of 76

Please see the *Schedule of Fees* for your account for more information about overdraft protection from another deposit account.

**Overdraft Protection from Your Credit Card** This plan links an eligible Bank of America credit card to your account for overdraft protection.

When you do not have enough available funds in your account to cover an item, we may automatically advance available funds from your linked credit card account and transfer the funds to your account. An advance is made under, and is subject to, the terms and conditions described in the applicable credit card agreement. We ordinarily do not make an advance if you are in default under your credit card agreement or if the advance would cause you to exceed the amount of credit available for that type of transaction. As examples, we may decide not to advance funds from your credit card account if you fail to make a credit card payment by its due date or if you exceed any credit card limit on your credit card account. The funds advanced are subject to fees and finance charges under your credit card agreement. For some business accounts, we may also charge an additional overdraft protection transfer fee to your account for each transfer.

Please see your credit card agreement for more information about overdraft protection from your credit card account.

**Overdraft Protection from Your Line of Credit** This plan links an eligible Bank of America line of credit to your account for overdraft protection.

When you do not have enough available funds in your account to cover a check or other item, we may automatically advance funds from your linked line of credit and transfer the funds to your account. The advance is made under, and is subject to, the terms and conditions described in the line of credit agreement. We ordinarily make the advance as long as you are not in default under the line of credit agreement and as long as the advance does not cause you to exceed the amount of your available credit on your line of credit. The funds advanced are subject to fees and finance charges under the line of credit agreement. We may also charge an additional overdraft protection transfer fee to your account for each transfer.

Please see your line of credit agreement for more information about overdraft protection from your line of credit.

# Processing and Posting Orders

### Processing Transactions and Posting Orders

Posting transactions to your account impacts your account balance. Posting a credit increases your balance. Posting a debit or hold reduces your balance. Credits include teller deposits, direct deposits and credits we make. Holds include deposit holds, debit card authorizations, and holds related to cash withdrawals and electronic transfers. Debits include withdrawals, transfers, payments, checks, one-time and recurring debit card transactions, and fees.

We use automated systems to process transactions and then to post transactions to accounts. When we process multiple transactions for your account on the same day, you agree that we may in our discretion determine our posting orders for the transactions and that we may credit, authorize, accept, pay, decline or return credits, debits and holds in any order at our option.

### Posting Orders

This section summarizes how we generally post some common transactions to your account.

We group the different types of transactions into categories. We use several different categories for holds, credits, and debits. Most categories include more than one transaction type.

After the end of the business day, our automated systems assign each transaction received for that day to a category. We generally post all transactions within a category, using the posting order or orders that apply to that category, before we post any transactions assigned to the next category.

We start with the balance in your account at the beginning of the business day, subtract holds from your balance, and make any adjustments from prior days. Next, we generally add credits to your balance and then subtract debits from your balance. Some, but not all, of our categories are shown below. For each debit category shown below, we list some common types of debits that we assign to the category and summarize how we generally post them within the category.

- We add deposits and other credits to your balance.
- Then, we subtract from your balance in date and time order the types of debits listed in this paragraph, when our systems receive date and time information. If our systems do not receive date and time information, then we subtract the remaining debits in this category from your balance in order from the highest to lowest dollar amount.

  Common debits in this category include:
  - one-time and recurring debit card transactions;
  - withdrawals made at our tellers and ATMs;
  - one-time transfers made at ATMs, through our tellers, by telephone, and through Online Banking and Mobile Banking;
  - checks you wrote that are cashed at our tellers; and
  - wire transfers.

- Then, for other checks you wrote, we subtract from your balance checks with check numbers sequentially in check number order when our systems can read the check number. Next, checks without a check number that our systems can read are subtracted in order from highest to lowest dollar amount.

  As an example, on the same business day we receive five checks that you wrote and were not cashed at a teller. Our systems can read three of the check numbers, which are #105, #112, and #115. The other two checks do not have check numbers that our systems can read. We subtract check #105 first, then #112, and then #115. Then, we subtract the two remaining checks in order from the highest to lowest dollar amount.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 52 of 76

* Then, we subtract from your balance many other types of electronic debits in order from the highest to lowest dollar amount. These debits include: scheduled transfers, preauthorized or automatic payments that use your deposit account number (generally referred to as automated clearing house (ACH) debits), and Online Banking and Mobile Banking bill payments.

* Then, we subtract from your balance most fees (such as monthly maintenance fees, overdraft item fees, returned item fees, and ATM fees) in order from highest to lowest dollar amount. Some fees may show as "processing" until the next day.

## Changing Posting Orders

You agree that we may determine in our discretion the orders in which we post transactions to your account.

You agree that we may determine in our discretion the categories, the transactions within a category, the order among categories, and the posting orders within a category. We sometimes add or delete categories, change posting orders within categories and move transaction types among categories. You agree that we may in our discretion make these changes at any time without notice to you.

## Posting Orders Determined at End of Day

We receive credits, debits and holds throughout the day. Regardless of when during the day we receive transactions for your account, you agree that we may treat them as if we received all transactions at the same time at the end of the business day.

During the day, we show some transactions as processing. As an example, we show some transactions as processing on the Account Details screen in Online Banking. Please note that transactions shown as processing have not been posted yet. The posting order for these transactions is determined at the end of the day, with the other transactions we receive for that day.

You should note that often we do not receive debits on the same day that you conduct them. As an example, when you use your debit card to pay for a purchase at a merchant and sign for the transaction, we usually receive an authorization request from the merchant the same day, but we might not receive the final debit card transaction for payment and posting until several days later.

We generally post credits and debits to your account, and report them on your statement, in a different order than the order in which you conduct them or we receive them.

## Overdraft Fees

We generally determine at the time we post a debit to your account whether it creates an overdraft and whether an overdraft or returned item fee applies. You should note that sometimes we authorize a transaction at a time when you have enough available funds to cover it, but because other transactions post before it and reduce your balance, the transaction creates an overdraft when we post it to your account. You can avoid fees for overdrafts and returned items by making sure that your account always contains enough available funds to cover all of your transactions. When your account balance includes some funds that are subject to a hold, dispute or legal process, you should note that those funds are not available to cover your transactions.

We offer services to help you manage and keep track of your finances, such as Online Banking and Online Alerts. Please see "How to Get Started" at the beginning of this agreement.

Our posting orders can impact the number of overdraft fees we charge you when you do not have enough available funds to cover all of your transactions. When several debits arrive the same business day for payment from your account and you do not have enough available funds in your account to cover all of the debits we receive for that day, you understand that some posting orders

can result in more overdrafts, and more fees for overdraft items and returned items, than if we had used other posting orders. You agree that we may in our discretion choose our posting orders, and also change them from time to time, regardless of whether additional fees may result.

When your account balance includes some funds that are not available at the time that we post a debit, and you do not have enough available funds in your account to cover the debit, the debit results in an overdraft and we generally charge you an overdraft item fee or returned item fee for the debit. You should note that we do not show holds, or distinguish between available and unavailable funds in your account balance, on your statement, so when you review your statement later, it might appear that you had enough available funds in your account to cover a debit for which we charged you a fee.

## Certain Transactions Made After Business Day Ends

During processing, we generally include in your account balance some transactions that you make after the business day cut-off, but before the end of the calendar day. These transactions are described below. This can impact fees that apply to your account. The credits can help you avoid overdrafts, returned items, and related fees. However, the debits can cause you to incur overdrafts, returned items, and related fees. You should note that we show these transactions on your statement as posting to your account on our next business day.

*Credits.* We generally add to your account balance the following credits, when the transaction occurs after the cutoff time for the business day, but during the same calendar day:

* Cash deposited at one of our ATMs or financial centers, and

* Transfers to your account from another deposit account with us made at one of our ATMs or financial centers, through Online Banking, Mobile Banking, or by calling customer service.

*Debits.* We generally subtract from your account balance the following debits, when the transaction occurs after the cutoff time for the business day, but during the same calendar day:

* Cash withdrawals made at one of our ATMs or financial centers, and

* Transfers from your account made at one of our ATMs or financial centers, through Online Banking, Mobile Banking, or by calling customer service.

# Processing Deposits and Cashed Items

We may forward deposits, cashed items and other transaction requests for an account to one of our processing centers. We may use the date that our processing center receives the transaction as the effective date of the transaction.

## Cashing Items or Accepting Items for Deposit

We may accept, accept for collection only, refuse, or return all or part of any deposit. If we accept checks or other items for deposit to your account or cash them, you are responsible for the checks and other items if there is a subsequent problem with them.

- If we cash a check or other item for you or credit it to your account and it is not paid for any reason, we may charge your account for the amount of the check or other item, even if this causes your account to become overdrawn.
- We may accept a check or other item for deposit to your account from anyone. We do not have to question the authority of the person making the deposit.
- If your account is overdrawn, we may use the deposit to pay the overdraft and any fees you owe us.
- We may adjust your account for any deposit errors, even if you have already withdrawn all or part of the deposit, though we reserve the right not to do so in every case.
- We may refuse to accept for deposit to your account items payable to another person.
- In receiving checks or other items for deposit or collection, we act only as your collecting agent and assume no responsibility beyond the exercise of ordinary care. We are not responsible for errors and delays made by others in the collection process.
- We may assess a charge for processing cash in a deposit.
- If you give us cash that we later determine to be counterfeit, we may charge your account for the amount we determine to be counterfeit.
- You will not knowingly deposit items into your account that do not have either a true original signature of the person on whose account it is drawn or an authorized mechanical reproduction of that person's signature.
- We may require ID or impose other conditions before accepting a deposit.

**Deposit Slips** You should always use our personalized deposit slips with your preprinted name and account number. If you use a blank deposit slip from one of our financial centers, rather than your personalized deposit slip, we are not liable to you for errors that may result from your or our hand encoding the account information.

**Checks, Cashier's Checks, and Similar Items** We cannot generally verify that checks, money orders, cashier's checks or similar items are authentic and valid at the time you ask us to cash them or accept them for deposit. If we cash, or accept for deposit, a check, money order, cashier's check or similar item and we later learn that the item is fraudulent, counterfeit or invalid for some other reason, we may charge your account for the amount of the item. This may occur even if we previously made the funds available to you, or this causes your account to become overdrawn.

**Foreign Items** You should be especially cautious about accepting items drawn on banks located outside of the United States. See *Foreign Items and Foreign Currency.*

## Checks Lost in the Collection Process

When we cash a check for you or accept a check for deposit to your account, we are acting as your agent in collecting the check. We are not responsible if the check is lost or delayed in the collection process. We may charge your account for the amount of the check, even if this causes

your account to become overdrawn, if a check is lost during the collection process or if the financial institution on which the check is drawn gives us a photocopy of the check or a debit slip representing the check.

A check that was lost may not be returned to us for some time. Despite any delay, we may charge your account when we receive either the returned check, a copy of the check, or a notice of return.

## Collection Items

We may accept certain items — such as certain securities and checks payable in foreign currencies or at foreign locations — on a collection basis only. We route and process collection items separately. We normally credit your account for collection items only after we receive payment for them. But if we do credit your account and then do not receive payment, we may debit your account for the amount of the item, even if this causes your account to become overdrawn.

We charge fees for processing collection items. Financial institutions in the collection process and the financial institution on which the collection item is drawn may also charge fees. If a financial institution requires payment of a fee before that institution will process the collection item, we may pay the fee and charge your account. A financial institution may subtract its fee from the amount of the payment we receive. You have to pay these fees even if the collection item is returned unpaid.

For our current collection fees, call us at the number for customer service shown on your statement, or ask a financial center associate.

## Demand Drafts and Remotely Created Checks

If you deposit a demand draft or remotely created check (an unsigned draft or a preauthorized draft) into your account, you warrant and guarantee that the draft or remotely created check is authorized according to the terms on its face by the person identified as drawer. You agree to indemnify us from all loss, expense and liability related to a claim that such draft or check was not authorized by the persons on whose accounts it was drawn.

## Deposit Preparation and Acceptance

When you make deposits through our financial centers, including lobby boxes, ATMs, night depositaries and other automated depositaries, or by mail, we may use the method of delivery to our branch or processing center to determine when we accept the deposit, when you receive credit for the deposit, and whether deposit fees apply.

If we credit your account for a deposit and provide you with a receipt, we may use the amount shown on the deposit slip or otherwise specified by you. The amount of the credit is subject to subsequent verification by us and, after review, we may adjust your account for any errors, though we reserve the right not to do so in every case.

Any of our employees or authorized agents may open and count any deposit that a teller did not count in front of you, including coin deposits, cash deposits, and each deposit made through the mail, a lobby box, a night depository, or other automated depository. You agree not to dispute that employee or agent's determination of the amount you delivered. The funds will be accepted for deposit after the counting has been completed and we have verified the amount, if we opt to do so. The funds will be made available to you in accordance with our funds availability schedule at that time.

If you make your deposit through a mechanical or automated depository such as an ATM or night depository, you agree to exercise due care in opening, closing and properly securing the depository.

If your deposit includes items that we do not accept for deposit, we may hold those items until claimed by you.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 54 of 76

## Deposit Error Correction

When we accept your deposits, we may provisionally credit your account for the amount declared on the deposit slip. You must ensure that the amount declared on the deposit slip is correct even if you did not prepare the deposit slip. If later we determine that the amounts declared on the deposit slip are incorrect, we may adjust [debit or credit] your account. That is, if the actual amount deposited is less than the amount declared on the deposit slip, the difference will become your property and if the actual amount deposited was more than the amount declared on the deposit slip, the difference will become our property. We may change our standard adjustment amount from time to time without notice to you.

We reserve the right not to do so if the error in completing the deposit slip was apparently inadvertent and is less than our standard adjustment amount. In that case, we may not adjust the deposit unless you notify us of the error within one year of the date of your periodic statement that shows the deposit. After this notice period has passed without your bringing an error to our attention, the deposit amount indicated on the statement will be considered finally settled. That is, if the actual amount deposited was less than the amount declared on the deposit slip, the difference will become your property and if the actual amount deposited was more than the amount declared on the deposit slip, the difference will become our property. We may change our standard adjustment amount from time to time without notice to you.

## Encoding Deposits

If you are a business client, you may ask us for permission to encode the MICR (Magnetic Ink Character Recognition) line of an item you deposit with us. If we permit this, you agree to follow the instructions we give you for preparing and encoding your deposits. If you make an encoding mistake that results in costs, losses or damages, including attorneys' fees. We may charge them to your account. We are not liable for any claims, costs, losses, or damages you may incur when you encode your own items.

If our equipment is unable to read what we consider a significant number of your encoded items, we may refuse to accept some or all of your items and we may charge you fees for each item we do accept.

You must provide us with a replacement of a copy of each original check if the deposit is lost or destroyed. We are not liable to you if you are unable to do so.

## Endorsing Checks

We may endorse and/or collect items deposited to your account without your endorsement but may, at our option, require your personal endorsement prior to accepting an item for deposit. If you deposit items which bear the endorsement of more than one person or of persons who are not signers on the account, we may refuse the item or may require you to have their endorsement guaranteed before we accept an item.

We may accept for deposit checks payable to any signer on your account when endorsed by any other signer.

When you endorse checks that you ask us to cash or deposit, you must endorse checks in the area that extends 1 1/2 inches from the trailing edge of the back of the check. You must also confine information that you place or have preprinted on the back of your checks to the same area. Otherwise, it may overlap into the area reserved for the banks' endorsements. The trailing edge is the left side of the check when you look at it from the front.

If you endorse a check outside of that area, mark or otherwise obscure the other area or a prior endorsement or make an endorsement that is illegible or incomplete, we may refuse the item or we may accept such nonconforming endorsement and you agree to hold us harmless from any loss, delay, liability, claim or damage which may arise as a result.

If it becomes necessary for us to return one of your checks, your endorsement or information placed on the back of the check may interfere with the bank endorsements and cause delays in returning the item. You are liable for and agree to reimburse us for all claims, costs, losses and damages that result from late return of a check due to material entered on the back of the check that obscured or interfered with the depository or another bank's endorsement.

## Identifying the Account for Your Deposit

You must correctly identify the account to which you want funds deposited. We may credit a deposit to an account based solely on the account number listed on the deposit slip or other instruction to credit an account, even if the name on the deposit slip or other instruction differs from the name on the account.

You are responsible for any claim, cost, loss or damage caused by your failure to properly identify the account to which a deposit is made or intended to be made.

## Overpayments and Reversals

If funds to which you are not entitled are deposited to your account by mistake or otherwise, we may deduct these funds from your account, even if this causes your account to become overdrawn. If the funds were transferred from your account, we may reverse the transfer. We can do this without giving you any prior notice or demand.

## Returned Items

This section applies to items that you deposit or that we cash for you (a "cashed or deposited item") and includes items drawn on us as well as items drawn on other financial institutions. You are responsible for returned items.

If a cashed or deposited item is returned to us at any time for any reason by the bank on which it is drawn or any collecting bank, we may accept that return, pay the claiming party, and charge the item to your account without regard to whether we or the other bank finally paid the item or returned the item in accordance with any applicable midnight deadline or clearinghouse rule. We may also deduct from your account any interest you may have provisionally earned on the item. We may charge you a fee for each returned item. Different fees may apply to domestic and foreign items. We may debit your account for a returned item at any time on or after the day it is returned to us by electronic, automated clearinghouse ("ACH") or other means or on the day we receive notice that the item is being returned to us - whichever is earlier.

As an example: if an item deposited in your account has been paid by the bank on which it is drawn (including us) and that item is later returned to us with a claim that the item was altered, forged, unauthorized, bears a forged or missing endorsement or should not have been paid for any reason, we may at our discretion charge the item against your account or place a hold on the amount of that item against your account until the claim is finally resolved. We may take these actions without prior notice to you and regardless of whether settlement with respect to such item is considered final.

We are not obligated to question the truth of the facts that are asserted, to assess the timeliness of the claim, to take any action to recover payment of a returned item, or to assert any defense. We do not need to notify you in advance of our actions related to the claim. If you do not have sufficient available funds to cover a returned item, we may overdraw your account. We are not liable to you if there are insufficient funds to pay your items because we withdraw funds from your account or in any way restrict your access to funds due to a hold or debit to your account in connection with a returned item. You agree to repay immediately an overdraft caused by a return of a cashed or deposited item.

In some cases, the financial institution on which the returned check or other item is drawn may send us an electronic notice of return; an indemnified copy of the original, an image replacement document ("IRD") or an image. Instead of returning the item. We may act on, and you agree to be bound by, the electronic notice of return, or indemnified copy or IRD just as if the original item had been returned.

We may send the unpaid item back for collection a second time before notifying you, but we are not obligated to do so. You waive notice of dishonor and protest. You agree that we will have no

obligation to notify you of any item that is being returned. However, if we receive advance notice from another financial institution that it is returning to us unpaid a check of $2,500 or more, we may send you a notice. We do not send a notice about returned checks of less than $2,500.

## Substitute Checks
You agree that you will not cash or deposit "substitute checks" as defined by federal law or Image Replacement Documents ("IRD") that purport to be substitute checks and have not been previously endorsed by a bank. If you cash or deposit such an item, you give us the same warranties and indemnities that we, as a reconverting bank, would give under applicable law or regulation and you agree to reimburse us for claims, losses, costs and damages we may incur. If you provide us with an electronic representation of a substitute check for deposit into your account instead of an original check, you agree to reimburse us for all claims, losses, costs and damages we incur because the substitute check resulting from the electronic representation does not meet applicable substitute check standards or causes duplicate payments.

## Third-Party Endorsements
We may require that checks and other items you want to deposit or cash be endorsed by all parties to whom the items are payable. We may require verification of any endorsement through either an endorsement guarantee or personal identification.

# When Funds are Available for Withdrawal and Deposit Holds

Our general policy is to make funds from your cash and check deposits available to you no later than the first business day after the day of your deposit. However, in some cases we place a hold on funds that you deposit by check. A hold results in a delay in the availability of these funds. When we place a hold, you will have to wait a few days before being able to use the funds. When we decide to place a hold at the time you make your deposit, the teller or ATM gives you a notice that lets you know funds are on hold. For ATM deposits, the hold notice is usually included on the ATM receipt. The hold notice will let you know the date and the time when the funds will be available for you to use. In some cases, you will not get the hold notice from the teller or ATM, but later by mail. You can avoid holds by using direct deposit or wire transfer.

In many cases, we make funds from your deposited checks available to you sooner than we are able to collect the checks. This means that, from time to time, a deposited check may be returned unpaid after we made the funds available to you. Please keep in mind that even though we make funds from a deposited check available to you and you withdraw the funds, you are still responsible for problems with the deposit. If a check you deposited is returned to us unpaid for any reason, you will have to repay us and we may charge your account for the amount of the check, even if doing so overdraws your account.

While we generally apply our funds availability policy to deposits you make to savings accounts (including money market savings accounts), and to deposits you make using a mobile device, please note that our funds availability policy does not apply to these deposits, and we may delay availability of funds from these deposits.

## Your Ability to Withdraw Funds
Our general policy is to make funds from your cash and check deposits available to you no later than the first business day after the day we receive your deposit. Our policy is to make funds from electronic direct deposits made through the automated clearing house (ACH) and incoming wire transfers available to you on the day of the deposit. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written.

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays.

If you make a deposit on a business day that we are open at one of our financial centers before 2:00 p.m. local time, or at one of our ATMs before 5:00 p.m. local time in the state where we maintain your account, we consider that day to be the day of your deposit. However, if you make a deposit after such times, or on a day when we are not open or that is not a business day, we consider that the deposit was made on the next business day we are open. Some locations have different cutoff times.

## Longer Delays May Apply
In some cases, we will not make all of the funds that you deposit by check available to you by the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $200 of your deposits, however, may be available no later than the first business day after the day of your deposit.

If we are not going to make all of the funds from your deposit available by the first business day after the day of your deposit, we generally notify you at the time you make your deposit. We also tell you when the funds will be available. If your deposit is not made directly to one of our

employees, or if we decide to take this action after you have left the premises, we mail you the notice by the next business day after we receive your deposit. If you need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, we may delay the availability of funds you deposit by check for a longer period under the following circumstances:

- We believe a check you deposit will not be paid.
- You deposit checks totaling more than $5,000 on any one day.
- You redeposit a check that has been returned unpaid.
- You have overdrawn your account repeatedly in the last six months.
- There is an emergency, such as failure of communications or computer equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

## Special Rules for New Accounts

If you are a new customer, the following special rules may apply during the first 30 days the account is open. Funds from electronic direct deposits to your account are available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks are available no later than the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you and deposited in person to one of our employees. The excess over $5,000 is available by the fifth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of deposit. Funds from all other check deposits are generally available by the fifth business day after the day of your deposit.

However, we may place longer holds on certain items for other reasons, such as large deposits (see Longer Delays May Apply above).

## Government Checks, Cashier's Checks and Other Special Types of Checks

Our policy is to make funds from U.S. Treasury checks that are payable to you available no later than the first business day after the day of the deposit.

If you make the deposit in person to one of our employees, and meet the other conditions noted below, our policy is to make funds from the following types of deposits available no later than the first business day after the day of your deposit:

- State and local government checks that are payable to you and are deposited in an account in the same jurisdiction that issued the check.
- Cashier's, certified and teller's checks that are payable to you.
- Federal Reserve Bank checks, Federal Home Loan Bank checks and U.S. Postal Service money orders that are payable to you.

If you do not make your deposit in person to one of our employees (for example, if you mail the deposit), our policy is to make funds from these deposits available no later than the second business day after the day of your deposit.

However, we may place longer holds on certain items for other reasons, such as large deposits (see Longer Delays May Apply above).

## Cash Withdrawal Limitation

If we delay availability of your deposit, we place certain limitations on withdrawals in cash or by similar means. In general, $200 of a deposit is available for withdrawal in cash or by similar means no later than the first business day after the day of deposit. In addition, a total of $400 of other funds becoming available on a given day is available for withdrawal in cash or by similar means at or after 5:00 p.m. on that day. Any remaining funds will be available for withdrawal in cash or by similar means on the following business day.

Similar means include electronic payment, issuance of a cashier's or teller's check, certification of a check, or other irrevocable commitment to pay, such as a debit card transaction.

## Holds on Other Funds

If we cash a check for you that is drawn on another financial institution, we may withhold the availability of a corresponding amount of funds that are already in your account. If we accept for deposit a check that is drawn on another financial institution, we may make funds from the deposit available for withdrawal immediately but delay your ability to withdraw a corresponding amount of funds that you have on deposit in another account with us. In either case, we make these funds available in accordance with our policy described above for the type of check that was cashed or deposited.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 57 of 76

# Processing Withdrawals

We may forward withdrawals and other transaction requests for an account to one of our processing centers. We may use the date that the processing center receives the transaction as the effective date of the transaction.

## Cashing Checks for You

Check cashing services may not be available at some financial centers. We may occasionally refuse to cash a check written to you. If we do cash such a check and it is returned to us unpaid for any reason at any time, we may deduct the amount of the check from your account, even if this causes your account to become overdrawn, and we may charge you a fee.

We may cash checks payable to any signer on your account when endorsed by any other signer.

If you ask us to cash a check or other items for you, we may apply the proceeds of the check or other item to fees, overdrafts and other amounts you owe us.

## Cashing or Accepting Your Checks for Others

When a person with a check or other item drawn on your account asks us to cash it or accept it for deposit, we may require identification satisfactory to us and their fingerprint. We may also impose additional requirements. We may refuse to cash a check for a person who is not our loan or deposit customer.

If the person with your check fails or refuses to satisfy our requirements, we may refuse to cash the check or accept it for deposit.

When we cash your check, or accept it for deposit, we may do so without reviewing your account at that time to see whether you have enough available funds to cover the check. We may charge that person cashing a check or other item a fee for cashing the check or other item if that person is not a customer of Bank of America.

We are not liable to you for refusing to cash or accept the check, or for charging a check cashing fee.

## Checks with Legends or Restrictions

Some customers print or write legends or restrictions on their checks. Sometimes the person to whom the check is payable prints or writes a legend or restriction on the check. Legends and restrictions include conditions, special or restrictive instructions, and other notations. Some examples are: "not valid after 60 days", "not valid over $1,000" or "paid in full". We may disregard legends and restrictions. We may pay the item even if the legend or restriction has not been met. We are not liable to you for any claims, costs, losses or damages that result from the placement of these legends or restrictions on your checks, or from our failure to abide by them.

## Collection Items

When another financial institution submits to us for collection an item drawn on your account, we may charge the other financial institution a fee. When you do not have enough funds in your account for us to process a collection item drawn on your account, we may charge you an overdraft or returned item fee.

## Check Stock and Ink

You agree to bear the risk of loss if you use check stock that contains defects, such as printing inaccuracies, faulty magnetic ink, faulty encoding, or duplicate serial numbers.

Checks you write may be converted into electronic images (truncated) during the check collection and return process. You also agree to bear the risk of loss if: you elect to have your checks printed by a vendor that has not been approved by us; you use check stock or features (such as security features) that cause critical data to disappear or be obscured upon truncation; or you make your check out in a way (such as, using a lightly colored ink) that causes critical data to disappear or be obscured upon truncation.

## Converting Checks to Electronic Debits

Some businesses convert checks that you give them into electronic debits (sometimes referred to as an electronic check) and then sends us an electronic debit for the transaction amount. When we receive the electronic debit, we charge it to your account. We may receive the electronic debit to your account immediately after the business enters the transaction, so you may have a reduced right to stop payment and you may incur an overdraft if you do not have sufficient funds in your account to cover the amount of the check at the time you write the check or authorize the transaction. Since the check is not sent to us, we do not have a copy of your check. We list these electronic debits on your account statement. If the business uses your check to initiate an electronic debit at the point of sale, the business should give you notice of the conversion and return the voided check to you. You should treat the voided check with care because someone else who obtains possession of it could use the information to initiate additional debits against your account. A business that receives your check by mail and converts it to an electronic debit may give you notice of the conversion and destroy the original check.

## Examining Checks

We receive checks in great volume. This and compliance with expedited funds availability laws require us to use automated check processing procedures. Although we may visually review a sample of checks and other items from time to time, reasonable commercial standards do not require us to do so.

We select some checks for review based on certain criteria that change from time to time. This means that most checks are processed on the basis of the MICR (Magnetic Ink Character Recognition) line printed along the bottom edge of the check, and are not individually examined for dates, maker signatures, legends or endorsements. You agree that we will have exercised ordinary care if we examine only those items that we have identified according to the criteria that we may establish in our discretion for inspection.

If we do visually review any check or other item, we may disregard any restrictive instructions or notations, such as an instruction to permit withdrawals only upon more than one signature. We may return the item unpaid if, in our opinion, it does not bear a signature matching any specimen signature we have on file for your account. You agree, however, that we will not be liable to you for honoring any check or other item bearing a signature that, in our sole opinion, resembles the specimen signature on file with us.

Since we do not individually examine most checks, it is critical for you to take care of your checks, promptly review your account statement, and immediately report any suspicious or unauthorized activity to us. You agree that automated processing of your checks is reasonable and that you accept responsibility for preventing and reporting forgeries, alterations, and other unauthorized uses of your checks or accounts. You agree that the exercise of ordinary care will not require us to detect forgeries or alterations that could not be detected by a person observing reasonable commercial standards.

Since some types of check fraud have become more difficult to detect, we may elect in some cases to make further inquiries about certain checks or other items that are presented for payment against your account. If we are unable to contact you, or take other steps, to determine with reasonable certainty that you authorized these payments, we may either pay the checks and other items or return them unpaid without any liability to you.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 58 of 76

## Items Resulting from Voluntary Disclosure

If you voluntarily disclose your account number to another person orally, electronically, in writing or by other means, you are deemed to authorize each item, including electronic debits, which result from your disclosure. We may pay these items and charge your account.

## Large Cash Withdrawals

We may require reasonable advance notice for large cash withdrawals. We may also refuse to honor a request to withdraw funds in cash from your account or to cash a check (including a cashier's check or other official item) at a financial center if we believe that the amount is unreasonably large or that honoring the request would cause us an undue hardship or security risk. We may require that such withdrawals be made at one of our cash vaults by an armored courier, acceptable to us and at your sole risk and expense. We are not responsible for providing for your security in such transactions.

## Paying Checks and Other Items

We may debit your account for a check or other item drawn on your account either on the day it is presented to us for payment, by electronic or other means, or on the day we receive notice that the item has been deposited for collection at another financial institution — whichever is earlier. If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account.

We may determine your balance and make our decision on an insufficient funds item at any time between our receipt of the item or notice and the time we must return the item. We are required to determine your account balance only once during this time period.

When you deposit checks or other items that are drawn on another account with us, we may treat such items as presented to us for payment on the business day that they are received by our office that processes checks drawn on the other account.

## Stale-Dated and Postdated Checks

If a stale-dated check — that is, a check dated more than six months in the past — is presented for payment against your account, we may pay the check and charge it to your account. If a postdated check — a check dated in the future — is presented for payment, we may pay the check and charge it to your account even if it is presented for payment before the date stated on the check. If you do not want us to pay a stale-dated or postdated check, you must place a stop payment order on it. See the *Stop Payment Orders and Postdating Orders* section.

## Substitute Checks, Indemnified Copies, Images and Image Replacement Copies

In some cases, we may be sent an indemnified copy of your original check, an image replacement document (IRD), a substitute check or an image of your check, instead of the original item. We may act upon presentment of an IRD, indemnified copy, substitute check, or image of your check and pay these items against your account, just as if the original item had been presented.

## Unpaid Items

If we decide not to pay a check or other item drawn on your account, we may return the original, an image or a copy of the item or we may send an electronic notice of return and keep either the original, an image or a copy of the item in our records. If we send an electronic notice of return, you agree that any person who receives that electronic notice may use it to make a claim against you to the same extent and with the same effect as if we had returned the original item.

# Substitute Checks and Your Rights

The following provisions help explain some of the rights a consumer has under a federal law commonly referred to as Check 21. Check 21 was enacted to increase the efficiency of the U.S. check clearing system. The clearing system relies heavily on the physical transport of checks between banks. Check 21 allows banks to create substitute checks and present them to other banks instead of the original check. This reduces the transport of checks among banks and helps enable the electronic collection of checks.

## What is a substitute check?

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

## What are my rights regarding substitute checks?

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

## How do I make a claim for a refund?

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us at the telephone number listed on your account statement, or write to us at:

Bank of America
Attn: Research and Adjustments
P. O. Box 655951
Dallas, TX 75265-5981

You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include—

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check or the following information to help us identify the substitute check: your account number, the check number, the name of the person to whom you wrote the check, the amount of the check and the date of the check.

# Notices, Statements and Other Communications

## General Terms for Notices, Statements and Other Communications

Please review promptly all notices, statements and other communications we send you. In this section "communications" means all notices, statements and other communications we send you.

We may provide communications in English. Many communications will be notices of change affecting your rights and obligations. If you have questions about any of them or difficulty reading English, please call us at the number for customer service on your statement.

We may:

- address communications to one account owner;
- provide communications in English, even though we may have given you account opening documents and disclosures in a language other than English;
- destroy communications that are sent to you and returned to us as being undeliverable, along with any accompanying checks and other items;
- authorize the Post Office or an agent to destroy communications, along with accompanying checks and other items, that the Post Office informs us are undeliverable; and
- stop sending communications to you until a new address is provided to us if one or more communications that we mail to you are returned to us as being undeliverable.

We are not responsible for communications, or for any checks or other accompanying items, lost while not in our possession.

If we receive communications that we sent you at a financial center, they are deemed to have been delivered to you at the time that they are available to you at the financial center.

Electronic delivery of communications We recommend that you use our Online Banking service and receive your communications electronically. When you use electronic or paperless delivery, we deliver communications to you by placing them in Online Banking. You can find your account statements, notices, and other eligible documents in Online Banking within the statements and documents area of your account details page. Communications currently available for electronic delivery are listed in the statements and documents area of Online Banking.

## Notices

When we inform you of changes affecting your rights and obligations, we do so by delivering or otherwise making a notice available to you. In some cases, we may post a notice of a change in our banking offices or on our website. Otherwise, we mail the notice to you at the address we currently show for your statement or, if we have agreed on this method, we provide it to you electronically. We may provide a notice as a message on your statement or as an insert with your statement.

If a notice of a change to this Agreement is returned to us as being undeliverable or if we stop sending notices or statements to you because we consider your account dormant or because notices or statements we previously sent you were returned to us as being undeliverable, you understand that the notices are available to you through our financial centers. You agree to that method of delivery and that changes covered in these notices are still effective and binding on you.

A notice sent to any one owner is deemed notice to all account owners and is effective for all account owners.

## Statements

We provide you with a single statement when there is activity on your checking or savings account. When there is no activity on your account, we may choose not to provide a statement. You may generally obtain an additional copy of your statement for a fee.

We recommend that you use our Online Banking service and receive your statements electronically.

If your statement is received at one of our offices, we may mail it to you or destroy it, along with any accompanying checks and other items.

For checking, money market savings and business savings accounts, we provide you with a monthly statement. Statement cycles generally vary from 28 to 33 days and may end on different days during the month. A statement cycle can be shorter than monthly. As examples, a statement cycle may only be a few days in length for the first statement cycle after an account is opened or when a statement date is changed to link accounts for combined statements. If you want to know the date your statement cycle ends, call us at the number for customer service on your statement.

For Regular Savings accounts, we provide you with a quarterly statement. If you have an electronic fund transfer (such as a direct deposit or an ATM withdrawal) to or from your account during any month, we provide a statement for that month.

For analyzed business checking accounts, you can elect to receive an additional monthly account analysis statement. This statement includes balance and float information, quantity of services used during the period, fees and charges for these services and the earnings allowance, if any.

For IRAs, we provide you with a quarterly statement.

Combined Statements With combined statement service we provide a single statement that reports activity for all accounts linked for this service, instead of separate statements for each linked account.

Accounts with at least one common owner may be linked and reported on a combined statement, either automatically or at your request. When accounts are reported on a combined statement, you understand and agree that each owner and each signer of any linked account can review information about all linked accounts. As an example: if you own a checking account jointly with others and you link your individual savings account to this checking account for combined statement service, then each of the other owners and signers of the joint checking account can review information about both the checking account and your individual savings account. You should not link accounts for combined statement service that you do not want others to see.

You must generally request combined statement service and tell us what accounts you want us to link and report on a combined statement. In some cases, however, we may automatically send you a combined statement. As an example: we may automatically link accounts that have the same owners and provide a combined statement for those accounts.

We may restrict what accounts can be linked for a combined statement. Please note that combining accounts on a single statement does not mean they are also linked for pricing. To determine which accounts can be linked, or to link accounts, for combined statements or for combined balances (pricing), please call us.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 60 of 76

## Check Image, Safekeeping and Enclosure Services

For most accounts, we offer the following options regarding your canceled checks.

**Check Image Service** We provide with your statement an image of the front of each of your canceled checks that we post to your account during the statement cycle. We print images of your checks up to 10 images on a page. We do not return your canceled checks. In some states and for some business accounts we provide an image of the front and back of your canceled checks. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

We store copies of your canceled checks (usually on microfilm or as a digital image) and then destroy the checks. Copies of checks are generally available for seven years from the date the checks are paid. See *Check Copies* in *Other Terms and Services*.

**Check Safekeeping Service** We report on your statement information about canceled checks (check number, amount and date posted) that posted to your account during the statement cycle. You do not receive your canceled checks with your account statement. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

If your statements are returned to us, you automatically receive check safekeeping service. If you usually receive your checks with your statement but we are unable to return them because of circumstances beyond our reasonable control, we may convert your account to check safekeeping service.

We store copies of your canceled checks (usually on microfilm or digital image) and destroy the checks. Copies of the checks are generally available for seven years from the date the checks are paid. See *Check Copies* in *Other Terms and Services*.

If you use our check safekeeping service, we cannot provide a copy of a check that posted to your account, and you lose money as a result, we may cover the loss up to the amount of the check. However, we are not liable to you for consequential loss or damage of any kind.

**Check Enclosure Service** This service is no longer available for most accounts. We return with your statement canceled checks that we received and posted to your account during the statement cycle. We may also provide you with images of your canceled checks.

We may not return some of your canceled checks. For example, if a check that you write is converted into an image or electronic debit during the check collection process, your check is not sent to us and, as a result, we cannot return the check to you. In some cases, we may receive a substitute check (also called an image replacement document) instead of your check. We do not return substitute checks with your statement.

## Your Address and Change of Address

We may send notices, statements and other communications regarding your account to you at the electronic or street address we have in our records for your account.

You agree to notify us if you change your address. If the United States Post Office or one of its agents tells us that your address has changed:

- we may change your address on our records to the address specified by the Post Office; and
- we may send notices, statements and other communications regarding your account to that new address.

# Actions You Can Take to Help Protect Your Account

Your role is extremely important in helping to prevent the wrongful use of your account. Please consider the measures below to help you protect your account.

**Stay Informed** We offer several services you can use to help you keep track of your account on a daily basis. You can use our Online Banking service to review your accounts and Online Alerts to receive notice of account balances and activity. Please see the information about these services in *How to Get Started*.

**Be Cautious about Giving Out Your Personal Information** We will not send you e-mails requesting personal information. If you receive an e-mail that seems to come from us and requests personal information, do not answer it. Instead, please contact us immediately at the number on your statement.

**Be Cautious about Accepting Checks, Money Orders and Cashier's Checks, especially from Strangers** You should be cautious about accepting checks, money orders and cashier's checks (especially foreign checks) from strangers. Sometimes they are fraudulent or counterfeit. We cannot verify that a check, money order or cashier's check that purports to be issued by another company or financial institution is authentic, or has any value at all, when you give it to us and ask us to cash or deposit it.

We ordinarily make funds from a check you deposit (or we cash for you) available to you sooner than we are able to collect the check or determine whether the check is any good. If the check is returned to us unpaid for any reason, you are still responsible for the check. We charge your account for, and you will have to repay us, the full amount of the returned check. A check may be returned because it "bounces" or because the check is fraudulent, counterfeit or invalid for some other reason.

One way to help protect yourself is to take the check to the bank, company (such as Western Union) or service (such as the U.S. Postal Service) that issued it and redeem the check for cash. For more information on how to avoid being a victim of fraud, visit bankofamerica.com, or consult trusted organizations such as your local Better Business Bureau or the Federal Citizen Information Center. The following website is also a good resource - www.fakechecks.org.

**Review Statements and Report Suspected Problems Immediately** You must promptly review the notices, statements and other communications, along with any accompanying checks and other items, we send you. You must also report problems or unauthorized transactions to us immediately, by calling the number for customer service on your statement. See *Reporting Problems*.

**Identity Theft** Identity theft occurs when someone uses your personal information without your permission to take over your existing account or to open new accounts in your name. Identity theft often begins with the loss or theft of a wallet or purse. Criminals can also obtain your personal information by stealing records from your trash or sending fraudulent e-mails to you requesting information.

You should destroy or shred account statements, checks, deposit slips and other documents with your personal information before you throw them away.

## Other Actions You Can Take

Here are some other actions you can take to help control your risk. This is by no means a complete list of preventive measures. You may want to take other or additional actions.

- Do not share your passwords, user numbers or Personal Identification Number (PIN) for Online Banking or your ATM or debit card.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 61 of 76

- Call us if your new check order or debit card does not arrive within 14 business days.
- Be cautious about giving someone your account number. If you give your account number to a third person and authorize that third person to initiate one or more transactions on your account, you may be liable for all transactions initiated by the third person even if you did not intend to authorize a particular transaction.
- Do not give anyone a pre-signed blank check. Do not give anyone permission to sign your name on a check.
- Do not preprint your driver's license or Social Security Number on your checks.
- Write checks in a dark colored permanent ink and fill in all lines. Make sure the written and numeric amounts match, are readable and begin on the far left of the line so additional numbers or words cannot be added.
- Write and sign your checks clearly, because illegible checks are easier to forge.
- Use tamper resistant checks. If you do not order checks through us, ask your check vendor about tamper resistant checks.
- Store blank checks, deposit slips and statements in a safe place and audit your check stock frequently. When discarding, destroy them by shredding or other means so they cannot be copied or used. Call us immediately if any of these items are lost, stolen or missing.
- Use the same precautions that apply to your checks to your endorsement and signature stamps.
- Do not leave outgoing mail in an unlocked collection box or in your residence mailbox. Deposit outgoing mail in a locked Postal Service mail deposit box.
- Keep accurate records of your transactions and reconcile your statements as soon as they are made available to you. Pick up your mail every day. When reviewing your statements, watch for:
    − Checks cashed out of sequence or made payable to cash
    − Use of a check number from a previously cleared item
    − Balance discrepancies or unexpected fluctuations
- Reconcile your account yourself. If you have authorized someone else to transact on your account and you do not reconcile your account yourself, someone other than an authorized signer should reconcile your accounts.
- Business customers should assign to different individuals responsibilities for: opening mail, reconciling bank statements, endorsing incoming checks, making deposits, reconciling accounts payable checks with vendor invoices, reconciling incoming checks against outstanding receivables and issuing checks.

# Reporting Problems

If you find that your records and ours disagree, if you suspect any problem of unauthorized transaction on your account or you do not receive a statement when expected, call us immediately at the number for customer service on your statement. If you fail to notify us in a timely manner, your rights may be limited.

This section does not apply to electronic fund transfers that are subject to Regulation E. If we have a specific agreement with you for a service or this Agreement has specific provisions for a service (such as the *Funds Transfer Services* section), these provisions supplement the specific agreement and provisions to the extent they are not inconsistent.

## Your Responsibility

You must exercise reasonable control over your statements, checks, deposit slips, endorsement and signature stamps, debit and ATM cards, Personal Identification Numbers and other access devices. It is your responsibility to keep them safe and secure and to promptly discover and report if any of them are missing in time to prevent misuse. You assume full responsibility for monitoring and reviewing the activity of your account, the work of your employees, agents and accountants, and any use they make of your account.

We may deny a claim for losses due to forged, altered or unauthorized transactions, items or signatures if you do not guard against improper access to your checks, statements, deposit slips, endorsement and signature stamps, and account information. We may also deny your claim if you do not monitor your account and report problems as provided in this section. Please review this *Reporting Problems* section carefully.

In some states we offer certain fraud prevention and detection products and services to business customers. If we have offered you one or more of these services, and you decline to use them or fail to implement them, or you fail to follow the procedures necessary for proper use of these products or services, or you fail to follow other precautions reasonable for your particular circumstances, you are precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent item that such product, service, or precaution was designed to detect or deter, and we will not be required to re-credit your account or otherwise have any liability for paying such items.

## What Are Problems and Unauthorized Transactions

Problems and unauthorized transactions include suspected fraud; missing deposits; unauthorized electronic transfers; missing, stolen, or unauthorized checks or other withdrawal orders; checks or other withdrawal orders bearing an unauthorized signature, endorsement or alteration; illegible images; encoding errors made by you or us; and counterfeit checks. This is not a complete list.

## Reviewing Your Account Statements

Your review of your statements, checks and other items is one of the best ways to help prevent the wrongful use of your account. You agree:

- to review your statements, checks and other items and reconcile them as soon as they are made available to you;
- that our statements provide sufficient information to determine the identification and authenticity of any transaction including without limit, whether any are forged, altered or unauthorized if the statement includes the item number, amount and the date the item posted to your account;
- to report any problems or unauthorized transactions as soon as possible; and

- that 60 days after we send a statement and any accompanying items (or otherwise make them available) is the maximum reasonable amount of time for you to review your statement or items and report any problem or unauthorized transaction related to a matter shown on the statement or items. There are exceptions to this 60-day period. For forged, unauthorized or missing endorsements, you must notify us within the period specified by the state law applicable to your account. For substitute checks, you must notify us within 40 days to qualify for an expedited recredit. See section titled *Substitute Checks and Your Rights*.

## We Are Not Liable If You Fail To Report Promptly

Except as otherwise expressly provided elsewhere in this agreement, if you fail to notify us in writing of suspected problems or unauthorized transactions within 60 days after we make your statement or items available to you, you agree that:

- you may not make a claim against us relating to the unreported problems or unauthorized transactions, regardless of the care or lack of care we may have exercised in handling your account; and
- you may not bring any legal proceeding or action against us to recover any amount alleged to have been improperly paid out of your account.

Except as otherwise expressly provided elsewhere in this agreement, we are not liable to you for subsequent unauthorized transactions on your account by the same person if you fail to report an unauthorized transaction on your account within 30 days (or such lesser period as is specified in the state law applicable to your account) following the closing date of the statement containing information about the first unauthorized transaction.

For business deposit accounts, also see *Electronic Banking Disclosures* in the *Electronic Banking Services* section and *ACH Debits and Credits* in the *Funds Transfer Services* section.

## Written Confirmation and Other Assistance

If you report to us that an unauthorized transaction has occurred on your account, we may require you to confirm your report in writing. We may also require that you give us a statement, under penalty of perjury, about the facts and circumstances relating to your report and provide such other information and proof as we may reasonably request.

If you assert a claim regarding a problem, you must cooperate with us in the investigation and prosecution of your claim and any attempt to recover funds. You also agree to assist us in identifying and in seeking criminal and civil penalties against the person responsible. You must file reports and complaints with appropriate law enforcement authorities.

If you fail or refuse to do these things, we will consider your failure or refusal to be your ratification of the defect in the statement or item, unauthorized transaction or other problem and your agreement that we can charge the full amount to your account.

## Our Investigation and Maximum Liability

We may take a reasonable period of time to investigate the facts and circumstances surrounding any claimed loss. We do not have to provisionally credit your account while we investigate.

Our maximum liability is the lesser of your actual damages proved or the amount of the missing deposit or the forgery, alteration or other unauthorized withdrawal; reduced in all cases by the amount of the loss that could have been avoided by your use of ordinary care.

We are not liable to you for special or consequential losses or damages of any kind, including loss of profits and opportunity or for attorneys' fees incurred by you.

## Business Insurance

If your claim relates to a business account, you agree to pursue all rights you may have under any insurance coverage you maintain before making a claim against us in connection with any transaction involving your accounts. You will provide us with all reasonable information about your coverage, including the name of your insurance carrier, policy number, policy limits and applicable deductibles. Our liability is reduced by the amount of all insurance proceeds you receive or are entitled to receive. At our request, you agree to assign to us your rights under your insurance policy.

## Opening a New Account

If you or we suspect that your account is or may be compromised, we may recommend that you close your account and open a new account. If there are any unauthorized transactions on your account, we recommend that you close your account and open a new one. If we recommend that you close your account and you do not do so, we are not liable to you for subsequent losses or damages on the account due to unauthorized transactions. When you open a new account, you are responsible for notifying any third parties that need to know your new account number.

# Foreign Items and Foreign Currency

## What Is a Foreign Item

A foreign item is a check or other item in any currency (including United States dollars) that is drawn on a bank or branch of a bank located outside of the United States. A foreign currency is any currency other than United States dollars. Some foreign items are payable in United States dollars. Some are payable in a foreign currency.

## Be Cautious About Accepting Foreign Items

You should be cautious about accepting foreign items because foreign items are not subject to United States laws or regulations. A foreign item may be returned unpaid much later (sometimes many months later) than checks or other items that are drawn on banks located in the United States. If a foreign item is returned to us unpaid or there is some other problem with the foreign item, you are responsible for the item and you may incur a loss.

## Currency Exchange Rates

We may receive transactions related to your account or relationship with us for which we determine that it is appropriate to convert the transaction from a foreign currency to United States dollars or from United States dollars to a foreign currency. As an example, we receive a wire denominated in a foreign currency for credit to your account. When we decide to convert a transaction, we may determine in our discretion the currency exchange rate and then assign that currency exchange rate to your transaction without notice to you. You agree to this procedure and accept our determination of the currency exchange rate.

We may consider many factors in setting our currency exchange rates. Some of these factors are exchange rates set by others, our desired rates of return, market risk and credit risk. We are not liable to you if our currency exchange rates are different from rates offered or reported by third parties; offered by us at a different time, at a different location or for a different transaction amount; or which involve different payment media (such as bank notes, checks and wire transfers).

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 63 of 76

You acknowledge that:

- our currency exchange rates for retail and commercial transactions, and for transactions effected after our regular business hours or on weekends, are different (and usually less favorable to you) from the exchange rates for large inter-bank transactions effected during a business day (the rates reported in *The Wall Street Journal* or elsewhere are usually for large inter-bank transactions);

- currency exchange rates offered by other dealers, or shown at other sources (including online sources) may be different from our rates; and

- currency exchange rates can be highly volatile and may change frequently during a day.

You assume all risks relating to or arising from fluctuations in the exchange rates between currencies.

### Wires Sent to a Foreign Currency Account

When you send a wire denominated in United States dollars to an account denominated in a foreign currency, an intermediary bank or the receiving bank may convert your wire into the applicable foreign currency and we may receive compensation in connection with any such conversion. When this occurs, the intermediary bank or the receiving bank determines in their discretion the currency exchange rate. We are not responsible for the exchange rate set by an intermediary bank or the receiving bank.

### You May Not Write Foreign Currency Checks

You may not write checks or give other withdrawal orders on your account, which order payment in a foreign currency. If we receive such a check or order, we may refuse to accept or process it without any liability to you.

### Processing and Collecting Foreign Items

We may refuse to accept a foreign item for deposit or collection. If we accept a foreign item for deposit or collection, you assume all risks relating to or arising from: the collection process, a late return and changes in currency exchange rates.

If we accept a foreign item for deposit or collection, we may decide not to credit the value of the foreign item to your account until we receive the proceeds in cleared funds from the paying bank. However, if we do credit your account, the credit is provisional and we may reverse the credit at any time.

If we accept an item for deposit which we later determine to be a foreign item, we may decide that the item needs to be sent for collection. If so, we may reverse any credit given for the item and mail the foreign item to you at the address we have for your account statement. You may ask us to send the item for collection.

When we send a foreign item for collection, you understand that the foreign item is sent solely for you and at your risk and that we are not liable for any event in the collection process which is beyond our control. As examples, we are not liable for a default by any bank or agent involved in the collection process or for the loss of the foreign item in transit. We may send the foreign item through a correspondent bank or directly to the paying bank. We may deduct our fees and the fees and charges assessed by the paying bank and any agents involved in the collection process from any amount collected or from your account.

If you request, we will try to determine the status of a collection. You agree to pay all fees and charges related to such a request. We may refuse your request if less than 30 business days have passed since we first processed the collection.

If a foreign item is returned to us unpaid for any reason at any time or is initially paid but then subsequently returned unpaid, we may charge your account for the foreign item and mail the foreign item to you at the address we have for your account statement. Even though the item is returned unpaid, we may charge you for our collection fees and for fees and charges assessed by the paying bank and any agents involved in the collection process.

When we credit your account for a foreign item, we use our applicable currency exchange rate on the day we credit the item to determine the amount of the credit. When we reverse a credit for a foreign item, we use our applicable currency exchange rate on the day we reverse the credit to determine the amount of the debit. Currency exchange rates are highly volatile and our rate on the day of the credit is likely to be different (sometimes very different) than our rate on the day of the debit. You understand and agree that this may result in a currency exchange loss to you.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 64 of 76

# Other Terms and Services

## Account Changes

You must notify us of any change to your name or address. If you do not provide notice of change of address, we may send notices, statements and other correspondence to you at the address maintained on our records for your account and you agree to indemnify us and hold us harmless for doing so.

You agree to notify us in writing of any change in ownership or authorized signers of your account or if an owner or authorized signer on the account dies or is adjudicated incompetent.

If there is more than one owner and/or authorized signer on the account, any one account holder or authorized signer may request the account be closed without consent of any other account holder or authorized signer. Further, any one account holder may request, and we may, at our option, permit removal of any account holder or authorized signer without consent of any other account holder or authorized signer on the account.

You acknowledge that we may, but need not, require a new signature card to be completed before any change in ownership or authorized signers becomes effective and each time you open a new account, we may require a Taxpayer Identification Number certification(s). You also acknowledge that we may require you to close your account in the event of any change in ownership or change in the authorized signers.

After we receive notice of a change and all documents we require regarding the change, we may take a reasonable period of time to act on and implement the change to your account.

## Automatic Transfer Service

You may have funds transferred automatically from most Bank of America checking or savings accounts to another Bank of America checking or savings account or to pay a Bank of America loan or credit card account or safe deposit rental fee.

Federal regulation and this Agreement place limits on the number of automated transfers you may make from savings accounts each month. Please see *"Limits on Withdrawals and Transfers from Savings Accounts"*. Certain other restrictions apply.

You must schedule transfers to pay a Bank of America loan for the due date each month. In most other cases, you may schedule transfers periodically on the dates and for the amounts that you specify. Transfers can only be made on a business day. If a scheduled transfer date falls on a weekend or bank holiday, we may make the transfer on the next business day. If we are unable to complete a transfer because you do not have enough available funds in your account, we may cancel this service.

## Check and Deposit Slip Forms

We offer checks, withdrawal forms and deposit slips in a number of styles and at various prices. We recommend that you use checks and other forms that we provide.

You are responsible for verifying the accuracy of all information on your checks and other forms, whether obtained through others or us. Our liability, if any, for any printing errors on checks or other forms obtained through us is limited to the cost of replacing the forms. We are not liable for any claims, costs, losses or damages you may incur when you use checks or other forms not obtained through us. Check deposits with a retired routing number will be returned unpaid.

We may refuse to accept checks or other forms that you create or someone else provides that do not meet our then current specifications, even if they met our specifications at the time they were initially drawn. You may obtain a copy of our printing specifications by calling the telephone number on your statement or asking your account representative. These specifications include

the magnetically encoded numbers, the size of the check and the weight, color and type of paper. If you create or obtain checks or other forms from someone else and our automated check processing systems are unable to read or process them, we may refuse to accept them and we may charge you a fee for each check or other item that we are unable to read or process through our automated systems.

## Check Copies

We generally keep a copy of each check we post to your account for seven years from the date the check posts to your account. We have no obligation to retain the original check. We typically keep the copies on microfilm or as a digital image. If a copy is unavailable or of poor quality, we are not liable to you for any claim, cost, loss or damage of any kind. After seven years, we may destroy the copies.

**Requesting Copies** You may request a copy of a canceled check by calling us at the number for customer service on your statement. To produce a copy, we need the account number, check number, exact amount of the check, and date the check was paid. This information is on your statement. Generally, we mail or make a copy available within seven business days. If we need more time, we will tell you. A fee may apply to each check copy. Please see the *Schedule of Fees* for your account.

If a check that you wrote was converted to an electronic debit, then the check was not sent to us for processing so we do not have a copy. We list these electronic debits on your account statement.

## Compliance

You agree to comply with applicable laws and regulations. You may not use your account or related services for any illegal transactions or activity, for example those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5381 et. seq. You agree to indemnify us from every action, proceeding, claim, loss, cost and expense (including attorney's fees) suffered or incurred by us due to any U.S. or foreign government entity seizing, freezing or otherwise asserting or causing us to assert control over any account or funds in an account of yours (or ours) when purportedly caused by, or arising out of, your action or inaction. This will apply whether or not such action is ultimately determined to be authorized under the laws of the U.S. or its territories, or of any foreign jurisdiction. We are not required to inquire or determine the authority of any action taken by the U.S. or foreign government entity prior to acceding to any legal process initiated by it.

Please note that your agreement to comply with applicable laws and regulations includes United States economic sanctions laws and regulations, including regulations issued by the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury, and Executive Orders issued by the President of the United States.

## Conflicting Demands and Disputes

We are not required to make payment from an account to a signer, a payee, a beneficiary of a trust account or Payable-on-Death (POD) account, or to any other person claiming an interest in any funds in the account:

- If we have actual knowledge of, or otherwise believe in good faith that there may be a bona fide dispute between the signers, beneficiaries, payees, or other persons concerning their rights to the account proceeds or
- If we are otherwise uncertain as to who is entitled to the account funds.

We may notify all signers, beneficiaries, payees, and other persons claiming an interest in the account of the dispute or uncertainty without liability to you.

We also may, at our option and without liability to you, take one or more of these actions:

- continue to rely on current signature cards and other account documents;
- honor the competing claim upon receipt of evidence we deem satisfactory to justify such claim;
- freeze all or part of the funds until the dispute is resolved to our satisfaction;
- close the account and distribute the account balance, subject to any bank claims, to each claimant payable jointly, or payable individually in equal shares to each claimant;
- pay the funds into an appropriate court for resolution; or
- refuse to disburse any funds in the account to any person until such time as: all persons claiming an interest in the account consent in writing to a resolution of the dispute; or a court of proper jurisdiction authorizes or directs the payment; or the person with a conflicting claim withdraws his or her claim in writing.

You are liable for all expenses and fees we incur, including attorneys' fees, and we may charge them to your account.

## Converting an Account

We may convert your account to another type of account, revoke privileges or close your account:

- if you make frequent transactions on a savings account;
- if your account frequently has debits against uncollected funds;
- if your account has excessive deposit activity;
- if you use a personal account for business purposes; or
- when we consider it appropriate or necessary to do so.

If we discontinue your type of account, we may convert your account to another type of account. We may also convert your account to another type of account based on our evaluation of how you use the account. If we convert your account, we will send you information about your new account.

## Cutoff Time for Receipt of Orders

Our cutoff time for receipt at a financial center of an order relating to your account is 10:00 a.m. local time or, if later, one hour after the financial center opens each business day. Orders include a stop payment order or postdating order, restraining order, writ of attachment or execution, levy, garnishment and any similar order.

The cutoff time relates to our obligation to pay or return checks and other items. If we receive an order before this cutoff time, we may review items presented for payment against your account on the previous business day to determine whether we need to return any of them to comply with the order. If we receive the order after the cutoff time, we may not review items presented on the previous business day.

For example, if you give us a stop payment order after our cutoff time and the item you want to stop was previously presented for payment or otherwise before we have the opportunity to act on your order, your order comes too late to stop payment on the item. Or, if we receive a levy before the cutoff time and you do not have enough funds in your account to cover both the levy and all items presented against your account the previous business day, we may return one or more items and apply the funds to the levy.

## Death or Incompetence

You agree to notify us promptly if any owner or authorized signer on your account dies or is declared incompetent by a court. Until we receive a notice of death or incompetency, we may act with respect to any account or service as if all owners, signers or other persons are alive and competent and we will not be liable for any actions or inactions taken on that basis.

If you give us instructions regarding your account, and you or another owner of the account subsequently dies or is declared incompetent, we may act on the instructions unless we receive written notice of death or incompetency prior to honoring such instructions.

When we receive a notice that an owner has died or been declared incompetent, we may place a hold on your account and refuse to accept deposits or permit withdrawals. We may hold any funds in your account until we know the identity of the successor.

If a deposit — including salary, pension, Social Security and Supplemental Security Income (SSI) — payable to the deceased owner is credited to the account after the date the deceased owner died, we may debit the account for the deposit and return it to the payer.

We may accept and comply with court orders, and take direction from court appointed personal representatives, guardians, or conservators from states other than where your account was opened or where the account, property or records are held. We reserve the right to require U.S. court documents for customers who reside outside of the U.S. at time of incompetence or death.

## Facsimile Signature

A facsimile signature can be a convenient method for signing or endorsing documents and other items. If you use a facsimile signature, you are responsible for any withdrawal from your account that bears or appears to us to bear a facsimile signature that resembles or purports to be the signature of a person authorized to withdraw funds. We will not be liable to you if use of the facsimile device (or similar device utilized to affix your signature) was unauthorized. You are responsible even if the size, or color of the facsimile signature is different from that of any signature previously presented to us. We may pay the withdrawal and may charge your account for it. You agree to reimburse us (and we may charge your account) for all claims, costs, losses and damages, including attorneys' fees, that result from our payment of a withdrawal bearing either a facsimile that resembles or purports to bear your signature or a facsimile that we believe you authorized.

## Deposit Bank Assessment

For some business accounts, Bank of America may, at our discretion, charge you a Deposit Bank Assessment on your average positive ledger balances. The assessment rate is variable and we may change it at any time without notice.

## Fingerprint

If a person to whom you gave your check asks us to cash the check, we may require them to place their fingerprint on the check. If they refuse to provide their fingerprint, we may refuse to cash the check. We have no liability to you for refusing to cash the check.

## "Freezing" Your Account

If we decide to close your account, we may freeze it. If we do this, we may in our discretion either accept or return deposits, checks and other items that we receive after we freeze your account without being liable to you.

If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent or illegal activity, we may, in our discretion, freeze the funds in the account and in other accounts

you maintain with us, without any liability to you, until such time as we are able to complete our investigation of the account and transactions. If we do freeze your account funds, we will provide notice to you as soon as reasonably possible. Notice may be made by mail or verbally or provided by other means such as via Online Banking or text alerts as permitted by law or by updated balance information. We may provide this notice to you prior to freezing the account if we believe that such notice could result in a security risk to us or to the owner of the funds in the account.

## Indemnification and Limitation of Liability

You agree to reimburse us for all claims, costs, losses and damages (including fees paid for collection) we may incur with respect to overdrafts or returned deposits in connection with your account.

We are not liable to you for errors that do not result in a financial loss to you. We may take any action authorized or permitted by this Agreement without being liable to you, even if such action causes you to incur fees, expenses or damages.

We are not liable to you for any claim, cost, loss or damage caused by an event that is beyond our reasonable control. In particular, we are not liable to you if circumstances beyond our reasonable control prevent us from, or delay us in, performing our obligations for a service, including acting on a payment order, crediting a funds transfer to your account, processing a transaction or crediting your account. Circumstances beyond our reasonable control include: a natural disaster; emergency conditions, such as: fire, theft or labor dispute; a legal constraint or governmental action or inaction; the breakdown or failure of our equipment for any reason, including a loss of electric power; the breakdown of any private or common carrier communication or transmission facilities, any time-sharing supplier or any mail or courier service; the potential violation of any guideline, rule or regulation of any government authority; suspension of payments by another bank; or your act, omission, negligence or fault.

Except as limited by applicable law, we are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind.

Our liability for a claim will be limited to the face value of an item or transaction improperly dishonored or paid or the actual value of any deposits not properly credited or withdrawals not properly debited.

You agree that the amount of any claim you have against us in connection with any account or transaction with us, whether brought as a warranty, negligence, wrongful dishonor or other action, is subject to reduction to the extent that: 1) negligence or failure to use reasonable care on your part, or on the part of any of your agents or employees, contributed to the loss which is the basis of your claim; and 2) damages could not be avoided by our use of ordinary care.

Any loss recovery you obtain from third parties on a particular claim will reduce the amount of any obligations we may have to you on that claim and you will immediately notify us of any such recovery. You agree to pursue all rights you may have under any insurance policy you maintain in connection with any loss and to provide us information regarding coverage. Our liability will be reduced by the amount of any insurance proceeds you receive or are entitled to receive in connection with the loss. If we reimburse you for a loss covered by insurance, you agree to assign us your rights under the insurance to the extent of your reimbursement.

## Legal Process – Subpoena and Levy

"Legal process" includes a writ of attachment, execution, garnishment, tax withholding order, levy, restraining order, subpoena, warrant, injunction, government agency request for information, search warrant, forfeiture or other similar order.

We may accept and comply with legal process: served in person, by mail, by facsimile transmission, or by other means; or served at locations other than the location where the account, property or records are held. You direct us not to contest the legal process. We may, but are not required to, send a notice to you of the legal process. We do not send a notice if we believe the law prohibits us from doing so.

We may hold and turn over funds or other property to the court or creditor as directed by the legal process, subject to our right of setoff and any security interest we have in the funds or other property. We do not pay interest on the funds during the period we hold them pursuant to legal process. If we hold or turn over funds, we may without any liability to you return checks and other items unpaid and refuse to permit withdrawals from your account. If the legal process applies to a time deposit account, we may charge the applicable early withdrawal penalty for funds taken from the time deposit.

We may charge your account a fee for each legal process. You agree to pay us for fees and expenses (including administrative expenses) that we incur in responding to any legal process related to your account, such as expenses for research and copying of documents. The fees and expenses may include attorneys' fees. We may deduct these fees and expenses from any of your accounts without prior notice to you.

If the legal process directs us to release information about one or more, but not all, accounts that are reported on a combined statement, we may release the entire combined statement, even though other accounts reported on the combined statement are not covered by the legal process. If the legal process requests information about one or more, but not all, account owners or signers, we may release information about all co-owners or signers on the account, even though some of the other co-owners or signers are not covered by the legal process.

We may produce documents held at, or provide access to property that is located in, any of our facilities or any facility operated by a third party on our behalf, even if the facility is not designated as the place to be searched in the legal process.

We have no liability to you if we accept and comply with legal process as provided in this section or by law.

## Multiple Signatures Not Required

We may act on the oral or written instructions of any one signer on the account. Each signer may make withdrawals, write checks, transfer funds, stop payments, obtain ancillary services (e.g., electronic fund transfer services or wire transfers), and otherwise give us instructions regarding your account. We may require written authorization for some actions.

We do not assume a duty to enforce multiple signature requirements that you may agree upon among yourselves. If you indicate on your checks or signature card or other account documents that more than one signature is required for withdrawal, this indication is for your own internal procedures and is not binding on us.

We may disregard any instructions to permit withdrawals only upon more than one signature with respect to checks, electronic fund transfer or other debit/withdrawal requests. We may pay out funds from your account if the check, item, or other withdrawal or transfer instruction is signed or approved by any one of the persons authorized to sign on the account. We are not liable to you if we do this.

## Notice of Withdrawal

Federal regulations require us to retain the right to require all savings and all NOW account depositors to give seven days' written notice before making a withdrawal. It is unlikely, however, that we would require this notice.

## Powers of Attorney/Appointment and Payment to Agents

You may decide to appoint someone to act for you as your agent or attorney-in-fact ("agent") under a power of attorney. Please note that the form must be satisfactory to us in our discretion and unless prohibited by law, we may refuse, with or without cause, to honor powers of attorney that you grant to others.

For our customers' convenience we have a banking power of attorney form, which is available at many of our financial centers. If your state has a statutory form power of attorney, we also generally accept that form. We may, however, accept any form that we believe was executed by you and act on instructions we receive under that form without any liability to you. You agree to reimburse us for all claims, costs, losses and damages that we incur in accepting and acting on any power of attorney form that we believe you executed.

We may pay any funds deposited in your account to your agent or upon the order of your agent. When we accept a power of attorney, we may continue to recognize the authority of your agent to act on your behalf without question until we receive written notice of revocation from you or notice of your death or incapacity and have had a reasonable time to act upon it. We will not be liable for action in accordance with the most current documentation if we have not received such notice.

We may require a separate form for each agent and for each account for which you want to grant power of attorney. We may require your agent to present the original form and refuse to act on a copy. In some cases, we may require that your agent confirm in an affidavit that the power has not been revoked or terminated or that you register the power with the appropriate recording authorities. We may restrict the types or sizes of transactions we permit your agent to conduct.

The authority of your agent to receive payments, transact on or otherwise make changes to your account generally terminates with your death or incapacity, unless the document creating such agency provides, in accordance with applicable law, that the agent's powers continue in spite of your incapacity.

## Records

We may in our discretion retain records in any form including, without limit, paper, film, fiche, digitalized or other electronic medium. If we are not able to produce the original or a copy of your signature card or any other document relating to your account or service, our records (including our electronic records) will be deemed conclusive. If there is a discrepancy between your records and our records, our records will be deemed conclusive.

## Right of Setoff

We may take or setoff funds in any or all of your accounts with us and with our affiliates for direct, indirect and acquired obligations that you owe us, regardless of the source of funds in an account. This provision does not apply to IRA or tax-qualified retirement accounts, to consumer credit card obligations or where otherwise prohibited by law. Your accounts include both accounts you own individually and accounts you own jointly with others. Our setoff rights are in addition to other rights we have under this Agreement to take or charge funds in your account for obligations you owe us.

If the law imposes conditions or limits on our ability to take or setoff funds in your accounts, to the extent that you may do so by contract, you waive those conditions and limits and you authorize us to apply funds in any or all of your accounts with us and with our affiliates to obligations you owe us.

We may use funds held in your joint accounts to repay obligations on which any account owner is liable, whether jointly with another or individually. We may use funds held in your individual accounts to repay your obligations to us, whether owed by you individually or jointly with another, including: obligations owed by you arising out of another joint account of which you are a joint owner, even if the obligations are not directly incurred by you; obligations on which you are secondarily liable; and any amounts for which we become liable to any governmental agency or department or any company as a result of recurring payments credited to any of your accounts after the death, legal incapacity or other termination of entitlement of the intended recipient of such funds. If you are a sole proprietor, we may charge any of your personal or business accounts.

If we take or setoff funds from a time deposit account, we may charge an early withdrawal penalty on the funds withdrawn.

We may take or setoff funds from your account before we pay checks or other items drawn on the account. We are not liable to you for dishonoring items where our action results in insufficient funds in your account to pay your checks and other items.

Some government payments may be protected from attachment, levy or other legal process under federal or state law. If such protections may apply, to the extent that you may do so by contract, you waive these protections and agree that we may take or setoff funds, including federal and state benefit payments, from your accounts to pay overdrafts, fees and other obligations you owe us.

This section does not limit or reduce our rights under applicable law to charge or setoff funds in your accounts with us for direct, indirect and acquired obligations you owe us.

## Sample of Your Signature

To determine the authenticity of your signature, we may refer to the signature card or to a check or other document upon which your signature appears. We may use an automated process to reproduce and retain your signature from a check upon which your signature appears.

If you create your own checks, or obtain them from someone else, and we cannot accurately verify your signature on a check by comparing it with a check that posted to your account, you are responsible for any losses that may result from our inability to use that check to verify your signature.

## Stop Payment Orders and Postdated Orders

**Acceptance of Stop Payment Orders** If we have not already paid a check or other item that is drawn on your account, then at your request and risk we may accept a stop payment order on it. If you request a stop payment on a check or other item in a financial center, we may require identification such as a Bank of America debit card with photo and a secondary form of identification. You may not stop payment on a point of sale transaction or an ATM withdrawal or transfer.

**Postdated Orders** If you write a postdated check (that is — you put a future date on the check), you may ask us not to pay the check before its date by giving us a stop payment order. Otherwise, we may pay it and deduct the amount from your account even if it is presented for payment before its date.

If we receive a postdated check that is subject to a stop payment order, we may return the check "payment stopped," "refer to maker," or with a similar designation.

**Placing A Stop Payment Order** We may accept a written or oral stop payment order from any person who has a right to withdraw funds from the account. We may require you to complete a form authorizing the order. You must give us sufficient notice and information so that we have a reasonable opportunity both to verify that the item is unpaid and to act on your request. We may charge you a fee for each stop payment order and each renewal of the order.

We use a computer system to identify items. Therefore, to place a stop payment order on a check or draft, we need specific information to process the request, such as the account number, the routing number, the name of the party to whom the item was made payable, the item number

and the exact amount of the item — in dollars and cents. If you give us the wrong amount (even one penny off) or the wrong item number, we may pay the item. We may also require the date of the item, the name of the person who signed or authorized the item, and the name of the party to whom the item was made payable. We may use only a portion of the required information to identify an item. Please see the *Additional Information about Stop Payments for Preauthorized (Recurring) Electronic Funds Transfers* section for information about how to stop those types of payments.

In some cases, we may pay an item even if an order is in effect. For example, if one of our financial centers, without notice of your request, pays a check that you have asked us to stop, we may still pay the check.

A stop payment order generally expires after six months. However, we may, in our sole discretion, elect to honor a stop payment order for a longer period of time without notice to you. If you want the order to continue after six months, you must ask us to renew the order. Each request for a renewal is treated as a new order. If you want the order to expire in less than six months, you must ask us to cancel the order on or after the date you want it to expire. We may accept a written or oral instruction to cancel the order. Your request to cancel the order is not effective until we have a reasonable opportunity to act on it. We cancel the order automatically when the account on which the item is drawn is closed. If the item is presented to us for payment after the stop payment order expires, we may pay the item.

If we pay an item subject to a valid and timely stop payment order, we may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment. Our liability, if any, is limited to the actual loss suffered, up to the amount of the item. You must prove the loss to our satisfaction. We are not liable to you for any special, incidental or consequential loss or damage of any kind.

*Additional Information about Stop Payments for Preauthorized (Recurring) Electronic Funds Transfers* If you have told us in advance to make regular payments out of your account (such as recurring debit transactions) or if you have authorized someone else to debit your account through the ACH system, you can stop these payments.

Here's how: Call us at 1.800.432.1000 or write us at Bank of America Customer Service, P.O. Box 25118, Tampa, FL 33622.

You must notify us in time to receive your request at least three business days before the payment order is scheduled to be made. If you call us to stop the payment, we may require you to confirm the request in writing. If you do not notify us in writing, we may remove the stop payment after 14 days. We may charge you a fee for each stop payment order you give.

Stop payment orders for preauthorized (recurring) payments do not expire without action on your part, including recurring debit card and ACH transactions. Should your debit card number change, please contact us to place a new stop payment on the transaction on your new card.

To place a stop payment order on an ACH debit, we may require you to provide your name and telephone number, the type of account (checking or savings), and the exact company name used by the sender of the ACH debit, and some of the other information listed under *Placing a Stop Payment Order*. You can obtain the company name used by your sender from your statement by looking at a prior ACH debit from this sender that posted to your account.

If you do not know the amount of the ACH debit, we may still be able to place the stop payment order based on the company name of the sender, but this may stop all ACH items from this sender. If you give us the wrong company name or if the sender changes the company name, we may pay the item.

To place a stop payment on other preauthorized (recurring) transactions, you must give us the identifying information we request. You may be able to give us a specific expiration date for certain stop payment orders if you choose to do so.

You must notify the payee that you have withdrawn your authorization for any preauthorized (recurring) transaction.

*Notice of Varying Amounts* If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. You may choose instead to receive this type of notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

*Liability for Failure to Stop Payment* If you order us to stop a preauthorized payment three business days or more before the transfer is scheduled, and you have given us all of the information we requested, and we do not stop the payment, we will be liable for your losses or damages directly caused by our failure to stop the payment.

## Subaccounts

For regulatory accounting purposes, we may classify checking accounts as two subaccounts: a checking subaccount and a savings subaccount. For interest bearing checking accounts, we calculate and pay interest at the same rate and in the same way on both subaccounts. For non-interest bearing checking accounts, we do not pay interest on either subaccount. We may transfer funds between these subaccounts. We record the subaccounts and any transfers between them on our internal accounting records only. Otherwise, the subaccounts are subject to the same terms as the checking and savings accounts described in this Agreement.

## Unclaimed Property – Accounts Presumed Abandoned or Inactive

State and federal law and our policy govern when accounts are considered abandoned. The applicable state law is generally the state listed in the address for your account statement.

Your account is usually considered abandoned if you have not performed at least one of the following activities for the period of time specified in the applicable state's unclaimed property law: made a deposit or withdrawal, written to us about the account, or otherwise shown an interest in the account, such as asking us to keep the account active. You usually need to perform the activity. Therefore, bank charges and interest payments, and automatic deposits and withdrawals, are usually not considered activity.

We are required by the unclaimed property laws to turn over accounts considered abandoned to the applicable state. Before we turn over an abandoned account, we may send a notice to the address we currently show for the account statement. We may not send this notice if mail we previously sent to this address was returned. Unless prohibited by the applicable state law, we may charge to the account our costs and expenses of any notice, advertisement, payment and delivery of the account to the applicable state agency.

After we turn the funds over to the state, we have no further liability to you for the funds and you must apply to the appropriate state agency to reclaim your funds.

If we consider your account inactive, then (unless prohibited by federal law or the law of the state where we maintain your account) we may:

- charge dormant account fees on the account in addition to regular monthly maintenance and other fees,
- stop sending statements,

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 69 of 76

- If the account received interest, stop paying interest on the account; and
- refuse to pay items drawn on or payable out of the account.

If you re-establish contact with us, we do not have to reimburse you for these fees and we are not liable to you for any interest that would otherwise have accrued on your account.

## Verification of Transactions and Right to Reverse Transactions

Transactions, including those for which we provide a receipt, may be subject to subsequent verification and correction, though we reserve the right not to do so in every case. We do not verify a deposit at the teller window so the receipt that you receive at the time of your deposit is not evidence that your deposit has been verified. We may reverse or otherwise adjust any transaction (both credit and debit) that we believe we erroneously made to your account at any time without prior notice to you, if we opt to do so.

## Waiver, Severability, and Change of Law by Agreement

Waiver We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. No delay in enforcing our rights will affect your obligation to pay us fees and other amounts you owe us under this Agreement. If we waive a provision of this Agreement, the waiver applies only in the specific instance in which we decide to waive the provision and not to future situations or other provisions regardless of how similar they may be.

Severability A determination that any part of this Agreement is invalid or unenforceable will not affect the remainder of this Agreement.

Change of Law by Agreement If any part of this Agreement is inconsistent with any applicable law, then to the extent the law can be amended or waived by contract, you and we agree that this Agreement governs and that the law is amended or waived by this Agreement.

# Electronic Banking Services

We offer a variety of electronic banking services for use with your deposit accounts. We describe some in this section and also provide certain disclosures that apply to use of an electronic banking service with personal deposit accounts. We provide separate agreements to you that govern the terms of some services, including separate agreements for ATM and debit cards and Online and Mobile Banking services. Please review the following provisions and the separate agreement for the service.

## Types of Electronic Banking Services

### ATM and Debit Cards

We may issue you an ATM or debit card (either is called a "card") and a personal identification number (PIN) when you open your account. The terms that govern this service are in a separate agreement that you receive with your card. Please review that agreement carefully.

There are daily dollar limits for withdrawals and purchases. We provide your card limits to you as part of the separate agreement for card services. We may occasionally decide not to issue a card or code to a customer. We may suspend or terminate a card or code at any time without cause or notice.

The following information is a summary of how you can use your card. Some of these uses may not be available with every card or at every ATM or other terminal.

At ATMs You can use your card with linked accounts at participating ATMs to withdraw cash, transfer funds, and find out balances. At most ATMs that are prominently branded with the Bank of America name and logo, you can also use your card and PIN with linked accounts to make deposits and make payments to qualifying Bank of America credit cards and loans.

At participating merchants You can use your card with linked accounts to purchase goods and services. Some merchants may also permit you to withdraw cash from your checking account while making a purchase.

At participating financial institutions You can use your card with linked accounts at participating financial institutions to obtain a cash withdrawal from a teller.

Payments, Credits, and Transfers You can send or receive electronic transfers from or to your accounts. We may do this by ACH (as a member of a national or local automated clearinghouse association) or other similar networks. Electronic transfers may take various forms, such as:

- Automatic electronic deposits to your account, such as payroll or benefits payments;
- Automatic one-time or repeating charges to your account for bill payments, sent by a merchant or other payee with your authorization. The merchant or payee may ask you for bank number and account information from your check or a canceled check to create these orders; and
- A "check conversion" transfer, where a merchant or other payee uses a check that you have written to create an electronic transfer from your account. The merchant may either keep the check you wrote or return it to you.

Online and Mobile Banking Online and Mobile Banking services are governed by a separate agreement. You receive the agreement for the service at the time you enroll. You can use these services with linked accounts to view your account information, make deposits, transfer funds between your accounts and to the accounts of others, pay qualifying loans or credit cards, and make payments from your account to third parties. You can enroll for these services on our website bankofamerica.com.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 70 of 76

**Telephone Banking** You may use our automated customer service system with an Access ID or speak to a telephone banker to get your account information, transfer funds between your accounts with us, and pay qualifying loans or credit cards.

## Access ID

An Access ID is a numeric code which, when used with a separate PIN number or passcode (plus, in some circumstances, another piece of identifying information called a "verbal verification code"), enables consumer and small business customers to do the following through our automated telephone system or in person at a financial center:

- obtain information about deposit and credit accounts that are linked to the Access ID
- transfer funds and make payments between linked accounts, and
- obtain other services such as stop payments, check reorders, and copies of checks and statements

You may request an Access ID and related security codes by calling customer service or at any financial center. Please note that Access IDs may not be available to customers in all states. In some states, individual account numbers, combined with additional security codes, may be required to obtain account information and transact other business.

Two activity levels are available for most accounts linked to your Access ID:

(1) Inquiry: Allows you to obtain account balances and transaction information.
(2) Financial: Allows you to obtain account information, transfer funds among accounts linked to the Access ID, and obtain certain other banking services.

When you first choose your Access ID, and when you subsequently open any new accounts, we will link all your Bank of America accounts that are eligible, and assign the financial activity level to all accounts for which that activity level is available, unless you tell us otherwise. We may establish certain limits on the accounts that can be linked to your Access ID and that can have the financial activity level.

If you permit another person to use your Access ID or account number(s) and related code(s), you are responsible for all transactions conducted by that person (even if he or she exceeds your authorization), until you notify us that the person is no longer authorized so that we may block the codes and issue new ones.

You must review your periodic statements and promptly report to us any unauthorized funds transfers initiated through the use of your security codes or otherwise. You must also promptly notify us of any suspected loss or theft of your security codes. Failure to take these actions may affect the extent of your liability for any unauthorized transfers under federal banking regulations or other applicable laws.

**Small Business Access IDs** If you are a small business customer, to uniquely identify each person who initiates a request for banking services, you should establish a separate Access ID and related security codes for each person who you determine needs access to your accounts. Your authorization (whether express or implied) for any individual to establish an Access ID shall constitute your authorization for the bank to provide account information to such individual and (unless inquiry only access is selected) to transfer funds and conduct other banking transactions upon that person's request. Such authorization supersedes any resolution, signature card or other document filed with the bank that purports to limit authority over any of your accounts, whether currently on file or submitted or modified in the future, unless the Access ID authorization is expressly modified or revoked.

## Electronic Banking Disclosures

**Personal deposit accounts** Our *Personal Schedule of Fees* describes our personal deposit accounts. This *Electronic Banking Disclosures* section explains provisions that apply to electronic fund transfers to or from personal deposit accounts (sometimes referred to as "consumer deposit accounts"). These Transfers are governed by Regulation E, which implements the federal Electronic Fund Transfer Act. A personal deposit account is an account that is owned by a natural person and that is established primarily for personal, family, or household purposes.

**Business deposit accounts** Our *Business Schedule of Fees* describes our business deposit accounts. Business deposit accounts are accounts that are established primarily for business purposes. When you open one of our business deposit accounts, you represent and agree to that you are establishing it primarily for business purposes. Provisions below that explain a consumer's liability for unauthorized transfers do not apply to business deposit accounts, although as a matter of practice we generally follow the error resolution procedures described in this *Electronic Banking Disclosures* section for business-purpose accounts. Please note that we are not required to follow these procedures for business accounts and that we may change our practice at any time without notice.

**Consumer's Liability for Unauthorized Transfers**

Tell us AT ONCE if you believe your card or your personal identification number (PIN) or other code has been lost or stolen. Also, tell us AT ONCE if you believe that an electronic fund transfer has been made without your permission using information from your check. The best way to keep your possible losses down is to call us immediately.

Your losses could include all of the money in your account plus, if you have an overdraft protection plan linked to your account, any transfers from another account or any advances on a credit line.

If you tell us within two business days after you learn of the loss or theft of your card or code, you can lose no more than $50 if someone uses your card without your permission.

If you do NOT tell us within two business days after you learn of the loss or theft of your card or code, and we can prove we could have stopped someone from using your card or code without your permission if you had told us, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us in writing within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

*Note: These liability rules are established by Regulation E, which does not apply to business deposit accounts. For personal deposit accounts, our liability policy regarding unauthorized debit card or ATM card transactions, and unauthorized Online Banking transactions may give you more protection, provided you report the transactions promptly. Please see the agreement you receive with your ATM or debit card and the Online Banking agreement.*

You should never write your PIN on your card or carry the PIN with you. This reduces the possibility of someone using your card without your permission if it is lost or stolen.

If you give, or make reasonably available, your card, PIN or other access device or code to anyone, you may be liable for any use made of such until you advise us that such person is not authorized to use them.

Also, the state law applicable to your account may give you more time to report an unauthorized transaction or may give you more protection. For example, in Massachusetts, the two day and 60 day time limits for reporting unauthorized transactions do not apply and the $500 limit does not apply.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 71 of 76

## Contact in Event of Unauthorized Transfer; and Lost or Stolen Card, PIN or Other Code

If you believe your card, PIN or other code is lost or stolen, or learned by an unauthorized person, or that someone has transferred or may transfer money from your account without your permission, notify us immediately by calling the number listed below.

*Telephone: 1.800.432.1000*

You can also write to us at: Bank of America, P.O. Box 53137, #7405, Phoenix, AZ 85072-3137

You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

If unauthorized activity occurs, you agree to cooperate during the investigation and to complete a Lost/Stolen Card and Fraud Claims Report or similar affidavit.

**Business Days** For purposes of these electronic banking disclosures, our business days are Monday through Friday. Weekends and bank holidays are not included.

### Documentation of Transfers

*Receipts* You can usually get a receipt at the time you make any transfer to or from your account at an ATM or point of sale terminal. You may not get a receipt for small dollar transactions. Transactions may be verified by us though we reserve the right not to do so in every case, so the receipt is not final and our records will control if there is a conflict.

*Preauthorized Credits* If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at 1.800.432.1000 to find out whether or not the deposit has been made.

*Periodic Statements* We send you a monthly account statement unless there are no electronic fund transfers in a particular month. In any case, we send you a statement at least quarterly unless we consider your account inactive.

### Preauthorized Payments

Please see the *Additional Information about Stop Payments for Preauthorized (Recurring) Electronic Funds Transfer* section in the *Stop Payment Orders and Postdated Orders* section of the Agreement.

### Liability for Failure to Make Transfers

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

- If, through no fault of ours, you do not have enough money in your account to make the transfer.
- If the transfer would go over the credit limit on your overdraft line.
- If the ATM where you are making the transfer does not have enough cash.
- If the ATM, terminal or system was not working properly and you knew about the breakdown when you started the transfer.
- If circumstances beyond our control (such as power outages, equipment failures, fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
- If the funds are subject to legal process or other encumbrance restricting the transfer.
- If we consider your account to be inactive or dormant.
- If your card or code has been revoked due to inactivity or at our discretion.

There may be other exceptions stated in our agreement with you or permitted by law.

**Confidentiality - Account Information Disclosure** We will disclose information to third parties about your account or transfers you make as stated in the *Information about You and Your Account* section near the front of this Agreement.

### Fees

*ATM Fees* When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer. We may also charge you fees.

*Other Fees* For other fees that apply to electronic banking services, please review the *Schedule of Fees* for your account and each agreement or disclosure that we provide to you for the specific electronic banking service, including the separate agreement for Online and Mobile Banking services and the separate agreement for ATM and debit cards.

**In Case of Errors or Questions about your Electronic Transfers You May Sign into Online Banking to Report the Error Promptly, or Call** or write us at the telephone number or address below, as soon as you can, if you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt.

Call us at 1.800.432.1000 during normal Claims Department business hours or write us at Bank of America, P. O. Box 53137, #7405, Phoenix, AZ 85072-3137.

We must hear from you NO LATER than 60 days after we sent you the FIRST statement on which the error or problem appeared. Please provide us with the following:

- Tell us your name and account number;
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information;
- Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point of sale, or foreign-initiated transactions, we may take up to 90 days (instead of 45) to investigate your complaint or question. For new accounts we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within 3 business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

*Notice:* As part of the security system to help protect your card and PIN, we may use hidden cameras and other security devices to determine who is using a card at an ATM. You consent to this.

*Additional Information for Massachusetts customers:* Any documentation provided to you which indicates that an electronic fund transfer was made shall be admissible as evidence of the transfer and shall constitute prima facie proof that the transfer was made. And the initiation by you of certain electronic fund transfers from your account will effectively eliminate your ability to stop payment of the transfer. UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT, YOU MAY NOT STOP PAYMENT OF ELECTRONIC FUND TRANSFERS. THEREFORE, YOU SHOULD NOT EMPLOY ELECTRONIC ACCESS FOR PURCHASES OR SERVICES UNLESS YOU ARE SATISFIED THAT YOU WILL NOT NEED TO STOP PAYMENT.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 72 of 76

# ATM Safety Tips

The suggestions that follow offer some simple tips on protecting your card and PIN and exercising care when using an ATM.

## Protect Your ATM Card and Personal Identification Number (PIN)

- Always protect your card by keeping it in a safe place. If your card is lost or stolen, contact us immediately.
- Memorize your PIN. Do not write it on your card, keep it in your wallet or give it to anyone.
- If you choose your own PIN, avoid using numbers for your PIN that are easily identifiable (such as birth dates, telephone numbers, addresses, etc.)
- Never give information about your card or PIN over the telephone, email or the Internet, unless to a trusted merchant in a call or transaction initiated by you. If someone is asking for this information, refuse and immediately contact us.
- Carefully review your account statements and report any fraudulent transactions immediately.

## Be Aware of Your Surroundings at ATMs

- Be aware of people and your surroundings before, during and after you use an ATM, particularly at night. If you think it is unsafe, leave immediately and visit another ATM.
- If you must visit an ATM at night, take someone with you.
- When using an ATM with a door that requires card access, close the door completely upon entering and exiting and do not open the door to anyone you don't know.
- When you use a drive-up ATM, keep your engine running, doors locked and only the driver's window open during the transaction.
- The activity around Bank of America ATMs may be monitored or recorded by surveillance cameras.

## Protect Your Privacy

- Shield the key pad with your hand or body while entering your PIN at an ATM.
- Put your card and receipt away immediately after completing your transaction. Do not count your cash at the ATM.
- Do not leave your transaction record at the ATM. Keep your transaction record in a safe place, so you can compare it to your statement.

## Request Emergency Assistance

- If you need emergency assistance, call 911 from the nearest telephone. If you have a complaint about the security of a Bank of America ATM, call our Corporate Security Department at 1.800.222.7511.
- Report all crimes immediately to law enforcement. If you think you're being followed from an ATM, go to a busy area and immediately contact the police.

# Funds Transfer Services

The following provisions apply to funds transfers you send or receive through us, but do not apply to electronic fund transfers governed by Regulation E, Subpart A of the Consumer Financial Protection Bureau. We provide separate agreements to you that govern the terms of some funds transfer services, including separate agreements for Online and Mobile Banking, telephone transfers, and funds transfers in the financial centers. If you have a specific agreement with us for these services, these provisions supplement that agreement to the extent these provisions are not inconsistent with the specific agreement.

The Uniform Commercial Code includes provisions relating to funds transfers. These provisions define the following terms: funds transfer, payment order and beneficiary. These terms are used here as they are defined in Article 4A of the Uniform Commercial Code – Funds Transfers as adopted by the state whose law applies to the account for which the funds transfer service is provided. In general: A funds transfer is the process of carrying out payment orders that lead to paying a beneficiary. The payment order is the set of instructions given to us to transfer funds. The beneficiary is the person or business who receives the payment.

In addition, funds transfers sent outside of the United States that are initiated by consumers primarily for personal, family or household purposes are governed by federal law (Remittance Transfers) (see below). Effective as of the date set forth in the final rules implementing EFTA (defined below), federal law may provide rights with respect to Remittance Transfers that may vary in certain ways from the terms and conditions set forth herein. Your rights with respect to Remittance Transfers, including disclosure, error resolution and cancellation rights, will be explained to you contemporaneously with each Remittance Transfer transaction you initiate, either orally or in writing.

In general, your and our rights and obligations under this Agreement are governed by and interpreted according to federal law and the law of the state where your account is located. However, Remittance Transfers shall be governed by federal law and, as applicable, the law of the State of New York. Funds transfers to your account or funded from your account or otherwise funded by you may involve one or more funds transfer systems, including, without limitation, Fedwire or Clearing House Interbank Payments System (CHIPS). Accordingly, notwithstanding any choice of law that may be provided elsewhere in this agreement, such transfers will be governed by the rules of any funds transfer system through which the transfers are made, as amended from time to time, including, without limitation, Fedwire, the National Automated Clearing House Association, any regional association (each an "ACH"), and CHIPS. Funds transfers through Fedwire will be governed by, and subject to, Regulation J, Subpart B, and Uniform Commercial Code Article 4A incorporated by reference thereunder. Funds transfers through CHIPS are governed by, and subject to, CHIPS Rules and Administrative Procedures and by the laws of the State of New York, including Article 4A of the New York Uniform Commercial Code, regardless of whether the payment message is part of a transfer that is a Remittance Transfer, except that in the case of an inconsistency between New York law and EFTA, EFTA shall govern.

We may charge fees for sending or receiving a funds transfer. We may deduct our fees from your account or from the amount of the transfer. Other financial institutions involved in the funds transfer may also charge fees. For current fees, call us at the number for customer service on your statement or ask a financial center associate.

## Remittance Transfers

The Bank may execute certain payment orders for you known as Remittance Transfers. A Remittance Transfer is a wire transfer initiated by a consumer primarily for personal, family or household purposes to a designated recipient in a foreign country. Effective as of the date set forth in the final rules implementing EFTA (defined below), federal law may provide certain rights

and obligations related to Remittance Transfers that may differ from rights and obligations that apply to other types of payment orders, including disclosure, cancellation and error resolution rights. To the extent the provisions of this Agreement are inconsistent with the oral or written disclosures provided to you for a Remittance Transfer governed by section 919 of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. section 1693o-1, the terms of the disclosures provided at the time of the Remittance Transfer shall govern. Notwithstanding anything to the contrary contained herein, rights and obligations that apply to Remittance Transfers are as set forth in EFTA and, as applicable, as set forth in New York law.

## Sending Funds Transfers

You may subscribe to certain services we offer or you may give us other instructions to pay money or have another bank pay money to a beneficiary. This *Sending Funds Transfers* section applies to wire transfers and transfers we make between Bank of America accounts. It does not apply to automated clearing house (ACH) system funds transfer services.

You may give us payment orders for ACH system funds transfers only if you have a separate agreement with us for those services.

**Cutoff Times for Payment Orders** We have cutoff times for processing payment orders. Cutoff times vary depending on the particular office of our bank and the type of payment order. We may treat payment orders we receive after a cutoff time as if received the next business day. We tell you our cutoff times upon request.

**Amending or Canceling Payment Orders** You may not amend or cancel a payment order after we receive it. If you ask us to do this, we may make a reasonable effort to act on your request. But we are not liable to you if, for any reason, a payment order is not amended or canceled. You agree to reimburse us for any costs, losses or damages that we incur in connection with your request to amend or cancel a payment order.

**Inconsistency of Name or Number** The beneficiary's bank may make payment to the beneficiary based solely on the account or other identifying number, even if the name on the payment order differs from the name on the account. We or an intermediary bank may send a payment order to an intermediary bank or beneficiary's bank based solely on the bank identifying number, even if the payment order indicates a different bank name.

**Sending Payment Orders** We may select any intermediary bank, funds transfer system or means of transmittal to send your payment orders. Our selection may differ from that indicated in your instructions.

**Notice of Rejection** We may reject payment orders. We notify you of any rejection orally, electronically or in writing. If we send written notices by mail, we do so by the end of the next business day.

We are not liable to you for the rejection or obligated to pay you interest for the period before you receive timely notice of rejection.

**Errors or Questions About Your Payment Orders** We notify you about certain funds transfers by listing them on your account statement. In some cases, we also may notify you electronically, in writing or by a report produced through one of our information reporting services.

You must notify us at once if you think a funds transfer shown on your statement or notice is incorrect. You must send us written notice, including a statement of relevant facts, no later than 14 days after the date you receive the first notice or statement on which the problem or error appears.

If you fail to notify us within this 14-day period, we are not liable for any loss of interest because of an unauthorized or erroneous debit or because your statement or notice is incorrect. We are not

required to compensate you, and we are not required to credit or adjust your account for any loss of interest or interest equivalent.

**Calculations** Unless otherwise prohibited by law, if we are obligated to pay for loss of interest that results from our error or delay regarding your payment order, we calculate compensation as follows. With an analyzed checking account, we credit the account to reflect the applicable value date or otherwise adjust the account under our account analysis procedure, to recalculate earnings credits for the period involved. With a non-analyzed, non-interest bearing account, we use a rate equal to the average of the Federal Funds rates set by the Federal Reserve Bank of New York, less a reserve factor. With a non-analyzed, interest bearing account, we use the rate applicable to the account. If we have a separate agreement with you specifying a different calculation method, we use that method instead.

## Receiving Funds Transfers

We may receive instructions to pay funds to your account. We may receive funds transfers directly from the sender, through a funds transfer system or through some other communications system. This includes wire transfers, ACH transfers that may be sent through an ACH system or processed directly to an account with us, and transfers between Bank of America accounts.

**ACH Provisional Payment Rule** Under ACH rules, funds transfers sent through an ACH are provisional and may be revoked prior to final settlement. You agree to these rules. If the funds transfer is revoked before final settlement, we may charge your account for the amount credited. The person who sent the payment order is considered not to have paid you. If this happens, we do not send a separate notice; we report the information on your account statement.

**Notice of Funds Transfer** We notify you that we have received funds transfers by listing them on your account statement. We provide statements to you by mail or through Online Banking if you selected paperless delivery through Online Banking for your deposit account documents. If you use one of our information reporting services, you may receive notice through that service.

We are not obligated to send you a separate notice of each incoming funds transfer. While we generally do not provide such separate notices, we may do so on occasion, in which case we send the notice within two business days after we credit your account.

We are not obligated to pay you interest for the period before you receive notice.

If you are expecting a funds transfer and want to find out if it has been credited to your account, call us at the number for customer service on your statement.

**Posting Your Customers' Payments** We credit to your account electronic payments (such as bill payments) that we receive from your customers. If you do not apply a payment to an account of your customer, you must promptly return the payment to us.

## ACH Debits and Credits

From time to time, originators that you authorize may send automated clearing house (ACH) credits or debits for your account. For each ACH transaction, you agree that the transaction is subject to the National Automated Clearing House Association (NACHA) Operating Rules and any local ACH operating rules then in effect. You agree that we may rely on the representations and warranties contained in these operating rules and either credit or debit your account, as instructed by the originator of the ACH transaction.

You should be careful about giving someone your account number to help prevent unauthorized transactions on your account. You must notify us immediately of unauthorized activity.

For information about stopping payment of an ACH transaction, see *Stop Payment Orders and Postdating Orders* in the *Other Terms and Services* section.

Case 3:22-cv-00621-RJC-DCK   Document 1-1   Filed 11/16/22   Page 74 of 76

Business deposit accounts You acknowledge and agree that if you request us to transmit an ACH return transaction in connection with any problem, including a claim of erroneous or unauthorized ACH debit posted to your account, the related originating depository financial institution has no obligation to accept that return transaction if the return request is not made within the applicable time frame set forth in the NACHA Operating Rules. We will respond to your reported problem and attempt to pursue your request with the originating depository financial institution as long as you report the problem to us in writing within 60 days after the statement first reflecting the transaction was mailed to you; however, we do not guarantee that we will be able to recover your funds if you notify us of the problem beyond NACHA time frames. In some cases, depending on the facts, your claim may not be honored and you could incur a loss.

## Tax Information

Generally, we are required to report annually to you and to the Internal Revenue Service (IRS) interest payments that total $10 or more during the year on your deposit account with us. We may also be required to report this information to the appropriate state revenue authority.

When you open an account, we are required to obtain — and each U.S. citizen or resident alien must give us — a certified U.S. Taxpayer Identification Number (TIN) and information regarding your backup withholding status. When you apply for an account, you certify that you have provided the correct TIN for the account holder and the correct backup withholding status.

For individual accounts, the TIN is your Social Security Number (SSN). For individual accounts with more than one owner, we report taxpayer information for the person listed first in our records. Resident aliens who do not qualify for Social Security should provide their individual Taxpayer Identification Number (ITIN). For other accounts, the TIN is the owner's Employer Identification Number (EIN). If you do not give us a certified name and TIN, if the IRS notifies us that the name and TIN you gave us is incorrect, or if the IRS notifies us that you failed to report all your interest and dividends on your tax return, we are required to backup withhold at the current backup withholding rate on interest paid to your account and pay it to the IRS. In some cases, a state and local tax authority may also require that we pay state and local backup withholding on interest paid to your account when we are required to pay backup withholding to the IRS. Backup withholding is not an additional tax. If you are subject to backup withholding, we are required to report to you and to the IRS regardless of the amount of the interest payment. You may claim amounts withheld and paid to the IRS as a credit on your federal income tax return.

If you are a certified nonresident alien individual, you are generally exempt from backup withholding on interest but may be subject to information reporting if you reside in a country in which we are required to report. If you are a certified foreign entity, you are generally exempt from backup withholding and information reporting for interest payments. Deposit interest income that is effectively connected with the conduct of a trade or business in the United States is subject to information reporting.

You must renew your status as an exempt foreign person or entity prior to the end of the third calendar year following the year in which you last certified your status. If you fail to renew your status by the last day of the fourth calendar year, your interest payments will be subject to backup withholding. If you become a U.S. citizen or resident after opening your account, you must notify us within 30 days and provide us with your certified name and TIN.

We comply with Foreign Account Tax Compliance Act (FATCA) as mandated by U.S. federal tax law. We will withhold on certain payments when required by such law.

For more information or to determine how this information applies to you, consult your U.S. tax advisor.

## Resolving Claims

If you and we are not able to resolve a claim ourselves, then you and we agree that the claim will be resolved as provided in this *Resolving Claims* section. This is a dispute resolution provision. Please read it carefully.

### What does "Claim" Mean?

Claim means any claim, dispute or controversy (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief) by either you or us against the other, or against the employees or agents of the other, arising from or relating in any way to this deposit agreement (including any renewals, extensions or modifications) or the deposit relationship between us.

Claim does not include provisional or ancillary remedies from a court of competent jurisdiction, which either you or we may exercise without waiving the right to arbitration or reference.

### How Claims on Personal Accounts will be Resolved

You and we both agree that all Claims relating to a personal account will be resolved in court by a judge without a jury, as permitted by law.

### JURY TRIAL WAIVER FOR PERSONAL ACCOUNTS

FOR PERSONAL ACCOUNTS, AS PERMITTED BY LAW, YOU AND WE AGREE AND UNDERSTAND THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY. THIS IS A JURY TRIAL WAIVER.

### How Claims on Business Accounts will be Resolved

You have the right to compel us at your option, and we have the right to compel you at our option, to resolve a Claim relating to a business account by binding arbitration. If neither you nor we decide to compel arbitration, then the Claim will be resolved in court by a judge without a jury, as permitted by law. There is an exception for Claims brought in a California state court. If a Claim relating to a business account is brought in a California state court, either you or we can seek to compel the other to have the Claim resolved by general reference to a judicial referee under California Code of Civil Procedure (C.C.P.) Section 638, as provided below. Both parties may also agree to resolve their disputes through judicial reference. The arbitration, judicial reference or trial by a judge will take place on an individual basis without resort to any form of class or representative action.

### CLASS ACTION AND JURY TRIAL WAIVER FOR BUSINESS ACCOUNTS

FOR BUSINESS ACCOUNTS, YOU AND WE AGREE AND UNDERSTAND: (1) THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY, AND (2) THAT THIS SECTION PRE-CLUDES YOU AND US FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR JOINING OR CONSOLIDATING THE CLAIMS OF OTHER PERSONS. THIS IS A CLASS ACTION WAIVER AND JURY TRIAL WAIVER.

### Judicial Reference

A case sent to judicial reference is heard by a neutral individual (a "judicial referee"), but remains in the court system subject to the same rules of procedure, discovery and evidence and appeal as any court case. The judicial referee will be an active or retired judge or attorney with more than 10 years of experience, chosen by mutual agreement of you and us.

If you and we are unable to agree on a judicial referee, then the judicial referee will be appointed according to the procedure for appointment of a referee under California C.C.P. Section 640.

The judicial referee, sitting alone without a jury, will decide questions of law and fact and will resolve the Claim. This includes the applicability of this *Resolving Claims* section and the validity of the deposit agreement.

Judicial reference will be governed by California C.C.P. Section 638 et seq. and the judicial referee will determine all issues in accordance with federal and California law and the California rules of evidence. The referee is empowered to provide all temporary or provisional remedies and rule on any motion that would be authorized in pretrial or trial proceedings in court, including motions for summary judgment or summary adjudication. The award that results from the decision of the referee will be entered as a judgment in the court that appointed the referee, in accordance with the provisions of California C.C.P. Sections 644(a) and 645. You and we both reserve the right to seek appellate review of any judgment or order to the same extent permitted in a court of law.

## Arbitration

This section on arbitration applies to business accounts and is subject to the provisions of the *Limitation and Non-Severability* section below.

Arbitration is a method of resolving disputes in front of one or more neutral individuals, instead of having a trial in front of a judge and/or jury. The arbitrator will be an active or retired judge or attorney with more than 10 years of experience, chosen by mutual agreement of you and us.

If you and we are unable to agree on an arbitrator, then you agree to choose one of the following Administrators within 10 days of our written notice that an agreement cannot be reached.

- JAMS Resolution Center
  1920 Main St., Suite 300
  Irvine, CA 92614
  www.jamsadr.com
  (800) 352-5267
- American Arbitration Association ("AAA")
  1633 Broadway, 10th Floor
  New York, NY 10019
  www.adr.org
  (212) 716-5800

If you do not choose the Administrator on a timely basis, we will select the Administrator and the Administrator will select the Administrator using the Administrator's rules. If an Administrator cannot hear or refuses to hear the arbitration, then the arbitration will be handled by the alternative Administrator.

The arbitrator, sitting alone without a jury, will decide questions of law and fact and will resolve the Claim. This includes the applicability of this *Resolving Claims* section and the validity of the deposit agreement, except that the arbitrator may not decide or resolve any Claim challenging the validity of the class action and jury trial waiver. The validity of the class action and jury trial waiver will be decided only by a judicial referee or a court.

After a decision is given by an arbitrator, and where the amount of the Claim exceeds $200,000, either you or we can appeal the arbitrator's decision to another arbitrator. If the amount of the Claim exceeds $1,000,000, either you or we can appeal the arbitrator's decision to a panel of three arbitrators. No decision may be appealed under this paragraph, unless the arbitrator that heard the matter first makes a finding that the Claim could reasonably have exceeded either $200,000 or $1,000,000. Any arbitrator who hears an appeal under this paragraph will be selected according to the rules of the Administrator.

The arbitration of any matter involves interstate commerce and is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"). The arbitrator will follow applicable substantive law to the extent consistent with the FAA. The arbitrator will give effect to the applicable statutes

of limitation and will dismiss barred claims. Arbitrations will be governed by the rules of the Administrator to the extent those rules do not conflict with this *Resolving Claims* section. In addition, you or we may submit a written request to the arbitrator to expand the scope of discovery normally allowable. At the timely request of either you or us, the arbitrator must provide a brief written explanation of the basis for the award.

Judgment upon the award given by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA or under this Agreement.

## Limitation and Non-Severability

For both personal and business accounts. Regardless of anything else in this *Resolving Claims* section, you and we both acknowledge and agree that the validity and effect of the class action and jury trial waiver for business accounts and the jury trial waiver for personal accounts may be determined only by a court or judicial referee and not by an arbitrator. You and we both have the right to appeal the limitation or invalidation of the waiver.

For business accounts. Regardless of anything else in this *Resolving Claims* section, you and we both acknowledge and agree that the class action and jury trial waiver is material and essential to the arbitration of any disputes between you and us and is non-severable from the agreement to arbitrate Claims. If the class action and jury trial waiver is limited, voided or found unenforceable, then the agreement to arbitrate (except for this sentence) will be null and void with respect to such proceeding and this *Resolving Claims* section will be read as if the provisions regarding arbitration were not present. You and we both have the right to appeal the limitation or invalidation of the class action and jury trial waiver. You and we acknowledge and agree that under no circumstances will a class action be arbitrated.

## Rules of Interpretation

Except as provided in the *Limitation and Non-Severability* section above, if any portion of this *Resolving Claims* section is determined to be invalid or unenforceable, it will not invalidate the remaining portions of this section. If there is a conflict or inconsistency between this *Resolving Claims* section and other terms of this deposit agreement or the applicable rules of the Administrator, this *Resolving Claims* section will govern. If there is any conflict between this *Resolving Claims* section and any other dispute provision (whether it be for arbitration, reference or any other form of dispute resolution), this *Resolving Claims* section will prevail for Claims arising out of this deposit agreement or transactions contemplated by this deposit agreement.

## Jurisdiction and Venue

Any action or proceeding regarding your account or this deposit agreement must be brought in the state in which the financial center that maintains your account is located. You submit to the personal jurisdiction of that state. Note that any action or proceeding will be governed by and interpreted in accordance with the *Governing Law* section of this agreement.

If a Claim is submitted to arbitration and the state where that financial center is located is not reasonably convenient for you, then you and we will attempt to agree on another location. If you and we are unable to agree on another location, then the location will be determined by the Administrator or arbitrator.